**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA**

| | |
|---|---|
| **WINNEBAGO TRIBE OF NEBRASKA, a federally recognized Indian Tribe,**<br><br>       **Plaintiffs,**<br><br>**v.**<br><br>**UNITED STATES DEPARTMENT OF THE ARMY; UNITED STATES DEPARTMENT OF THE ARMY, OFFICE OF ARMY CEMETERIES; CHRISTINE E. WORMUTH, KAREN DURHAM-AGUILERA, RENEA C. YATES, Lieutenant Colonel PRISCELLA A. NOHLE, in their official capacities,**<br><br>       **Defendants.** | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>       **Civil No. _____** |

## INTRODUCTION

1.     This is an action for declaratory and injunctive relief, as provided by 25 U.S.C. § 3013 and 28 U.S.C. §§ 2201 and 2202, brought by Plaintiff Winnebago Tribe of Nebraska ("Winnebago" or "Plaintiff"), a federally recognized Indian Tribe, against Defendants the United States Department of the Army ("DOA"); the United States Department of the Army, Office of Army Cemeteries ("OAC"); Christine E. Wormuth, in their official capacity as Secretary of the Army; Karen Durham-Aguilera, in their official capacity as Executive Director of the Office of Army Cemeteries; Renea C. Yates, in their official capacity as Director of the Office of Army Cemeteries; and Lieutenant Colonel Priscella A. Nohle, in their official capacity as Garrison Commander of the United States Army Carlisle Barracks (collectively, "Defendants"), for on-going violations of the Native American Graves Protection and Repatriation Act ("NAGPRA"), 25 U.S.C. §§ 3001-3013, and its implementing regulations, 43 C.F.R. § 10 (2023).

1

2.      Defendants currently possess and control the bodily remains of two of Winnebago's boys, Samuel Gilbert and Edward Hensley, within a holding or collection of Native American human remains buried at the Carlisle Barracks Post Cemetery ("Carlisle Cemetery"), a cemetery at the Carlisle Barracks Army base, in Carlisle, Pennsylvania. Winnebago seeks declaratory relief to address Defendants' on-going violations of NAGPRA. These violations stem from Defendants' denial of Winnebago's request to repatriate the remains of Samuel and Edward, in accordance with 25 U.S.C. § 3005(a)(4). Additionally, Winnebago seeks injunctive relief to correct these violations and to enjoin Defendants to repatriate the remains of the boys pursuant to 25 U.S.C. § 3005(a)(4) and NAGPRA's other applicable provisions.

3.      On October 16, 2023, Winnebago sent a formal letter to Defendants requesting that they repatriate the remains of Samuel and Edward from Carlisle Cemetery pursuant to NAGPRA. On December 11, 2023, Winnebago received a letter from Defendant Karen Durham-Aguilera denying Winnebago's request and refusing to repatriate Samuel and Edward pursuant to NAGPRA. Defendant Durham-Aguilera stated that OAC would only consider "disinterring and returning" Samuel and Edward according to makeshift OAC internal policies and practices ("the OAC Disinterment and Return Process"). Defendants' denial and continuing refusal to comply with Winnebago's repatriation request violates NAGPRA.

4.      Defendants' conduct perpetuates an evil that the United States Congress sought to correct when it enacted NAGPRA in 1990; namely, the United States Army's ("the Army") historical and longstanding practice of abusing and mishandling Native American human remains, funerary and sacred objects, and objects of cultural patrimony, and its refusal to treat such remains and objects with dignity and respect.

5.     Defendants denied Winnebago's request on the erroneous basis that NAGPRA does not apply to the repatriation of "Native American human remains" (43 C.F.R. § 10.1 (2023)) in their possession and control at Carlisle Cemetery. Defendants' main justification for this position is that the Native American human remains at Carlisle Cemetery do not constitute a holding or collection under NAGPRA. Defendants' position, however, obfuscates the actual standard articulated in NAGPRA that determines the statute's applicability to Winnebago's request. The actual standard is whether Native American human remains are "possessed or controlled by Federal agencies[.]" 25 U.S.C. § 3005(a). It is obvious and undisputed that Samuel's and Edward's remains are Native American human remains in Defendants' possession and control. And even if relevant, Defendants' position is incorrect, as Samuel's and Edward's remains are part of a holding or collection for the purposes of NAGPRA. By refusing to repatriate Samuel and Edward to Winnebago pursuant to NAGPRA, Defendants violated federal law, unlawfully denied Winnebago its right to have Samuel and Edward repatriated, and undermined Congress's objectives in enacting NAGPRA in 1990.

6.     Defendants' refusal to comply with NAGPRA unlawfully restricts a myriad of rights Congress extended to Indian Tribes under the law. Under NAGPRA, it is Winnebago's right to direct the repatriation of the remains of Samuel and Edward. Instead of complying with NAGPRA's heightened standards, Defendants have attempted to force the application of the generic and toothless OAC Disinterment and Return Process for the return of Samuel and Edward, a process that strips Winnebago of the rights guaranteed under NAGPRA.

7.     For example, pursuant to NAGPRA, upon receiving Winnebago's repatriation request, Defendants are *required* to repatriate Samuel and Edward to Winnebago itself, as an Indian Tribe, within ninety days, and in a culturally appropriate manner. In contrast, by imposing

the OAC Disinterment and Return Process, Defendants retain complete discretion over whether to return the boys' remains at all. And if Defendants decide to return the remains, the OAC Disinterment and Return Process provides no timeline, allowing Defendants to drag their feet and adopt generic protocols for disinterment instead of those aligned with Winnebago cultural traditions. Under the OAC Disinterment and Return Process, Defendants will not return Samuel and Edward to Winnebago directly or by its request alone; instead, Defendants require a "closest living relative,"—a concept that is nowhere defined and nearly impossible to apply in these circumstances—to initiate the OAC Disinterment and Return Process.

8.      Beyond the right of an Indian Tribe to itself request the repatriation of culturally affiliated Native American human remains, Indian Tribes are entitled to other crucial rights under NAGPRA, such as the right to robust consultation regarding the handling and disposition of their relatives' remains. NAGPRA also includes mechanisms that enable Indian Tribes to hold federal agencies accountable for carrying out expeditious and culturally appropriate repatriations. Indian Tribes have the right to bring enforcement actions in federal district courts for violations of NAGPRA.

9.      Through NAGPRA, Congress sought to return control over the manner and disposition of Native American human remains to their culturally affiliated Indian Tribes. Unlike the OAC Disinterment and Return Process, NAGPRA provides a clear, familiar, and culturally sensitive framework for Indian Tribes to follow in securing the remains of their relatives. Indian Tribes regularly utilize NAGPRA to repatriate relatives in virtually every other setting in which a federal agency has possession or control of Native American human remains. Congress did not exempt Defendants from NAGPRA's application and accountability measures. Indeed,

NAGPRA expressly recognizes the federal government's trust responsibility to Indian Tribes. *See* 25 U.S.C. § 3010.

10.     The historical context of how Defendants came to possess and control the holding or collection of Native American human remains at Carlisle Cemetery, and why Winnebago seeks the repatriation of Samuel's and Edward's remains pursuant to NAGPRA, begins with the Carlisle Indian Industrial Boarding School ("Carlisle Indian School" or "Carlisle"). In 1895, Captain W. H. Beck, United States Army, Indian Agent of the Omaha and Winnebago Indian Agency, sent Samuel and Edward from their home in Winnebago to Carlisle. Samuel and Edward, like so many other Indian children forcibly removed to Indian boarding schools nationwide, were sent to Carlisle to erase their Native American culture and identity and replace it with Euro-American culture.

11.     Samuel and Edward, like so many other Indian children sent to Indian boarding schools, died during and because of their time at Carlisle. Upon their deaths, Carlisle officials failed to return Samuel and Edward home to their families and communities for proper burials pursuant to Winnebago beliefs, customs, and practices. Instead, Carlisle officials buried Samuel and Edward without notice to Winnebago or their families. Since then, Defendants have grossly mishandled Samuel's and Edward's remains, along with the rest of the remains at Carlisle Cemetery. Moreover, Defendants use the holding or collection of remains at Carlisle Cemetery for research, display, tourism, and education. Particularly egregious, Defendants use the holding or collection for these purposes to serve their institutional goals: to tell their own version of Carlisle's history and to distance themselves from and absolve themselves of responsibility for their role in tragic aspects of that history.

12.     Today, Winnebago continues to experience the pain of knowing that Samuel's and Edward's spirits remain lost and unable to rest as they have been waiting to come home for nearly 125 years. Winnebago brings this action to have Samuel and Edward repatriated in an expeditious and appropriate manner, and to do so by vindicating its right to repatriate the boys' remains from Defendants' holding or collection at Carlisle Cemetery, in accordance with the substantive and procedural rights guaranteed to it under NAGPRA.

## PARTIES

### I.     Plaintiff

13.     Plaintiff WINNEBAGO TRIBE OF NEBRASKA is a sovereign Tribal Nation and a federally recognized Indian Tribe, *see* 89 Fed. Reg. 944, 947 (Jan. 8, 2024), whose present-day reservation lands were established by the Treaty with the Winnebago, 1865. Treaty with the Winnebago, 14 Stat. 671, art. 2 (Feb. 13, 1866). Winnebago's reservation and Tribal Lands are located in the States of Nebraska and Iowa, and Winnebago's seat of government is Winnebago, Nebraska.

### II.     Defendants

14.     Defendant UNITED STATES DEPARTMENT OF THE ARMY is a federal agency located in Arlington, Virginia, and whose mailing address is: 101 Army Pentagon, Washington, DC 20310-0101. DOA is responsible for ensuring that it, its subordinate agencies, including OAC, and all officials thereunder comply with NAGPRA. DOA is the federal agency with direct supervision over OAC and Carlisle Cemetery and their officials.

15.     Defendant UNITED STATES DEPARTMENT OF THE ARMY, OFFICE OF ARMY CEMETERIES is a federal agency located in Arlington, Virginia, and whose mailing address is: 1 Memorial Avenue, Arlington, Virginia 22211-5003. OAC is a subordinate agency

of DOA, is the federal agency that directly manages Carlisle Cemetery, and is responsible for

complying with NAGPRA.

16.    Defendant CHRISTINE E. WORMUTH is sued in their official capacity as the

Secretary of the Army. Defendant Wormuth is located in Arlington, Virginia, and their mailing

address is: 101 Army Pentagon, Washington, DC 20310-0101. Defendant Wormuth is directly

responsible for overseeing DOA's operations and programs, including OAC and Carlisle

Cemetery, and ensuring DOA, its subordinate agencies, and officials comply with NAGPRA.

17.    Defendant KAREN DURHAM-AGUILERA is sued in their official capacity as

Executive Director of OAC. Defendant Durham-Aguilera is located in Arlington, Virginia, and

their mailing address is: 1 Memorial Avenue, Arlington, Virginia 22211-5003. Defendant

Durham-Aguilera is directly responsible for OAC's operations and programs, including

management of Carlisle Cemetery and compliance with NAGPRA. Defendant Durham-Aguilera

signed the letter denying Winnebago's NAGPRA repatriation request on behalf of the

Defendants.

18.    Defendant RENEA C. YATES is sued in their official capacity as the Director of

OAC. Defendant Yates is located in Arlington, Virginia, and their mailing address is: 1

Memorial Avenue, Arlington, Virginia 22211-5003. Defendant Yates is second-in-charge of

OAC's operations and programs, management of Carlisle Cemetery, and compliance with

NAGPRA.

19.    Defendant Lieutenant Colonel PRISCELLA A. NOHLE is sued in their official

capacity as Garrison Commander of the Carlisle Barracks. Defendant Nohle is located in

Carlisle, Pennsylvania, and their mailing address is: 22 Ashburn Drive, Carlisle, Pennsylvania

17013-5006. As the Garrison Commander of the Carlisle Barracks, Defendant Nohle is responsible for NAGPRA compliance at the Carlisle Barracks.

## JURISDICTION AND VENUE

20.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (conferring United States district courts with original jurisdiction over civil actions arising under federal laws), 28 U.S.C. § 1362 (conferring United States district courts with jurisdiction over civil actions brought by Indian Tribes for matters or controversies arising under the laws of the United States), 25 U.S.C. § 3013 (conferring United States district courts with jurisdiction over actions to enforce NAGPRA), and, alternatively, 5 U.S.C. § 706 (providing a right to judicial review of agency actions).

21.     This Court has authority to grant declaratory and injunctive relief pursuant to its inherent authority to issue equitable relief, 25 U.S.C. § 3013, 28 U.S.C. §§ 2201-2202, and 5 U.S.C. § 706.

22.     Defendants' sovereign immunity is expressly waived under 5 U.S.C. § 702.

23.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because all but one of the Defendants reside within the boundaries of this District and a substantial part of the events or omissions giving rise to this action occurred within this District. In particular, Defendant OAC, the federal agency that directly manages Carlisle Cemetery and receives and approves or denies requests for repatriation and disinterment from Carlisle Cemetery, and Defendant Durham-Aguilera, who denied Winnebago's repatriation request, are both located in Arlington, Virginia.

## FACTUAL AND HISTORICAL BACKGROUND

24.     Today, Samuel's and Edward's remains are buried at Carlisle Cemetery, 1,000 miles from where they belong. They are part of a holding or collection of Native American human remains at Carlisle Cemetery under Defendants' possession and control. On December 11, 2023, Defendants unlawfully denied Winnebago's request to repatriate Samuel and Edward pursuant to NAGPRA. Prior to that, for nearly 100 years, Defendants exercised careless and arbitrary control over the holding and collection of the Carlisle students' remains, at the expense of Indian Tribes. Defendants have repeatedly denied that NAGPRA applies at Carlisle Cemetery, basing their position on a clearly incorrect reading of NAGPRA's applicability standard. This position blatantly conflicts with the plain language and purpose of NAGPRA, a statute enacted to address the epidemic of museums and federal agencies—and, especially, the Army— misappropriating Native American human remains and leaving Indian Tribes with no legal recourse to secure the return of their relatives.

I.      **The history of Carlisle, the Carlisle cemeteries, and the Army's historical mismanagement of the holding or collection of Native American human remains in their possession or control demonstrates that Carlisle was never meant to be Samuel's and Edward's final resting place.**

25.     The history of Carlisle, the Carlisle cemeteries, how Defendants came into possession and control of the holding or collection of Native American human remains at Carlisle Cemetery, and the Army's historical mismanagement of it, show why Defendants are required to comply with Winnebago's NAGPRA request to repatriate Samuel and Edward to Winnebago.

A. **Carlisle was established for the explicit purpose of erasing Native American culture by forcibly removing Indian children from their families and Indian Tribes.**

26.   General Richard Henry Pratt, United States Army, opened Carlisle on October 5, 1879, as one of the first federal off-reservation Indian boarding schools. JACQUELINE FEAR-SEGAL & SUSAN D. ROSE, CARLISLE INDIAN INDUSTRIAL SCHOOL: INDIGENOUS HISTORIES, MEMORIES, AND RECLAMATIONS 91 (2016) [hereinafter FEAR-SEGAL & ROSE].

27.   The United States designed the off-reservation Indian boarding school system to remove children to places far from their communities, families, and Indian Tribes with the goal of "destroying tribal identity and assimilating Indians into broader society." *Haaland v. Brackeen*, 599 U.S. 255, 298 (2023) (Gorsuch, J., concurring).

28.   Indian children were often sent to federal off-reservation boarding schools like Carlisle without parental consent. *See* U.S. DEP'T OF INTERIOR, FEDERAL INDIAN BOARDING SCHOOL INITIATIVE INVESTIGATIVE REPORT 36 (May 2022) [hereinafter BOARDING SCHOOL REPORT], https://www.bia.gov/sites/default/files/dup/inline-files/bsi_investigative_report_may_2022_508.pdf.

29.   When parents resisted, the Army was often deployed to Tribal Lands with clear "orders: *Take the children*." *The Native American Boarding School System*, N.Y. TIMES, [hereinafter N.Y. TIMES]  https://www.nytimes.com/interactive/2023/08/30/us/native-american-boarding-schools.html (emphasis added) (last visited Jan. 6, 2024).

30.   The Carlisle Indian School operated according to a policy of assimilation through education, which Federal officials maintained to be a more "enlightened and humane" way to continue "dispossess[ing] Native peoples of their lands and extinguish[ing] their existence" to promote the expansion of the United States. FEAR-SEGAL & ROSE, *supra* ¶ 26, at 1-2.

31.     Federal policy confirmed that assimilation through federal Indian boarding schools and Indian land dispossession worked in concert: "'If it be admitted that education affords the true solution to the Indian problem, then it must be admitted that the boarding school is the very key to the situation.'" BOARDING SCHOOL REPORT, *supra* ¶ 28, at 38.

32.     The United States Secretary of the Interior at the time supported these policy goals, concluding "that it would cost a million dollars to kill an Indian in warfare" but "only $1200 to school an Indian child for eight years." FEAR-SEGAL & ROSE, *supra* ¶ 26, at 7.

33.     From 1879 to 1918, nearly 7,800 children were sent to Carlisle. *See* N.Y. TIMES, *supra* ¶ 29.

34.     "Carlisle became the model for what would become a system of 408 similar federal institutions nationwide." *Brackeen*, 599 U.S. at 299 (Gorsuch, J., concurring).

35.     While nearly 7,800 Indian students attended Carlisle, "fewer than 7 percent of the Carlisle Indian School population graduated," revealing that the true purpose of Carlisle was to eradicate and assimilate, not to educate. FEAR-SEGAL & ROSE, *supra* ¶ 26, at 100.

**B.      Edward's and Samuel's arrivals and deaths, and Carlisle officials' neglect of the boys and their families after their deaths reveal that neither Winnebago nor Samuel's and Edward's families gave consent for the boys to be buried at Carlisle.**

36.     Consistent with federal policy to forcibly remove children from their Indian Tribes and families, on September 7, 1895, Captain Beck, the Indian Agent of the Omaha and Winnebago Indian Agency, sent Edward and Samuel to Carlisle.

37.     Edward's Carlisle Student Card indicates that he was to attend for five years. Pl.'s Ex. 1.

38.     Edward died four years after his arrival at Carlisle, on June 29, 1899.

39.     Edward's Student Card states his "Date Discharged" as June 29, 1899, and "Cause of Discharge" as "Died."

40.     None of Carlisle's records indicate that Carlisle officials ever notified Edward's family or Winnebago of his death.

41.     As such, neither Edward's family nor Winnebago had any choice or input about where and how he was buried.

42.     Samuel's Carlisle Student Card states that he was to attend Carlisle for five years. Pl.'s Ex. 2.

43.     Samuel died forty-seven days after his arrival at Carlisle, on October 24, 1895.

44.     Samuel's Student Card states his "Date Discharged" as October 24, 1895, and his "Cause of Discharge" as "Died."

45.     None of Carlisle's records indicate that Carlisle officials ever notified Samuel's family or Winnebago of his death.

46.     As such, neither Samuel's family nor Winnebago had any choice or input about where and how he was buried.

47.     Carlisle records indicate that both Samuel and Edward were originally interred in the Carlisle Indian burial ground.

**C.     Many other Indian students died at Carlisle.**

48.     During the first year that Carlisle was open, at least seven students died. CBPC Native American Student Decedent List, OFFICE OF ARMY CEMETERIES, https://armycemeteries.army.mil/Portals/1/Documents/CarlisleBarracks/CBPC%20Native%20American%20Decedent%20List%20as%20of%201%20June%202019.pdf?ver=2019-06-07-115642-010 (last visited, Jan. 16, 2024).

49.     Amos LaFromboise, of Sisseton Wahpeton Oyate, was the first of these seven students to die. When Amos died, Carlisle did not have a school cemetery and Carlisle officials buried him in a "government-owned plot" in the town of Carlisle. FEAR-SEGAL & ROSE, *supra* ¶ 26, at 157.

50.     Nearly three months after Amos's death, the United States War Department (now the United States Department of Defense) determined that the government-owned plot only permitted the burials of "[w]hite persons" and not Indians. *Id*. at 159.

51.     Subsequently, General Pratt had Amos's body disinterred and reburied at the newly opened Carlisle Indian burial ground, located within the Carlisle Indian School grounds. *Id*.

52.     No known records indicate that General Pratt or Carlisle officials notified or sought consent from Amos's family or Sisseton Wahpeton Oyate for this move or his original burial.

53.     During the school's second year, Carlisle officials buried an additional ten students in the Carlisle Indian burial ground. *Id.* at 160.

54.     During the school's first decade, Carlisle officials buried ninety-six students at the Carlisle Indian burial ground, including Samuel and Edward. *Id*.

55.     In total, Carlisle officials buried at least 179 students at the Carlisle Indian burial ground. HUGH MATTERNES, ET AL., NEW SOUTH ASSOCIATES, ARCHIVAL RESEARCH OF THE CARLISLE INDIAN SCHOOL CEMETERY 1 (2017), [hereinafter CARLISLE RESEARCH REPORT], https://armycemeteries.army.mil/Portals/1/Documents/CarlisleBarracks/Archival%20Research%20Report%20-%20July%202017v2.pdf?ver=2019-06-07-121535-723.

56.     No known records indicate that *any* of the students' families or Indian Tribes gave permission to Carlisle officials to bury their children at the Carlisle Indian burial ground.

57.     "There is no evidence that any Indian families or community members were ever present at interments or that they were permitted to carry out their own traditional ceremonies." FEAR-SEGAL & ROSE, *supra* ¶ 26, at 160.

> **D.     After the United States closed Carlisle, the Army prioritized expanding the grounds into a post, at the cost of hastily and carelessly removing the students' remains.**

58.     The United States government closed Carlisle in 1918 because of the high death rate of Indian students, evidence of rampant physical abuse, and financial corruption. *Id*. at 164.

59.     After Carlisle closed, the Army turned the grounds into an Army hospital and, in 1920, opened an Army medical school on the grounds. *Id*.

60.     During this time, the Army referred to the original Carlisle Indian burial ground as "'solely an Indian Burial Ground'" and refused to bury non-Indians there. *Id*.

61.     At the same time, the Army showed little regard for the Carlisle Indian burial ground and the Native American human remains therein, letting the grounds fall "into a state of disrepair" and allowing many of the gravesite markers to rot away. *Id*.

62.     When the Army decided to expand and develop the grounds into the Army War College, the Army deemed the Carlisle Indian burial ground as "an obstacle to the expansion of the post." *Id*.

63.     In 1926, Army officials made a request to dig up the Carlisle students' remains to make way for the post's expansion. *Id*. at 164-65.

64.     Questions arose about where to move the remains, as they could not be moved to the local government-owned cemetery plot because the students had no "[M]ilitary, [N]aval[,] Marine Corp or Coast Guard Service." *Id*. at 165 (internal quotation marks omitted).

65.     In 1927, the Army moved some indefinite portion of the remains collectively from the Carlisle Indian burial ground to their current location at Carlisle Cemetery. *Id*.; *accord* Pl.'s Exhibit 3.

66.     After the move, the Army constructed a building for Army officers and a parking lot over the Carlisle Indian burial ground. FEAR-SEGAL & ROSE, *supra* ¶ 26, at 166.

67.     Defendants' 2017 Archival Research of the Carlisle Indian School Cemetery report ("Carlisle Research Report") states that "the process and parties involved in the relocation of remains . . . are unknown." CARLISLE RESEARCH REPORT, *supra* ¶ 55, at i.

68.     When the Army moved the remains, "coffins crumbled when handled to any extent." FEAR-SEGAL & ROSE, *supra* ¶ 26, at 165.

69.     Upon information and belief, the remains were removed haphazardly and placed in pine boxes of one-foot width by two-feet length.

70.     When the remains were reburied at Carlisle Cemetery, their placement "appears random." CARLISLE RESEARCH REPORT, *supra* ¶ 55, at i.

71.     After the collection of Native American human remains was removed to Carlisle Cemetery, the Army replaced gravestones with an astounding lack of care, incorrectly transcribing many students' names, Tribal affiliations, and dates of deaths on the new gravestones or omitting them altogether. FEAR-SEGAL & ROSE, *supra* ¶ 26, at 167.

72.      Edward's current gravestone marker incorrectly spells Winnebago as "Winnebaloo" and omits his date of death.

73.     Samuel's current gravestone marker incorrectly spells Winnebago as "Winnchaga."

74.     The Army mishandled and mismanaged the remains during the move so egregiously, as a result, there are at least fourteen gravesites at the current Carlisle Cemetery marked "unknown." CARLISLE RESEARCH REPORT, *supra* ¶ 55, at 3.

75.     In 1940 "during [the] excavation of a water line," the Army discovered that not all Native American human remains had been removed from the Carlisle Indian burial ground when it discovered the remains of student Wallace Derryman. *Id*. at 32. His remains were subsequently reburied at the current Carlisle Cemetery. *Id*.

76.     In 2017, Defendants commissioned a ground penetrating radar survey of Carlisle Cemetery and the Carlisle Indian burial ground. *See* GROUND PENETRATING RADAR SURVEY OF THE CARLISLE INDIAN SCHOOL CEMETERY OLD BURIAL GROUND AND THE CARLISLE BARRACKS POST CEMETERY (February 2017),

https://armycemeteries.army.mil/Portals/1/Ground%20Penetrating%20Radar%20Survey.pdf.

The survey sought to detect whether some remains may have been left behind and now lie beneath the base parking lot.

77.     Upon information and belief, portions of remains from Carlisle students and other associated funerary objects from these students may be held by Defendants in undisclosed locations. *See* CARLISLE RESEARCH REPORT, *supra* ¶ 55, at 11.

78.     Today, Defendants continue to operate the old Carlisle grounds as the Army War College, and it is an active Army base.

**II.     Defendants' refusal to comply with NAGPRA is irreconcilable with NAGPRA's legislative history and purpose to ensure the rights of Indian Tribes to control the return of their relatives remains.**

79.     NAGPRA "was first enacted in 1990 'as a way to correct past abuses to, and guarantee protection for, the human remains and cultural objects of Native American tribal culture.'" *Thorpe v. Borough of Thorpe*, 770 F.3d 255, 259-60 (3d Cir. 2014) (quoting 173 A.L.R. Fed. 585).

80.     The plain text of NAGPRA and NAGPRA's legislative history show that the solution was a new federal law providing meaningful, enforceable legal mechanisms to restore Indian Tribes' control over the manner and disposition of the remains of their relatives and cultural patrimony.

81.     To this end, one of NAGPRA's two primary objectives was to create a process to require federal agencies to "work with tribes" to repatriate such remains and objects. *Id*. at 260.

82.     NAGPRA's method to accomplish this objective was to establish a strong, systematic framework premised on tribal consultation in the repatriation of the remains of Indian Tribes' relatives in the possession or control of federal agencies and museums. Consultation and strengthening the leverage of Indian Tribes in handling and disposition of the remains of their relatives were critical components of NAGPRA.

83.     One of the fundamental issues leading to enactment of NAGPRA was that federal agencies had a long history of disregarding the sanctity of Native American human remains, and that there was no adequate legal mechanism in place under federal law for Indian Tribes to stop the misappropriation of their relatives' remains or hold those in possession or control of relatives' remains accountable for the treatment of such remains.

84.     The Army was a notorious bad actor in terms of its long and sordid history of grave robbing, collecting, and desecrating Native American human remains and burial grounds. *Native American Grave and Burial Protection Act (Repatriation): Hearing on S. 1021 Before the*

*Select Comm. On Indian Affairs*, 101st Cong. 1-2 (1990) [hereinafter NAGPRA Hearing Record]

(statement of Select Committee Chairman Sen. Daniel K. Inouye),

https://heinonline.org/HOL/LandingPage?handle=hein.cbhear/nagvbupc0001&div=2&id=&page
=.

85.     Indeed, the NAGPRA Senate Committee Hearing and the House Report begins

with the Statement of Senator Daniel K. Inouye, Chairman of the Select Committee on Indian

Affairs, highlighting the macabre and disgraceful history of the Army exploiting Indian remains

in the second half of the 19th Century. *Id*.

86.     Senator Inouye noted that the Army plundered Indian burial grounds for research,

indifferent to the concerns of Indian Tribes. "When the Army Surgeon General ordered the

collection of Indian osteological remains during the second half of the 19th century, his demands

were enthusiastically met by not only Army medical personnel, but by collectors who made

money by selling Indian skulls to the Army Medical Museum. The desires of Indians to bury

their dead were ignored." *Id*. Senator Inouye stressed how especially grievous was the nature of

the problem by acknowledging "the important role that death and burial rights play in Native

American cultures." *Id*.

87.     "[T]he Army Medical Museum, founded in 1862, sought human remains of all

races but from 1865 through the 1880s gathered primarily Indian remains." *Id.* at 29 (statement

of Select Committee Vice Chairman Sen. John McCain); *id.* at 319 (Dr. Bieder report;

attachment to statement of Jerry Flute, field director of the Association of American Indian

Affairs, Inc.).

88.     Notably, during the time the Army Medical Museum was gathering remains,

Carlisle was open and Carlisle officials were already abusing and neglecting the remains of

Native American students who died during and as a result of their time at Carlisle. *See supra* ¶¶ 58-78 (Discussing lack of care for the Carlisle Indian burial ground and lack of care, consultation, and consent during the disinterment and burial of remains).

89.     Although federal agencies and museums testified during the congressional hearings that they could be trusted to handle Native American human remains and patrimony with care and respect, Congress determined that such sentiments were not good enough to address the harm already perpetrated.

90.     For example, museum representatives abstractly waxed poetic about "dialog," "conciliation," and "impartial dispute resolution" in lieu of "judicial review." NAGPRA Hearing Record, *supra* ¶ 84, at 42-43 (statement of Willard Boyd, President of the Field Museum of Natural History). Senator John McCain, Vice Chairman of the Select Committee on Indian Affairs, however, brought attention to the facts: out of hundreds of thousands of Native American human remains and objects possessed by those museums alone, none had been repatriated under such toothless, self-regulating policies to-date. *Id.* at 45 (Sen. McCain's questioning of Mr. Willard Boyd, establishing that it was "correct" that "up to this time, there have not been any repatriations").

91.     Senator McCain further remarked that, while he appreciated museums' well-intentioned efforts to preserve Native American culture and objects, there was "another side to that coin[,]" exemplified by a harrowing experience Chairman Inouye had recently had at the Smithsonian Museum of witnessing "thousands of remains sitting in boxes or lying around unattended for years and years." *Id*. at 46.

92.     Perhaps the most concise description of how NAGPRA was designed to correct the status quo was provided in a statement by Walter Echo-Hawk, a former attorney with the

Native American Rights Fund: "The purposes of the bill are straightforward. It does three basic things. First, it grants needed legal protections for Indian graves. Second, it allows Indians and Native people to bury their dead under specified repatriation guidelines and procedures. Third, it restores stolen or improperly acquired property to the rightful Native owners upon request." *Id.* at 51 (statement of Walter Echo-Hawk).

93.     Mr. Echo-Hawk's statement highlighted the underlying problem of the concept of ownership that stood in the way of Indian Tribes recovering their relatives' remains and patrimony.

94.     This problem is reflected in the Senate Report Findings, which stated that "[c]onfusion exists over who should rightfully have control or ownership over skeletal remains and ownership of associated grave offerings and sacred ceremonial objects which are located on, or which have been disinterred from, Federal lands." NAGPRA Hearing Record at 5 (congressional finding § 2(7)). Thus, Congress found it "necessary to clarify ownership interests in Native American items located on tribal and Federal lands." *Id.* at 6 (congressional findings § 2(8)).

95.     The solution was to create a regime based on empowering not those who currently exercised possession or control, but those who *should* have the right to remains and patrimony— *i.e.*, Indian Tribes.

96.     This solution was particularly essential given that many Native American human remains and much patrimony had been obtained by or ended up in the possession of their contemporary owners by illegitimate means.

97.     In sum, Congress enacted NAGPRA as remedial human rights legislation intended to protect Indian Tribes from the historical desecration of their relatives' graves, in

large part by empowering Indian Tribes to control the process for the return of their relatives' remains.

98.     NAGPRA's enactment as human rights legislation requires that it "be liberally interpreted as remedial legislation to benefit the class for whom it was enacted." Jack R. Trope & Walter R. Echo-Hawk, *The Native American Graves Protection and Repatriation Act: Background and Legislative History*, 24 Ariz. St. L.J. 35, 76 (1992).

### III.   Defendants unlawfully denied Winnebago's request to repatriate Samuel and Edward from Carlisle Cemetery pursuant to NAGPRA and, instead, have attempted to impose the OAC Disinterment and Return Process.

99.     The legislative history and the plain language of the law demonstrate that NAGPRA applies to the Native American human remains at Carlisle Cemetery. NAGPRA's applicability is clear, particularly in light of the history of the Army's illegitimate acquisition and gross mishandling and mismanagement of the holding or collection of Native American human remains in its possession and control at Carlisle. Nonetheless, Defendants unlawfully denied Winnebago's request to repatriate its children pursuant to NAGPRA, and instead have sought to impose the unwieldy, arbitrary, and improper OAC Disinterment and Return Process.

### A.     Winnebago requested the return of Samuel and Edward pursuant to NAGPRA.

100.    In July 2021, Sunshine Thomas-Bear, acting in her official capacity as Winnebago's Cultural Preservation Director, Tribal Historic Preservation Officer, and NAGPRA Representative, began investigating how to bring Samuel and Edward home from Carlisle Cemetery.

101.    Because the Army had in their possession and control the remains of Samuel and Edward, Ms. Thomas-Bear assumed that the boys' remains would be repatriated pursuant to NAGPRA.

102.     On July 16, 2021, Ms. Thomas-Bear contacted Justin Buller, Associate Deputy General Counsel, United States Army, to inquire about how to bring the Winnebago boys home from Carlisle Cemetery.  Pl.'s Ex. 4 at 9.

103.     On July 19, 2021, Mr. Buller responded, stating: "Thank you for reaching out to me.  Mark Gilfillan (copied) can provide the documents that would need to be completed and provided to us to move forward with disinterments. That said I recommend that we at least do a teleconference or an in person meeting prior to completing the documents so that we can fully explain the program to your Tribal leaders and Families. Please let us know how you would like to proceed."  *Id*. at 8.

104.     On July 19, 2021, Ms. Thomas-Bear replied: "Yes we will move forward with the process. I will be awaiting documents that I will need to fill out then we can set up a meeting after you have received those documents?" *Id*. at 7.

105.     On July 19, 2021, Mr. Buller replied, stating: "Let's do the meeting prior to completing the documents. As I am sure you have experienced sometimes government documents are painful and maybe not a [sic] clear as they could be[.]" *Id*.

106.     After this reply, Ms. Thomas-Bear and Mr. Buller exchanged three more emails to confirm an initial meeting between Ms. Thomas-Bear and Mr. Gilfillan.

107.     On July 27, 2021, Ms. Thomas-Bear had an initial phone conversation with Mr. Gilfillan, who was then Project Manager/Senior Tribal Liaison of the United States Army Corps of Engineers-Tribal Nations Technical Center of Expertise. During that call, Mr. Gilfillan explained the OAC Disinterment and Return Process.

108.     Mr. Gilfillan explained that, to request the return of children's remains from Carlisle Cemetery, Ms. Thomas-Bear would need to identify the "closest living relative" of both

Edward and Samuel. Mr. Gilfillan stated that only the closest living relative could request the return of the children.

109.    Mr. Gilfillan suggested that Ms. Thomas-Bear could identify the closest living relatives of Samuel and Edward by searching Winnebago's census rolls.

110.    Ms. Thomas-Bear knew that identifying closest living relatives would be challenging, if not impossible, because neither Edward nor Samuel had any direct descendants, since they died at Carlisle without any children.

111.    Mr. Gilfillan instructed that if Ms. Thomas-Bear could not identify the closest living relatives, then the Winnebago Tribal Council ("Council"), the governing body of Winnebago, would need to pass a formal resolution designating Ms. Thomas-Bear as the boys' closest living relative.

112.    These suggestions were problematic. For one, requiring the Council to pass such a resolution, which carries the weight of Tribal law, would be to require the Council to knowingly make a false statement to the federal government, as there is no evidence that Ms. Thomas-Bear is the boys' closest living relative.

113.    Furthermore, Winnebago did not believe Defendants could direct its Council to pass a specific resolution as a fundamental matter of tribal sovereignty and self-governance.

114.    Ms. Thomas-Bear herself did not feel comfortable identifying as the closest living relative of Samuel and Edward, as it would be a false statement.

115.    Ms. Thomas-Bear was also unsure as to why Defendants were following an internal disinterment and return process designed for the return of the remains of service members to their next of kin, rather than NAGPRA. Ms. Thomas-Bear is familiar with NAGPRA

and knew it is tailored to address the difficult problems in repatriating Native American relatives whose remains had been misappropriated.

116.     Ms. Thomas-Bear was also concerned because, as a Winnebago Tribal member herself, she knew that identifying an individual as the "closest living relative" was contrary to Winnebago practices regarding repatriation and feared that designating any particular person as a closest living relative would be divisive.

117.     On September 16, 2021, Defendants visited Winnebago to discuss the return of Edward and Samuel. During this visit, they again insisted upon the OAC requirement to identify closest living relatives of Samuel and Edward for them to "qualify" for disinterment and return.

118.     Following DOA's visit, Ms. Thomas-Bear diligently searched Winnebago's records but could not determine who to designate as the closest living relatives of Samuel and Edward.

119.     Tragically, since Ms. Thomas-Bear first began her attempts to bring home Samuel and Edward in 2021, many Winnebago Tribal members have died without seeing the return of the boys.

120.     Of these deaths, the death of one of the Council members and longtime NAGPRA champion, Louis LaRose, in November 2023, emphasized the importance of the expeditious repatriation of the boys' remains pursuant to NAGPRA, the applicable federal law that is utilized in nearly every other context, that provides Indian Tribes with robust rights and mechanisms to ensure federal agencies' compliance, and that Indian Tribes fought for years to see enacted.

121.     According to Winnebago traditional beliefs, the longer that Samuel and Edward remain at Carlisle, the more harm is done to their spirits and to Winnebago.

122.    Winnebago believes that Samuel and Edward have been in a perpetual state of unrest since their respective burials in 1895 and 1899 and that the boys have been waiting to come home since their deaths.

123.    On October 16, 2023, Winnebago sent a letter, return receipt requested, to Defendants requesting the repatriation of Samuel and Edward, pursuant to NAGPRA, 25 U.S.C. § 3005(a)(4). *See* Pl.'s Ex. 5.

124.    Each of the Defendants received Winnebago's request letter on a date between October 23 and October 26, 2023.

**B.   Following Winnebago's NAGPRA request, Defendants sought to unlawfully impose the OAC Disinterment and Return Process.**

125.    On November 2, 2023, Mr. Buller responded to Winnebago's repatriation request, indicating that the Army had been carrying out the OAC Disinterment and Return Process for other Native American human remains at Carlisle Cemetery. Mr. Buller requested a virtual meeting to discuss Winnebago's request but did not indicate whether the Army would grant Winnebago's request and comply with NAGPRA to complete repatriation to Winnebago. Pl.'s Ex. 6.

126.    On November 3, 2023, Winnebago responded to Mr. Buller, stating that it was aware that Defendants had disinterred and returned remains under the OAC Disinterment and Return Process, but restated that Winnebago's request was to have Samuel and Edward repatriated pursuant to NAGPRA. *Id*. at 2.

127.    On November 3, 2023, Mr. Buller responded, again failing to answer whether the Army would honor the request and stating, "this matter is highly complex and cannot be addressed with simple yes or no answers [ ]." *Id*. at 1-2.

128.    On November 6, 2023, Winnebago responded, acknowledging that Defendants may view the matter as highly complex, but asserting that Winnebago does not. Winnebago reiterated that its sole question was whether Defendants would work with Winnebago to repatriate Samuel and Edward pursuant to NAGPRA, 25 U.S.C. § 3005(a)(4). Winnebago reminded that Defendants had ninety days after receipt of Winnebago's request to complete repatriation, unless Winnebago consented to an alternative timeline, and urged Defendants to comply with NAGPRA. *Id*. at 1.

129.    On December 11, 2023, Mr. Buller forwarded a letter dated December 7th from Defendant Durham-Aguilera denying Winnebago's NAGPRA request. Pl.'s Ex. 7.

130.    Defendant Durham-Aguilera stated that the letter served as the official written response for why the Army "cannot repatriate these children under [NAGPRA]." *Id*.

131.    Defendant Durham-Aguilera stated that "disinterment and return" of Samuel and Edward might be done under the OAC Disinterment and Return Process and claimed that such was "in accordance with the [NAGPRA] savings clauses at 25 U.S. Code s. 3009." *Id*. Defendant Durham-Aguilera did not elaborate on how Defendants maintain that the OAC Disinterment and Return Process is in accordance with the NAGPRA savings clause under 25 U.S.C. § 3009.

132.    Defendant Durham-Aguilera further stated: "[I]ndividually named graves located within the Carlisle Barracks Post Cemetery do not constitute 'holdings or collections' of the Army (s. 3003(a))." *Id*. Defendant Durham-Aguilera did not elaborate on why the Native American human remains at Carlisle do not constitute a holding or collection simply because some of the remains are marked by graves.

133.    Defendant Durham-Aguilera further stated: "Federal Courts have held that NAGPRA (s. 3002) does not require the Army to engage in the intentional excavation or

exhumation of a grave." *Id*. Durham-Aguilera did not elaborate as to why this would mean that

Defendants could not comply with Winnebago's NAGPRA request to *repatriate* Samuel and

Edward. Durham-Aguilera further did not indicate which "Federal Courts" in which cases have

held that Defendants are not required to engage in the intentional excavation or exhumation of a

grave. Defendants did not cite any specific court or case, likely because they cannot: no federal

court has ever held or said what Defendants assert.

      **C.    The OAC Disinterment and Return Process is, at best, a modified version of Defendants' process for the disinterment and return of military servicemembers and their dependents and is inapplicable once Indian Tribes make NAGPRA requests.**

     134.    Since at least 2017, Defendants have maintained that the OAC Disinterment and

Return Process, and not NAGPRA and its implementing regulations, applies to the handling and

disposition of Native American human remains in their possession or control at the Carlisle

Cemetery.

     135.    Defendants state that the authority to disinter and return Native American human

remains from Carlisle Cemetery is pursuant to Army Regulation 290-5 ("AR 290-5"),

https://armypubs.army.mil/epubs/DR_pubs/DR_a/ARN31366-AR_290-5-001-WEB-2.pdf.

     136.    AR 290-5 "states the authority and prescribes the policies, procedures, and

responsibilities for the development, operation, maintenance, administration, and inspection of

cemeteries for which the Department of the Army is responsible. This includes Army national

military cemeteries (ANMC), as defined in 10 USC 7721(b), [and] open and closed Army post

cemeteries, as defined in Part 553, Code of Federal Regulations, Subpart B (32 CFR Part 553,

Subpart B)." AR 290-5 § 1-1.

     137.    The Army classifies Carlisle Cemetery as an Army Post Cemetery. AR 290-5,

app. B.

138.     Burials in Army Post Cemeteries are typically reserved for those who have served in the United States military, their spouses, and their dependents. *See* 32 C.F.R. § 553.41 (2019).

139.     AR 290-5 also acknowledges that Defendants have a duty to comply with NAGPRA at their cemeteries. AR 290-5 § 1-7(e)(1)(b); AR 290-5, at 37.

140.     Defendants characterize the handling and disposition of Native American human remains from Carlisle Cemetery as "return and disinterment" to "closest living relatives," pursuant to AR 290-5 § 3-7, as opposed to "repatriation" to "Indian tribes" pursuant to NAGPRA, 25 U.S.C. § 3005(a).

141.     According to AR 290-5: "[I]nterments in ANMC and Army post cemeteries are considered permanent and final." AR 290-5 § 3-7(a).

142.     Further, "[d]isinterment and removal of remains from ANMC and Army post cemeteries at no expense to the Government are permitted with the prior approval of the Executive Director, ANMC." *Id.*

143.     According to AR 290-5, to request disinterment from an Army post cemetery, one must submit to the garrison commander the following: "(1) A notarized letter stating the reasons for the disinterment request with the name of the interred individual; (2) Notarized statements by all close living relatives (widow or widower; parents; adult brothers and sisters; and natural or adopted adult children; even though the legal relationship of that person to the decedent may have changed) of the interred individual, stating they have no objection to the proposed disinterment; (3) A notarized sworn statement from a third party who knows those who have provided the statements and attests to the fact that the persons providing the statements constitute all the close living relatives as defined in paragraph 3–7b(2)." AR 290-5 § 3-7(b).

144.    Defendants have liberally modified the process outlined in AR 290-5 § 3-7 for the disinterment and return of Native American human remains at Carlisle Cemetery.

145.    The modified process is based on informal practices developed at Defendants' convenience, rather than according to any newly issued regulations or formal amendments to the existing written policies, guidance, or regulations.

146.    Defendants describe the OAC Disinterment and Return Process with respect to the holding or collection of Native American human remains at Carlisle Cemetery as follows: "Based on Army Regulation 290-5 Disinterment of remains a. Each request for disinterment of Native American remains from Carlisle Barracks Post Cemetery will be addressed to the Executive Director, Office of Army Cemeteries for approval. mailto:usarmy.pentagon.hqdaanmc.mbx.accountabilitycoe@army.mil. The request will include the following documents: (1) Notarized affidavit by the *closest living relative* of the decedent requesting the disinterment. This document includes the reason for the proposed disinterment. (2) A notarized sworn statement by a person knowing that the person who supplied the affidavit is the closest living relative of the deceased." Pl.'s Ex. 8 (emphasis added) (2023 affidavit document described above in (1); exhibit, notarized sworn statement described above in (2)).

147.    Defendants have continued to modify the affidavit document as Indian Tribes have put more pressure on them.

148.    For example, Defendants have changed the sample affidavit. A prior version of the sample stated: "The decision that the remains of the decedent be interred at Carlisle Barracks was made by *an ancestor and the administrators* of the Carlisle Indian Industrial School." Pl.'s Ex. 9 at 2 (emphasis added) (2022 affidavit).

149.    Defendants proposed this language in the sample affidavit, despite the historical record demonstrably establishing that it is untrue that any ancestors made the decision to have their relatives buried at either the Carlisle Indian burial ground or subsequently the Carlisle Cemetery.

150.    The sample affidavit was revised and issued on July 23, 2023, now reads: "The decision that the remains of the decedent be interred at Carlisle Barracks was made by *the administrators* of the Carlisle Indian Industrial School." Pl.'s Ex. 8 at 2 (emphasis added).

151.    Defendants removed the reference to "ancestors" as being among those who made the decision to bury the decedent at the Carlisle Indian burial ground or the Carlisle Cemetery, tacitly acknowledging that none of the students' families or Indian Tribes authorized Carlisle officials or Defendants to bury the students at Carlisle.

152.    The OAC Disinterment and Return Process does not allow Indian Tribes to request the return of their children from Carlisle, only the "closest living relatives."

153.    The OAC Disinterment and Return Process does not require formal consultation, whether with "closest living relatives" or Indian Tribes, to ensure remains are handled in a culturally appropriate manner.

154.    The OAC Disinterment and Return Process does not provide any timeline or deadlines to adhere to have Native American human remains returned.

155.    In a series of Federal Register notices issued in connection with the disinterment of other Native American human remains at Carlisle Cemetery, Defendants have asserted that disinterment of students from Carlisle is not governed by NAGPRA for various reasons, which have changed from 2017 to 2023, as shown in the table below.

**Federal Register Notices of Intent to Disinter, 2017-2023**

| Date of Notice | Request of... | Number of Students | Date of disinterment | Authority | NAGPRA does not apply because... |
|---|---|---|---|---|---|
| 6/21/17 | ...students' "families" | 3 | 8/8/17 | Army Regulation 210-190 | ...the remains are not part of a collection, as they are interred in graves that are individually marked in the Cemetery. |
| 5/21/18 | ..."closest living relative" | 4 | 6/14/18 | Army Regulation 210-190 | ...the remains are not part of a collection, as they are interred in graves that are individually marked in the Cemetery. |
| 5/3/19 | ..."closest living relative" | 6 | 6/15/19 | Army Regulation 210-190 | ...the remains are not part of a collection, as they are interred in graves that are individually marked in the Cemetery. |
| 4/2/21 | ..."closest living relative" | 10 | 6/14/21 | Army Regulation 290-5 | ..."[1.] Individually marked graves located within the Carlisle Barracks Post Cemetery do not constitute 'holdings or collections' of the Army (§ 3003(a)) [2.] nor does NAGPRA (§ 3002) require the Army to engage in the intentional excavation or exhumation of a grave." |
| 4/22/22 | ..."closest living descendent" | 8 | 6/6/22 | **1.** Army Regulation 290-5; **2.** 'in accordance with NAGPRA savings clauses at 25 U.S.C. 3009' | ..."[1.] Individually marked graves located within the Carlisle Barracks Post Cemetery do not constitute 'holdings or collections' of the Army (§ 3003(a)) [2.] nor does NAGPRA (§ 3002) require the Army to engage in the intentional excavation or exhumation of a grave." |
| 5/24/23 | ..."the family members" | 5 | 9/11/23 | **1.** Army Regulation 290-5; **2.** 'in accordance with NAGPRA savings clauses at 25 U.S.C. 3009' | ..."[1.] Individually marked graves located within the Carlisle Barracks Post Cemetery do not constitute 'holdings or collections' of the Army (§ 3003(a)) [2.] nor does NAGPRA (§ 3002) require the Army to engage in the intentional excavation or exhumation of a grave." |

156.    A primary reason Defendants have provided for why they maintain NAGPRA does not apply is that the remains are buried in individually marked graves, thus somehow making them not part of holdings or collections subject to NAGPRA, without any explanation justifying this position.

157.    Moreover, Defendants added an assertion in 2021 that NAGPRA does not require federal agencies to intentionally excavate graves.

158.    These notices provide no explanation to support Defendants' conclusory assertions for why NAGPRA does not apply to Carlisle.

**D. Defendants' denial of Winnebago's NAGPRA request was preceded by years of refusing to follow NAGPRA and failures under the OAC Disinterment and Return Process.**

159.    Defendants have refused to comply with NAGPRA to repatriate Native American human remains from Carlisle Cemetery pursuant to the law since NAGPRA was first enacted in 1990.

160.    One of NAGPRA's most important provisions required federal agencies and museums to compile inventories of all "holdings or collections of Native American human remains" in their "possession and control[.]" 25 U.S.C. § 3003(a). These inventories were supposed to be completed within five years of NAGPRA's enactment—by 1995. *Id*. § 3003(b)(1)(B); *see* 43 C.F.R. § 10.9 (2023).

161.    Alternatively, NAGPRA allowed federal agencies and museums to complete a written summary of all "holdings or collections of Native American human remains" in their "possession or control[.]" 25 U.S.C. § 3004(a). These summaries were supposed to be completed

within three years of NAGPRA's enactment—by 1993. *Id.* § 3004(b)(1)(C); *see* 43 C.F.R. § 10.8 (2023).

162.    These inventories and summaries were supposed to be compiled in consultation with culturally affiliated Indian Tribes and made available to the culturally affiliated Indian Tribe within six months of their completion. *See* 43 C.F.R. §§ 10.8(d)(3), 10.9(c), (e) (2023).

163.    The inventories and summaries are supposed to establish, to the greatest extent possible, the cultural affiliation of the Native American human remains in a federal agency's or museum's possession or control. *See* 25 U.S.C. §§ 3003(a), 3004(a); 43 C.F.R. §§ 10.8(a), 10.9(a) (2023).

164.    NAGPRA's implementing regulations clarify that the purpose of these inventories and summaries is to facilitate the repatriation of Native American human remains to their culturally affiliated Indian Tribes. *See* 43 C.F.R. §§ 10.8(a), 10.9(a) (2023).

165.    Defendants never completed an inventory or summary of the Native American human remains in their possession and control at Carlisle, pursuant to 25 U.S.C. §§ 3003 and 3004.

166.    This failure has hampered efforts of Indian Tribes to seek repatriation of their relatives buried at Carlisle.

167.    In 2007, the Northern Arapaho Tribal Historic Preservation Office ("Northern Arapaho THPO") wrote to Lieutenant Colonel Thomas G. Kane, Installation Legal Officer at the Army War College, to request the return of a Northern Arapaho child's remains. *See generally* Vi Waln, *Sicangu Youth Council Works with Northern Arapaho to Have Human Remains Returned*, LAKOTA TIMES (Jan. 21, 2016),  https://www.lakotatimes.com/articles/sicangu-youth-council-works-with-northern-arapaho-to-have-human-remains-returned/.

168.    Lieutenant Colonel Kane responded to the letter denying the request. In the denial letter, Lieutenant Colonel Kane stated that 'the installation has serious concerns' particularly in light of its view of the Cemetery as a historic site. *See id.*

169.    Lieutenant Colonel Kane further stated that the Army would "hate to disrupt such a tranquil site, if it can be avoided" and "the cemetery represents one of the most beautiful tributes to the Native American people." Pl.'s Ex. 10 at 1.

170.    In 2015, the Northern Arapaho THPO wrote to Lieutenant Colonel Greg W. Ank, Carlisle Barracks Garrison Commander, to renew the Northern Arapaho Tribe's ("Northern Arapaho") request for the return of three of their children. Pl.'s Ex. 10.

171.    In its letter, the Northern Arapaho THPO objected to the treatment of the remains of the Northern Arapaho's children as a tourist attraction or object of research and asserted that the Northern Arapaho would exercise its rights under NAGPRA to seek repatriation of its children's remains buried at Carlisle Cemetery. *Id*. at 1-2.

172.    Defendants, initially, refused to return the remains of the Northern Arapaho's children at all. That is, prior to 2017, Defendants did not even offer any Army process as an option to return the Northern Arapaho's children, even though Defendants had a process for returning remains of prisoners of war to other countries.

173.    It was only in 2017, following the Northern Arapaho's persistence and growing pressure from other Indian Tribes, that Defendants announced they would return Native American human remains from Carlisle Cemetery, albeit, pursuant to the OAC Disinterment and Return Process.

174.    This was the first time Defendants explicitly disavowed that NAGPRA applied to the Native American human remains at Carlisle Cemetery.

175.    Notably, Defendants only furnished this option after the Northern Arapaho formally invoked NAGPRA.

176.    Defendants did not invite or facilitate consultation with Indian Tribes regarding NAGPRA's application to the Native American human remains Carlisle Cemetery, nor did they provide opportunities for comment on Defendants' imposition of the OAC Disinterment and Return Process.

177.    Since then, several other Indian Tribes have made efforts to have their children's remains brought home from Carlisle Cemetery, working—in essence, as third parties—with the OAC Disinterment and Return Process.

178.    Upon information and belief, several Indian Tribes found the OAC Disinterment and Return Process to be onerous, time-consuming, and confusing to navigate, and ultimately were required to identify a "closest living relative" to secure the return of their relatives' remains.

179.    Additionally, while NAGPRA requires the repatriation of remains within ninety days of a request, several Indian Tribes experienced multi-year-long delays under the OAC Disinterment and Return Process and Defendants did not provide any written deadlines to follow to have the remains returned.

180.    The burdens that arise under the OAC Disinterment and Return Process have been exacerbated by Defendants' failure to locate and return the remains of Tribal relatives. On at least five prior occasions, when families and Tribal members went to Carlisle Cemetery to have their children's remains returned to them, Defendants exhumed graves that contained remains that were not those of the correct child, or contained multiple sets of remains within one box. *See* Jenna Kunze, *When it Comes to Indian Boarding School Graves, Tribal Spiritual Law is*

*Shunned as Repatriations Continue to Fail Some Tribes*, NATIVE NEWS ONLINE (June 23, 2022),

https://nativenewsonline.net/sovereignty/when-it-comes-to-indian-boarding-school-graves-tribal-
spiritual-law-is-shunned-as-the-army-continues-to-fail-at-repatriations.

181.    As a result, these families and Tribal members were forced to leave Carlisle

without their children's remains.

**IV.    Defendants rely on the incorrect provision to NAGPRA to deny its applicability at
Carlisle.**

    **A.    NAGPRA applies because Defendants have possession or control over
Samuel's and Edward's remains; Defendants' incorrect interpretation of the
definition of "holding or collection" does not determine NAGPRA's
applicability.**

182.    NAGPRA is exceedingly clear: Indian Tribes have the right to seek the

repatriation of Native American human remains that are "possessed or controlled by Federal

agencies[.]" 25 U.S.C. § 3005(a). Upon receiving such a request, federal agencies are *required* to

repatriate such remains "expeditiously[.]" *Id*. § 3005(a)(1).

183.    The only qualifications that NAGPRA's repatriation provision places on Indian

Tribes' ability to repatriate their ancestors is: (1) the Native American human remains are

culturally affiliated with the Indian Tribe, based on either an official NAGPRA inventory or

summary, or the preponderance of the evidence, *id.* § 3005(a)(1), (a)(4), and (2) the remains are

in the federal agency's possession or control. *Id*. § 3005(a).

184.    Notably absent from NAGPRA's repatriation provision is any mention of the

words "holding" or "collection." The only relevant factor is whether the Native American human

remains are possessed or controlled by a federal agency, not whether they are part of a holding or

collection. *See* 43 C.F.R § 10.1(b)(1)(i) (2023).

185.    Samuel's and Edward's remains are "Native American human remains" because the boys were Native American, and their remains were not "freely given" to Defendants in any sense. *Id.* § 10.2(d)(1); 25 U.S.C. § 3001(3).

186.    Moreover, Defendants do not dispute that Samuel's and Edward's remains are culturally affiliated with Winnebago and therefore, Winnebago meets the "preponderance of the evidence" standard regarding cultural affiliation. *Id*. § 3005(a).

187.    Further, it is undeniable that Defendants have "possession or control" over Samuel's and Edward's remains because they restrict who can access the remains and they maintain exclusive control over the remains. *See* 43 C.F.R. § 10.2(a)(3)(i)-(ii) (2023).

188.    As such, under the plain language of NAGPRA, because Samuel and Edward's remains meet the definition of Native American human remains, and because Defendants maintain possession or control over them, the remains must be expeditiously returned pursuant to Winnebago's request.

189.    Defendants' reliance on holdings or collections is irrelevant, as the applicable factor is possession or control. *See* 43 C.F.R § 10.1(b)(1)(i) (2023).

**B.      Even if Defendants' standard was correct, their refusal to apply NAGPRA belies their treatment of the remains at Carlisle Cemetery as a holding or collection of Native American human remains.**

190.    Even if Defendants are correct that NAGPRA only applies to human remains in a federal agency's holding or collection, NAGPRA still applies to the remains of Samuel and Edward.

191.    Defendants' assertion that the Native American human remains buried at the Carlisle Cemetery are not part of a holding or collection simply because they are "individually marked graves" is inconsistent with the plain meaning of holding and collection; the National

Park Service's ("NPS") newly-adopted regulations; the history of Carlisle (and the boarding school era, generally); NAGPRA's legislative history, purpose, and intent; and Defendants' management and treatment of the remains and the Cemetery.

192.    Defendants' interpretation of the meaning of holding or collection is not entitled to deference, as they are not the agency responsible for interpreting and administering NAGPRA. *See* 25 U.S.C. § 3011; *A.T. Massy Coal Co. v. Holland*, 472 F.3d 148, 166 (4th Cir. 2006).

193.    When Winnebago made its repatriation request on October 16, 2023, NAGPRA and its implementing regulations did not define "holding or collection."

194.    On December 13, 2023, the NPS published a final rule, revising NAGPRA's implementing regulations. *See* 88 Fed. Reg. 86,452 (Dec. 13, 2023). The revised regulations went into effect on January 12, 2024. *See Id*. at 86,452. Since Winnebago's NAGPRA repatriation request and Defendants' denial occurred prior to the revised regulations coming into effect, Winnebago's request, Defendants' denial, and this action are governed by the regulations in place at the time the request was made.

195.    Nevertheless, the revised regulations define, for the first time, "holding" and "collection" and affirm Winnebago's position that the Native American human remains in Defendants' possession or control are part of a holding or collection that is subject to NAGPRA's repatriation provisions. Specifically, the revised regulation clarify that a "[h]olding or collection means an accumulation of one or more objects, items, or human remains for any temporary or permanent purpose, including: (1) Academic interest, (2) Accession; (3) Catalog; . . . (5) Conservation; (6) Education; . . . (8) Exhibition; . . . (10) Interpretation; (11) Preservation; (12) Public benefit; (13) Research; (14) Scientific interest; or (15) Study." *Id*. at 86,520.

196.    Regardless of the new rulemaking, the plain meaning of "holding" and "collection" clearly demonstrates that the Native American human remains at Carlisle Cemetery is a "holding or collection."

197.    According to Merriam Webster Dictionary, collection is defined broadly as "something collected" (https://www.merriam-webster.com/dictionary/collection), with "collected" meaning "gathered together" (https://www.merriam-webster.com/dictionary/collected). Merriam Webster's definition also notes that it is "especially: an accumulation of objects gathered for study, comparison, exhibition or as a hobby." *Id*.

198.    According to Merriam Webster Dictionary, the most pertinent definition of holdings is "property." Holdings, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/holding.

199.    The Native American human remains at Carlisle Cemetery are part of a holding or collection for the purposes of NAGPRA because the manner in which Defendants have handled, represented, and used the remains within the Carlisle Cemetery is clearly centered on the remains' historic nature and "Indian" and/or "Native American" identity.

200.    For all intents and purposes, Defendants operate the Carlisle Cemetery not as an actual cemetery, but as a museum and tourist attraction, with the holding or collection of Native American students' remains buried there as an exhibit and for any other purpose they deem fit.

201.    For instance, Defendants conduct tours of the Carlisle Barracks, which focus on buildings and places of historic importance when the area was an Indian boarding school.

202.    Among the stops on the tour is the Carlisle Cemetery, which welcomes visitors with a plaque inscribed "INDIAN CEMETERY" and identifying the remains as those of

"INDIANS WHO DIED WHILE ATTENDING THE CARLISLE INDIAN SCHOOL." Pl.'s Ex.

11. CARLISLE RESEARCH REPORT, *supra* ¶ 55, at 39.

203.    Defendants' Carlisle Research Report highlights that Defendants have always

viewed and treated the Native American human remains as a collection or holding.  *See*

*generally* CARLISLE RESEARCH REPORT, *supra* ¶ 55.

204.    This report refers to the Carlisle Cemetery as a "repository for the remains of

Indian School students."  *Id*. at 32.

205.    Today, a plaque from the Pennsylvania Historical and Museum Commission is

mounted outside Carlisle Cemetery. The plaque "informs passers-by of the history of the Carlisle

Indian Industrial School and its intention 'to assimilate American Indians into mainstream

culture.'" FEAR-SEGAL & ROSE, *supra* ¶ 26, at 152.

206.     Defendants also maintain a webpage for Carlisle Cemetery, the "Overview" of

which notes, "The school was the model for a nationwide system of boarding schools intended to

assimilate American Indians into mainstream culture." *Cemetery Overview*, OFFICE OF ARMY

CEMETERIES, [hereinafter *Cemetery Overview*]

https://armycemeteries.army.mil/Cemeteries/Carlisle-Barracks-Main-Post-Cemetery (last visited

Dec. 30, 2023).

207.    The overview concludes: "Small, *orderly and historical*, the Carlisle Cemetery

*offers visitors a glimpse into the unique past of the United States and Native American history.*"

*Id*. (emphasis added).

208.    OAC's webpage provides a link to a function that allows one to locate gravesites

of specific Native American human remains. *See Carlisle Barracks*, ARMY CEMETERIES

EXPLORER, https://ancexplorer.army.mil/publicwmv/index.html#/carlisle-barracks/search/ (last visited Dec. 30, 2023).

209.     While Defendants are responsible for thirty cemeteries across the United States, Defendants do not operate any of the other twenty-nine cemeteries the same way they operate Carlisle Cemetery.

210.     In most cases, individuals are buried at DOA cemeteries by their (or their families') choice and because of their service in a military or military affiliation. *See* 32 C.F.R. §§ 553.43-553.49 (2019).

211.     This is, clearly, not true of the Native American human remains at Carlisle Cemetery, which are of individuals who were not military service members and who were buried at the Carlisle Indian burial ground, disinterred, and removed to the current Carlisle Cemetery without notice to, let alone with consent of, their Indian Tribes or families.

212.     The OAC webpage also includes a "Return of Native American Remains" tab, a unique feature that it does not have for any other of its twenty-nine cemeteries. *See Cemetery Overview*, *supra* ¶ 205.

213.     The OAC webpage invites viewers to seek further information, providing a link to the "Digital Resource Center" webpage created by Dickinson College, which describes Carlisle Cemetery as an object of research to better understand Carlisle's "complex legacy." *Welcome*, CARLISLE INDIAN SCH. DIGITAL RES. CTR., https://carlisleindian.dickinson.edu/ (last visited Dec. 30, 2023).

214.     The Dickinson website includes student cards for many students who attended Carlisle. https://carlisleindian.dickinson.edu/ (last visited Jan. 16, 2024).

215.    DOA also internally and externally classifies the Native American human remains at Carlisle Cemetery in a different manner than remains at its other cemeteries.

216.    In each record catalogue, DOA classified remains of Carlisle students separately from military remains. *See CARLISLE RESEARCH REPORT, supra* ¶ 55*, at 48.*

217.    For example, in 1982, the U.S. Military History Institute ("USMHI"), a division of the Army Heritage Education Center, catalogued the Native American human remains at Carlisle Cemetery. *Id.*

218.    The remains of Thomas Marshall, a Native American man who was a Carlisle employee when he died in 1899, were left out of this catalogue. *Id.*

219.    Defendants state that Mr. Marshall was excluded from this catalogue because of "the difference between modern and USMHI Native American decedent accounts." *Id.*

220.    In 1998, eight years after NAGPRA's enactment, DOA again catalogued the Native American human remains at Carlisle Cemetery. *Id.*

221.    As explained above, while NAGPRA required every federal agency to compile an inventory or summary of every Native American human remain under their possession or control, 25 U.S.C. §§ 3003(a), 3004(a), DOA's 1998 catalogue was not produced pursuant to NAGPRA.

222.    Again, in this catalogue, DOA classified the Native American human remains of Carlisle students separately from military remains. *See* CARLISLE RESEARCH REPORT, *supra* ¶ 55, at 48.

223.    The manner in which Defendants have handled, represented, and used the remains at the Carlisle Cemetery for display, education, tourism, and research, as well as the catalogues

they have produced for particular sets of remains demonstrate that the Native American human remains buried at Carlisle are part of a collection or holding for the purposes of NAGPRA.

224.    The history of Carlisle, and the Indian boarding school era more generally, NAGPRA's legislative history, purpose, and intent, as well as the manner in which Defendants manage and use the Native American human remains buried at the Carlisle Cemetery demonstrates that Samuel's and Edward's remains are part of a collection or holding and that NAGPRA application is requisite.

**APPLICABLE LAW**

I.    **NAGPRA**

225.    NAGPRA establishes two procedures that allow Indian Tribes to protect and repatriate Native American human remains.

226.    First, NAGPRA establishes procedures to protect and repatriate Native American human remains that are inadvertently discovered on Federal and Tribal land. *See* 25 U.S.C. § 3002.

226.    Second, NAGPRA establishes procedures by which Indian Tribes can secure the repatriation of Native American human remains that are "possessed or controlled by Federal agencies and museums[.]" *Id.* § 3005(a).

227.    Winnebago's request and this action concern the second part of NAGPRA, the repatriation provision.

228.    Under this second part, NAGPRA outlines the systematic process for the "repatriation of human remains currently held by federal agencies" to the requesting Indian Tribe. *Thorpe*, 770 F.3d at 262.

229.    This process establishes a robust set of rights for Indian Tribes to secure repatriation of and control the manner and disposition of Native American human remains in the possession and control of federal agencies and museums and creates significant duties and obligations on these federal agencies and museums to repatriation such remains. *See* 25 U.S.C. § 3005; 43 C.F.R. § 10.10 (2023).

230.    NAGPRA's regulations define "Native American human remains" as "the physical remains of the body of a person of Native American ancestry. The term does not include remains or portions of remains that may reasonably be determined to have been freely given or naturally shed by the individual from whose body they were obtained, such as hair made into ropes or nets." 43 C.F.R. § 10.2(d)(1) (2023).

231.    NAGPRA's regulations define "possession" as "having physical custody of human remains, funerary objects, sacred objects, or objects of cultural patrimony with a sufficient legal interest to lawfully treat the objects as part of its collection for purposes of these regulations." *Id.* § 10.2(a)(3)(i).

232.    NAGPRA's regulations further define "control" as "having a legal interest in human remains, funerary objects, sacred objects, or objects of cultural patrimony sufficient to lawfully permit the museum or Federal agency to treat the objects as part of its collection for purposes of these regulations whether or not the human remains, funerary objects, sacred objects or objects of cultural patrimony are in the physical custody of the museum or Federal agency." *Id.* § 10.2(a)(3)(ii).

233.    Where a federal agency has compiled an inventory or summary of Native American human remains and established their cultural affiliation pursuant to 25 U.S.C. §§ 3003(a) and 3004(a), the federal agency "shall expeditiously return such remains" to the

culturally affiliated Indian Tribe when that Indian Tribe requests their repatriation. 25 U.S.C. § 3005(a)(1).

234.    Where a federal agency has *not* compiled an inventory or summary of Native American human remains and established their cultural affiliation pursuant to 25 U.S.C. § 3003(a) and 3004(a), the federal agency "shall expeditiously return such remains" to an Indian Tribe that requests their repatriation and "can show cultural affiliation by a preponderance of the evidence based upon geographical, kinship, biological, archaeological, anthropological, linguistic, folkloric, oral traditional, historical, or other relevant information or expert opinion." *Id*. § 3005(a)(4).

235.    An Indian Tribe's request for the repatriation of Native American human remains made pursuant to 25 U.S.C. § 3005(a) triggers several rights of Indian Tribes and duties of federal agencies.

236.    For instance, NAGPRA's regulations require that the "[r]epatriation must take place within ninety (90) days of receipt of a written request for repatriation that satisfies the requirements of § 10.10 (b)(1) from the culturally affiliated Indian tribe or Native Hawaiian organization, provided that the repatriation may not occur until at least thirty (30) days after publication of the notice of inventory completion in the Federal Register as described in § 10.9." 43 C.F.R. § 10.10(b)(2) (2023).

237.    Further, the consultation requirements outlined in 43 C.F.R. § 10.10 (2023) detail explicit rights of Indian Tribes after they make such repatriation requests.

238.    In particular, NAGPRA's regulations mandate that "[t]he repatriation of human remains, funerary objects, sacred objects, or objects of cultural patrimony must be accomplished by the museum or Federal agency in consultation with the requesting lineal descendants, or

culturally affiliated Indian tribe or Native Hawaiian organization, as appropriate, to determine the place and manner of the repatriation." *Id.* § 10.10(d).

239.    During the consultation, the agency "must inform the recipients of repatriations of any presently known treatment of the human remains, funerary objects, sacred objects, or objects of cultural patrimony with pesticides, preservatives, or other substances that represent a potential hazard to the objects or to persons handling the objects." *Id.* § 10.10(e).

240.    An agency "must adopt internal procedures adequate to permanently document the content and recipients of all repatriations." *Id.* § 10.10(f)(1).

241.    Indian Tribes may also request that agency officials "take such steps as are considered necessary pursuant to otherwise applicable law, to ensure that information of a particularly sensitive nature is not made available to the general public." *Id.* § 10.10(f)(2).

242.    Because repatriations are often costly, NAGPRA authorizes the Secretary of the Interior "to make grants to Indian tribes and Native Hawaiian organizations for the purpose of assisting such tribes and organizations in the repatriation of Native American cultural items." 25 U.S.C. § 3008(a).

243.    NAGPRA grants are non-competitive grants, awarded on a rolling basis, and are for amounts up to $25,000. *See Repatriation Grants*, NAT'L PARK SERV., https://www.nps.gov/subjects/nagpra/repatriation-grants.htm (last visited Dec. 30, 2023).

244.    These grant funds are only available for NAGPRA repatriations. *See FY2024 NAGPRA Repatriation Grants*, GRANTS.GOV, https://www.grants.gov/search-results-detail/351058 (last visited Dec. 30, 2023).

245.    NAGPRA also includes a savings provision that allows federal agencies and Indian Tribes to *consensually* enter into alternative agreements regarding the disposition or

control over remains and objects. *See* 25 U.S.C. § 3009(1)(B). The savings provision also states that it is not to be construed to "deny or otherwise affect access to any court," nor to limit any substantive or procedural rights of Indian Tribes. *Id*. § 3009(3)-(4).

246.    Thus, the savings provision provides Indian Tribes and federal agencies with flexibility to negotiate the terms of repatriations, without sacrificing Indian Tribes' rights under NAGPRA or limiting the federal government's responsibility to fulfill its obligations under NAGPRA.

247.    NAGPRA also includes an enforcement provision, vesting United States district courts with jurisdiction over actions alleging violations of NAGPRA's provisions and the authority to issue relief necessary to enforce its provisions. *Id*. § 3013. This provision provides Indian Tribes with a private right of action to enforce violations of NAGPRA against federal agencies in federal court. *See San Carlos Apache Tribe v. United States*, 272 F. Supp. 2d 860, 886 (D. Ariz. 2003).

248.    NAGPRA's regulations clarify that any final determination making NAGPRA inapplicable is subject to judicial review. *See* 43 C.F.R. § 10.1(b)(3) (2023).

249.     NAGPRA's regulation also delineates what constitutes "final agency action" under NAGPRA's repatriation procedures: "With respect to Federal agencies the final denial of a request of a lineal descendant, Indian tribe, or Native Hawaiian organization for the repatriation or disposition of human remains, funerary objects, sacred objects, or objects of cultural patrimony brought under, and in compliance with, the Act and this part constitutes a final agency action under the Administrative Procedure Act (5 U.S.C. 704)." *Id*.

250.    Finally, NAGPRA expressly recognizes the "unique relationship between the Federal government and Indian tribes." 25 U.S.C. § 3010. This includes the United States' trust

responsibility to Indian Tribes. *See, e.g.*, *Seminole Nation v. United States*, 316 U.S. 286, 297 (1942) (stating that the federal government, in its dealings with Indians, "has charged itself with moral obligations of the highest responsibility and trust. Its conduct, as disclosed in the acts of those who represent it in dealings with the Indians, should therefore be judged by the most exacting fiduciary standards").

## II.   Administrative Procedure Act (APA)

251.   Under the APA, courts may "compel agency action unlawfully withheld or unreasonably delayed[.]" 5 U.S.C. § 706(1).

252.   Under the APA, courts may also "hold unlawful and set aside agency action, findings, and conclusions found to be[] . . . (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [and] (D) without observance of procedure required by law[.]" *Id*. § 706(2)(A), (C)-(D).

**CLAIMS**

**FIRST CLAIM FOR RELIEF**
**Failure to Repatriate**
**(25 U.S.C. §§ 3005, 3013)**

253.   Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

254.   Samuel's and Edward's remains are "Native American human remains" under NAGPRA's definition of "cultural items." 43 C.F.R. § 10.2(d)(1) (2023); 25 U.S.C. § 3001(3)(A).

255.   Samuel's and Edward's remains are under Defendants' "possession or control." 25 U.S.C. § 3005(a).

256.     Samuel's and Edward's remains are part of Defendants' "holding or collection" of Native American human remains. *Id*. § 3004(a).

257.     Winnebago is an Indian Tribe under NAGPRA's definition. 25 U.S.C. § 3001(7).

258.     Defendants never compiled an inventory or summary of the Carlisle Cemetery collection or holding of Native American human remains in their possession and control and never established the cultural affiliation of those human remains, including Samuel and Edward, pursuant to NAPGRA. *See id.* §§ 3003(a), 3004(a); 43 C.F.R. §§ 10.8, 10.9 (2023).

259.     On October 16, 2023, Winnebago submitted a written request to Defendants, pursuant to 25 U.S.C. § 3005(a)(4) and 43 C.F.R. § 10.10(b) (2023) to repatriate Samuel and Edward.

260.     Defendants do not dispute that Samuel and Edward are culturally affiliated with Winnebago. Indeed, Defendants have in their possession, and have presented to Plaintiff, ample evidence that the remains of Samuel and Edward are in fact culturally affiliated with Winnebago.

261.     Samuel's and Edward's remains were not freely given, nor have Defendants obtained consent from their families or Winnebago to possess or control their remains. Defendants, therefore, do not have the "right of possession" to Samuel's and Edward's remains, 25 U.S.C. § 3001(13).

262.     None of the exceptions to repatriation provided at 43 C.F.R. § 10.10(c) (2023) apply.

263.     Defendants had ninety days upon receipt of Winnebago's written request to repatriate Samuel and Edward. *Id.* § 3005(b); 43 C.F.R. § 10.10(b)(2) (2023).

264.    On December 11, 2023, Defendants sent a letter to Winnebago denying Plaintiff's request to repatriate Samuel and Edward pursuant to NAGPRA.

265.    Defendants' letter denying Winnebago's request to repatriate the remains of Samuel and Edward constitutes reviewable agency action. *See* 43 C.F.R. § 10.1(b)(3) (2023) ("Any final determination making the Act or this part inapplicable is subject to review under section 15 of the Act. With respect to Federal agencies, the final denial of a request of a lineal descendant, Indian tribe, or Native Hawaiian organization for the repatriation or disposition of human remains, funerary objects, sacred objects, or objects of cultural patrimony brought under, and in compliance with, the Act and this part constitutes a final agency action under the Administrative Procedure Act (5 U.S.C. 704).").

266.    Defendants' denial of Winnebago's written request and their failure to repatriate Samuel and Edward violates NAGPRA and are therefore unlawful.

267.    NAGPRA provides Winnebago with a private right of action to enforce violations of NAGPRA, 25 U.S.C. § 3013; *San Carlos Apache Tribe*, 272 F. Supp. 2d at 886, and the APA waives Defendants' sovereign immunity. 5 U.S.C. § 702.

## SECOND CLAIM FOR RELIEF IN THE ALTERNATIVE

### Failure to Repatriate
### (25 U.S.C. § 3005; 5 U.S.C. § 706)

268.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

269.    Samuel's and Edward's remains are "Native American human remains" under NAGPRA's definition of "cultural items." 43 C.F.R. § 10.2(d)(1) (2023); 25 U.S.C. § 3001(3)(A).

270.     Samuel's and Edward's remains are under Defendants' "possession or control." 25 U.S.C. § 3005(a).

271.     Samuel's and Edward's remains are part of Defendants' "holding or collection" of Native American human remains. *Id*. § 3004(a).

272.     Winnebago is an Indian Tribe under NAGPRA's definition. 25 U.S.C. § 3001(7).

273.     Defendants never compiled an inventory or summary of the Carlisle Cemetery collection or holding of Native American human remains in their possession and control and never established the cultural affiliation of those human remains, including Samuel and Edward, pursuant to NAPGRA. *See id.* §§ 3003(a), 3004(a); 43 C.F.R. §§ 10.8, 10.9 (2023).

274.     On October 16, 2023, Winnebago submitted a written request to Defendants, pursuant to 25 U.S.C. § 3005(a)(4) and 43 C.F.R. § 10.10(b) (2023) to repatriate Samuel and Edward.

275.     Defendants do not dispute that Samuel and Edward are culturally affiliated with Winnebago. Indeed, Defendants have in their possession, and have presented to Plaintiff, ample evidence that the remains of Samuel and Edward are in fact culturally affiliated with Winnebago. Defendants had ninety days upon receipt of Winnebago's written request to repatriate Samuel and Edward. 25 U.S.C. § 3005(b); 43 C.F.R. § 10.10(b)(2) (2023).

276.     Samuel's and Edward's remains were not freely given, nor have Defendants obtained consent from their families or Winnebago to possess or control their remains. Defendants, therefore, do not have the "right of possession" to Samuel's and Edward's remains. 25 U.S.C. § 3001(13).

277.     None of the exceptions to repatriation provided at 43 C.F.R. § 10.10(c) (2023) apply.

278.     On December 11, 2023, Defendants sent a letter to Winnebago denying Plaintiff's request to repatriate Samuel and Edward pursuant to NAGPRA.

279.     Defendants' letter denying Winnebago's request to repatriate the remains of Samuel and Edward constitutes a final agency action under the APA. *See* 43 C.F.R. § 10.1(b)(3) (2023) ("Any final determination making the Act or this part inapplicable is subject to review under section 15 of the Act. With respect to Federal agencies, the final denial of a request of a lineal descendant, Indian tribe, or Native Hawaiian organization for the repatriation or disposition of human remains, funerary objects, sacred objects, or objects of cultural patrimony brought under, and in compliance with, the Act and this part constitutes a final agency action under the Administrative Procedure Act (5 U.S.C. 704).").

280.     Defendants' denial of Winnebago's written request and their refusal to repatriate Samuel and Edward violates NAGPRA, and constitute "agency action unlawfully withheld or unreasonably delayed[,]" 5 U.S.C. § 706(1), are "arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with law[,]" *id.* § 706(2)(A), are "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[,]" *id.* § 706(2)(C), and were made "without observance of procedure required by law[.]" *Id.* § 706(2)(D).  The APA waives Defendants' sovereign immunity. *Id.* § 702.

281.     Winnebago pleads this Second Claim for Relief in the alternative to its First Claim for Relief, since NAGPRA provides Winnebago with a private right of action to enforce its provisions against Defendants, separate from the APA.

### RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests the Court to:

A.      Declare that Defendants' denial of Winnebago's written request to repatriate the remains of Samuel and Edward in Defendants' possession or control from the holding or collection of Native American human remains at Carlisle Cemetery and their refusal to repatriate Samuel and Edward within ninety days of their receipt of Winnebago's written request is in violation of NAGPRA, 25 U.S.C. § 3005(a)(4); 43 C.F.R. § 10.10(b)(2) (2023);

B.      Alternatively, declare that Defendants' denial of Winnebago's written request to repatriate the remains of Samuel and Edward in Defendants' possession or control from the holding or collection of Native American human remains at Carlisle Cemetery and their refusal to repatriate Samuel and Edward within ninety days of their receipt of Winnebago's written request was in violation of NAGPRA, 25 U.S.C. § 3005(a)(4); 43 C.F.R. § 10.10(b)(2) (2023), and thus was agency action unlawfully withheld, arbitrary, capricious, an abuse of discretion, not in accordance with law, in excess of statutory jurisdiction, authority, or limitations, short of statutory right, and without observance of procedure required by law, 5 U.S.C. §§ 706(1), (2)(A), (C), (D);

C.      Issue injunctive relief enjoining Defendants to repatriate Samuel and Edward pursuant to 25 U.S.C. § 3005 within ninety days of the Court's ruling;

D.      Award attorneys' fees as authorized by law, including under the Equal Access to Justice Act, 28 U.S.C. § 2412; and

E.      Award any other just relief as this Court deems just and proper.

Dated:          January 17, 2024

Respectfully submitted,

53



Gregory A. Werkheiser (VA Bar #45986)
Jessica R. G. Krauss (VA Bar #94847)
Cultural Heritage Partners, PLLC
1811 East Grace Street
Richmond, VA 23223
Phone: (703) 408-2002
greg@culturalheritagepartners.com
jessica@culturalheritagepartners.com

Danelle J. Smith (NE Bar #22717)*
BIG FIRE LAW AND POLICY GROUP LLP
272 Ho-Chunk Plaza, Suite A
Winnebago, NE 68971
Phone: (402) 307-9905
dsmith@bigfirelaw.com

Beth Margaret Wright (CO Bar #55339)*
Jason Searle (CO Bar #57042)*
NATIVE AMERICAN RIGHTS FUND
250 Arapaho Avenue
Boulder, CO 80302
Phone: (303) 447-8760
wright@narf.org
searle@narf.org

Wesley James Furlong (AK Bar #1611108)*
NATIVE AMERICAN RIGHTS FUND
745 West 4th Avenue, Suite 502
Anchorage, AK 99501
Phone: (907) 276-0680
wfurlong@narf.org


*Pro hac vice forthcoming*

*Counsel for THE WINNEBAGO TRIBE OF NEBRASKA*