UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

WINNEBAGO TRIBE OF NEBRASKA, a federally recognized Indian Tribe,
Plaintiff,
v.

UNITED STATES DEPARTMENT OF THE ARMY; UNITED STATES DEPARTMENT OF THE ARMY, OFFICE OF ARMY CEMETERIES; CHRISTINE E. WORMUTH, KAREN DURHAM-AGUILERA, RENEA C. YATES, Lieutenant Colonel PRISCELLA A. NOHLE, in their official capacities,
Defendants.

1:24-cv-78 - CMH-IDD

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

Plaintiff seeks declaratory and injunctive relief pertaining to the repatriation of the remains of two boys interred, in 1895 and 1899, at the Army cemetery in Carlisle, Pennsylvania. To support its claims, the Complaint relies upon the repatriation provisions of the Native American Graves Protection and Repatriation Act (NAGPRA), 25 U.S.C. §§ 3003, 3005, and the Interior Department's implementing regulations, 43 C.F.R. § 10 (2024).[1] As the Army has informed Plaintiff more than once, Defendants are ready and willing to assist in the return of the boys' remains to their rightful resting place, and at the Army's expense. But this lawsuit can be of no help in making that happen, because the invoked provisions of NAGPRA do not apply to the remains interred at the Carlisle Barracks Main Post Cemetery. The Complaint therefore does not state an actionable claim and must be dismissed under Fed. R. Civ. P. 12(b)(6).

[1] Interior's regulations were updated as of January 12, 2024. *See* 88 Fed. Reg. 86518 (Dec. 13, 2023). Unless otherwise indicated, all references to the C.F.R. are to the 2024 edition.

# TABLE OF CONTENTS


FACTUAL BACKGROUND ........ 1

A. The Carlisle School and Cemetery ........ 1

B. NAGPRA ........ 3

C. Plaintiff's Suit ........ 6

ARGUMENT ........ 7

A. Legal Standards ........ 7

B. The Statute's Plain Meaning Shows, and All Pertinent Caselaw Holds, that NAGPRA's Repatriation Requirements Do Not Apply to Cemeteries ........ 8

1. Under the ordinary meaning of the terms the Carlisle Barracks Main Post Cemetery is not a "holding or collection" ........ 9

a. A cemetery does not meet the ordinary meaning of a "holding or collection" ........ 9

b. In holding that NAGPRA does not require disinterment of Native American remains, the caselaw confirms that a cemetery is not a "holding or collection" ........ 12

c. Plaintiff's contrary arguments fail ........ 13

2. The Third Circuit's decision in Thorpe v Borough of Thorpe confirms that NAGPRA Sections 3003 and 3005 do not create obligations to disinter buried remains ........ 15

C. NAGPRA's Legislative History Confirms That the Statute's Repatriation Requirements do not Apply to Cemeteries ........ 22

D. NAGPRA's Implementing Regulations Further Confirm That the Statute's Repatriation Requirements do not Apply to Indian Boarding School Burial Sites ........ 26

CONCLUSION ........ 29

# TABLE OF AUTHORITIES

Page(s)

**Other Authorities**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)........................................ 8

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544(2007)........................................ 8

*Bittner v. United States*,
598 U.S. 85 (2023)........................................ 20

*Bonnichsen v. United States*,
367 F.3d 864, 874 n.14 (9th Cir. 2004) ........................................ 26

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
467 U.S. 837 (1984)........................................ 29

*Clark v. BASF Corp.*,
142 Fed. App'x 659 (4th Cir. 2005) ........................................ 1

*Clark v. BASF Salaried Employees' Pension Plan*,
329 F. Supp. 2d 694 (W.D.N.C. 2004) ........................................ 1

*Fallon Paiute-Shoshone Tribe v. U.S. Bureau of Land Mgmt.*,
455 F. Supp. 2d 1207 (D. Nev. 2006)........................................ 4

*First Merchs. Acceptance Corp. v. J.C. Bradford & Co.*,
198 F.3d 394 (3d Cir.1999) ........................................ 17

*Garcia v. United States*,
469 U.S. 70 (1984)........................................ 17

*Gasner v. County of Dinwiddie*,
162 F.R.D. 280 (E.D. Va. 1995) ........................................ 1, 2, 3

*Geronimo v. Obama*,
725 F. Supp. 2d 182 (D.D.C. 2010)........................................ 13, 26, 27, 28

*Greer v. Gen. Dynamics Info. Tech., Inc.*,
808 F. App'x 191 (4th Cir. 2020) ........................................ 8

*Griffin v. Oceanic Contractors, Inc.*,
458 U.S. 564 (1982)........................................ 17, 18

*Hawk v. Danforth*,
No. 06-C-223, 2006 WL 6928114 (E.D. Wis. Aug. 17, 2006)........................................ 9, 12, 13, 20

*Henson v. CSC Credit Servs.*,
29 F.3d 280 (7th Cir. 1994) ........................................................................................ 1

*Hicks v. Fed. Bureau of Prisons*,
603 F. Supp. 2d 835 (D.S.C.)........................................................................................ 15

*Holloway v. Pagan River Dockside Seafood, Inc.*,
669 F.3d 448 (4th Cir. 2012) ........................................................................................ 8

*In re Birmingham v. PNC Bank*,
846 F.3d 88 (4th Cir. 2017) ........................................................................................ 8

*Levy v. Sterling Holding Co., LLC*,
544 F.3d 493 (3d Cir. 2008) ........................................................................................ 15

*Marx v. Gen. Revenue Corp.*,
568 U.S. 371 (2013)........................................................................................ 29

*Navy Fed. Credit Union v. LTD Fin. Servs., LP*,
972 F.3d 344 (4th Cir. 2020) ........................................................................................ 29

*Neitzke v. Williams*,
490 U.S. 319 (1989)........................................................................................ 8

*People for the Ethical Treatment of Animals v. U. S. Dep't of Agric.*,
861 F.3d 502 (4th Cir. 2017) ........................................................................................ 29

*Pueblo of San Ildefonso v. Ridlon*,
103 F.3d 936 (10th Cir.1996) ........................................................................................ 18

*Searcy v. Locke*,
2010 WL 3522967 (E.D. Va. Sept. 7, 2010) ........................................................................................ 8

*Smiley v. Citibank (South Dakota), N.A.*,
517 U.S. 735 (1996)........................................................................................ 29

*Thorpe v. Borough of Thorpe*,
770 F.3d 255 (3d Cir. 2014) ........................................................................................ 3, 16, 17, 18, 19, 20, 22, 28

*United States v. Rippetoe*,
178 F.2d 735 (4th Cir. 1949) ........................................................................................ 18

*Walters v. McMahen*,
684 F.3d 435 (4th Cir. 2012) ........................................................................................ 8

*White v. Univ. of California*,
765 F.3d 1010 (9th Cir. 2014) ........................................................................................ 26

*Whitman v. Am. Trucking Associations*,
531 U.S. 457 (2001)........................................................................................ 22

*Yankton Sioux Tribe v. U.S. Army Corps of Eng's*,

209 F. Supp. 2d 1008 (D.S.D. 2002) .......... 10

*Yates v. Collier*,
868 F.3d 354 (5th Cir. 2017) .......... 22

**Statutes**

18 U.S.C. § 1170 .......... 4

25 U.S.C. § 3002(a) .......... 4, 9, 27

25 U.S.C. § 3002(c) .......... 4, 27

25 U.S.C. § 3002(c)(1) .......... 9, 27

25 U.S.C. § 3003 .......... 1, 13

25 U.S.C. § 3003(a) .......... 5, 7, 8, 14

25 U.S.C. § 3005 .......... 9, 18, 27

25 U.S.C. § 3005(a) .......... 6, 13

25 U.S.C. § 3011 .......... 10, 26

25 U.S.C. §§ 3001-3013 .......... 6

Pub. L. No. 101–601, 104 Stat. 3048 (1990) .......... 20

Pub. L. No. 104-134, 110 Stat. 1321 (1996) .......... 8

**Rules**

Fed. R. Civ. P. 12(b)(6) .......... 1, 8

**Regulations**

43 C.F.R. § 10 (2023) .......... 6

43 C.F.R. § 10 (2024) .......... 1

43 C.F.R. § 10.1(b)(1)(i) .......... 14, 16

43 C.F.R. § 10.1(b)(1)(ii) .......... 14

43 C.F.R. § 10.2 .......... 10

43 C.F.R. § 10.3(b) .......... 9

43 C.F.R. § 10.4 .......... 26

87 Fed. Reg. 63202-01 .......... 27

88 Fed. Reg. 86452-01 .......... 11, 26

**Other Authorities**

135 Cong. Rec. S5517 .......... 22

136 Cong. Rec. S17173-02 .......... 5

*Graves Protection and Repatriation Act: Background and Legislative History,*
24 Ariz. St. L.J. 35 (1992) .......... 3

*H.R. 1381,* 101st Cong. (1990) .......... 23

*H.R. 1646,* 101st Cong. (1990) .......... 23

*H.R. 5237.* 101st Cong. (1990) .......... 23

## FACTUAL BACKGROUND

### A. The Carlisle School and Cemetery

The United States' school program for Native Americans dates back to 1819, when Congress authorized the President, wherever he deemed it "practicable," and where "the means of instruction can be introduced with their own consent," to "employ capable persons of good moral character to instruct [Indians] in the mode of agriculture suited to their situation; and for teaching their children in reading, writing, and arithmetic." Act of March 3, 1819, ch. 85, 3 Stat. 516 (codified at 25 U.S.C. § 271 (2020)).[2] In the century that followed, an extensive system of Indian boarding schools was developed, designed in significant part to accomplish the forced assimilation of Native Americans to European/American culture. Boarding School Report at 37-46. Between 1819 and 1969 the federal government operated 408 Indian boarding schools at 431 locations. *Id*. at 6, 82.

---

[2] *See generally*, Bryan Newland, U.S. Dep't of Interior, *Federal Indian Boarding School Initiative Investigative Report* (Boarding School Report) 27 (2022), https://www.bia.gov/sites/default/files/dup/inline-files/bsi_investigative_report_may_2022_508.pdf. Because this Report is a public record, because Plaintiff relies upon it (ECF No. 1 ¶¶ 28, 31), and because (we expect) there will be no dispute as to its contents, the Report may be relied upon here without converting Defendants' motion to dismiss into a summary judgment motion. *See Clark v. BASF Salaried Employees' Pension Plan*, 329 F. Supp. 2d 694, 697 (W.D.N.C. 2004) (citing *Henson v. CSC Credit Servs*., 29 F.3d 280, 284 (7th Cir. 1994), recognizing that the "district court may also take judicial notice of matters of public record without converting a 12(b)(6) motion into a motion for summary judgment"), *affirmed as modified by Clark v. BASF Corp*., 142 Fed. App'x 659, 661 (4th Cir. 2005) (also recognizing that district court properly considered document, which was not part of the public record, without converting the motion to dismiss into a motion for summary judgment, where there was no dispute as to document's authenticity, the document was referenced in the complaint and the document was central to the plaintiff's claim); *Gasner v. County of Dinwiddie*, 162 F.R.D. 280, 282 (E.D. Va. 1995) (court may consider documents outside the pleadings, without converting motion to dismiss into a motion for summary judgment, to include "documents quoted, relied upon, or incorporated by reference in the complaint, [as well as] official public records pertinent to the plaintiff's claims," so long as the documents are "of unquestioned authenticity").

"The Carlisle Indian Industrial School (Carlisle Indian School) was established at Carlisle Barracks by the Bureau of Indian Affairs (BIA) in 1879 and operated until 1918 when the school was closed and the barracks returned to military use."[3] While in operation, the Carlisle Indian School offered education and training for industrial technology and other skills to over 10,500 Native Americans. Carlisle Research Report at i. The Carlisle Indian School Cemetery was established for the burial of Native American students who died while attending the school. *Id*.

The cemetery contains 229 burial plots, of which 180 have been identified as Native American, including 179 students and one former student. *Id*. at 1.[4] Of the Native American burials, 157 have a known tribal affiliation and 23 burials have an unknown tribal affiliation. Carlisle Research Report at 1. There are members of approximately 50 tribes in the cemetery. *Id*. In 1927, the current Carlisle Indian School Cemetery's burials were moved from the original burial ground to Carlisle Barracks Main Post Cemetery (Post Cemetery). *Id*. Because the historical records are poor, "it is impossible to definitively state whether the markers are correctly associated with the physical remains of the individuals name[d] on these respective markers without physical investigation." *Id*. at i, 56.

---

[3] J.W. Joseph *et al*., New South Associates, *Archival Research of the Carlisle Indian School Cemetery* (Carlisle Research Report) at i (2017), https://armycemeteries.army.mil/Portals/1/Documents/CarlisleBarracks/Archival%20Research%20Report%20-%20July%202017v2.pdf?ver=2019-06-07-121535-723. The Carlisle Research Report, a public report that Plaintiff relies upon (ECF No. 1 ¶ 55, 67, 70, 74, 77) may be considered here without converting Defendants' motion into a motion for summary judgment. *See* Footnote 2, *supra*.

[4]This number has been reduced, because the Army has disinterred the remains of thirty-two Native Americans buried at the Post Cemetery. *See*, *e.g*., Office of Army Cemeteries Public Affairs, *Office of Army Cemeteries finalized fifth disinterment project at Carlisle Barracks*, U.S. Army War College News Archives (July 7, 2022), https://www.armywarcollege.edu/News/archives/14284.pdf.

The Army is currently engaged in a major effort to identify all Native American graves at the Post Cemetery and to return the remains to the decedents' families. *Id*. at 1. This effort is being carried out with the support of Registered Professional Archeologists, Board Certified Physical Anthropologists, and highly experienced professional cemetarians. *Id*. Notwithstanding the challenges presented by the imperfect historical records of the cemetery, the research team has created an inventory of 214 of the 229 burial plots, including 166 of the 180 Native American plots. *Id*. at Appendix A.

The Cemetery falls underneath the responsibility of the Carlisle Barracks Garrison Command and the U.S. Army's Installation Management Command. It is under the control of the Office of Army Cemeteries (OAC). OAC provides oversight and expertise for all Army cemeteries through policy, program management, inspections, training, and assistance.

**B. NAGPRA**

The origin and development of NAGPRA is recounted in Jack F. Trope and Walter R. Echo-Hawk, *The Native American Graves Protection and Repatriation Act: Background and Legislative History* (Trope & Echo-Hawk), 24 Ariz. St. L.J. 35 (1992) (cited at Compl. ¶ 98, ECF No. 1). *See also Thorpe v. Borough of Thorpe*, 770 F.3d 255, 259-62 (3d Cir. 2014). According to Trope & Echo-Hawk, one of the major incentives for the legislation was the existence of large collections of Native American remains held in museums:

> In 1986, a number of Northern Cheyenne leaders discovered that almost 18,500 human remains were warehoused in the Smithsonian Institution. This discovery served as a catalyst for a concerted national effort by Indian tribes and organizations to obtain legislation to repatriate human remains and cultural artifacts to Indian tribes and descendants of the deceased. Between 1986 and 1990, a number of bills were introduced in the 99th, 100th, and 101st Congresses to address this issue.

Trope & Echo-Hawk, at. 54-55. Partly as a result of the Antiquities Act of 1906, which

characterized Native American remains on federal lands as federal property and as "archeological resources," museums across the country had built collections like those of the Smithsonian. *Id*. at 42.

At the same time, despoilers of gravesites gathered bones and burial artifacts for sale here and in Europe. *Id*. at 43-44; H.R. Rep. No. 101–877 at 8-9 (1990), *as reprinted in* 1990 U.S.C.C.A.N. 4367, 4367-68.

NAGPRA seeks to deal with both problems, and also creates rules and procedures governing the disinterment of existing Native American gravesites. *See*, generally, *Fallon Paiute-Shoshone Tribe v. U.S. Bureau of Land Mgmt.*, 455 F. Supp. 2d 1207, 1217 (D. Nev. 2006).

Section 4 (codified at 18 U.S.C. § 1170) deals with profiteering and grave-robbing by criminalizing traffic in Native American human remains and cultural items.

Section 3 creates procedures for the protection and repatriation of remains unearthed after the Act's passage. Section 3(a) broadly applies to remains and cultural items "excavated or discovered" after the passage of the Act and sets out a detailed hierarchy that addresses their "ownership or control." 25 U.S.C. § 3002(a). Sections 3(c) and 3(d) distinguish between intentional, and inadvertent, disinterment of Native American remains and objects. Section 3(c) creates permitting and consultation requirements for the "intentional removal from or excavation of Native American cultural items from Federal or tribal lands for purposes of discovery, study, or removal." 25 U.S.C. § 3002(c). Section 3(d) governs the "inadvertent discovery of Native American remains and objects" by requiring that such discoveries be reported to the Interior Department and by setting rules for the disposition of the materials discovered.

Thus the entirety of Section 3 (which we refer to below by its codified number, "Section

3002") deals with excavations of Native American remains and cultural items occurring after NAGPRA's passage, and nothing in Section 3002 proactively requires excavation.

Some of the most hard-fought provisions of the bill, however, dealt with repatriation of remains already held by museums. The bill's principal sponsors, Senators John McCain and Daniel Inouye, put it this way:

> The passage of this legislation marks the end of a long process for many Indian tribes and museums. The subject of repatriation is charged with high emotions in both the Native American community and the museum community. . . For several years, the Congress has considered the difficult issue of the repatriation of Native American human remains and funerary objects from museum collections to Indian tribes.

136 Cong. Rec. S17173-02 (daily ed. Oct. 26, 1990) (remarks of Sen. McCain), 1990 WL 165443.

> In cases where native Americans have attempted to regain items that were inappropriately alienated from the tribe, they have often met with resistance from museums and have not had the legal ability or financial resources to pursue the return of the goods. It is virtually only in instances where a museum has agreed for moral or political reasons to return the goods that tribes have had success in retrieving property.

*Id.* at S17174 (remarks of Sen. Inouye), 1990 WL 165443.

Congress resolved the museum collection issue by creating two, complementary, requirements. First, NAGPRA Section 5 requires that existing collections be inventoried.

> Each Federal agency and each museum which has possession or control over holdings or collections of Native American human remains and associated funerary objects shall compile an inventory of such items and, to the extent possible based on information possessed by such museum or Federal agency, identify the geographical and cultural affiliation of such item.

25 U.S.C. § 3003(a). Second, where the decedent's lineal descendants or cultural affiliation can be established, NAGPRA Section 7 requires repatriation of the inventoried remains and associated artifacts.

> If . . . the cultural affiliation of Native American human remains and associated funerary objects with a particular Indian tribe or Native Hawaiian organization is established, then the Federal agency or museum, upon the request of a known lineal descendant of the Native American or of the tribe or organization . . . shall expeditiously return such remains and associated funerary objects.

25 U.S.C. § 3005(a).

The history and contents of NAGPRA are discussed in more detail below.

### C. Plaintiff's Suit

Plaintiff Winnebago Tribe of Nebraska filed the instant action on January 17, 2024, seeking declaratory and injunctive relief "for ongoing violations of the Native American Graves Protection and Repatriation Act . . ., 25 U.S.C. §§ 3001-3013, and its implementing regulations, 43 C.F.R. § 10 (2023)." ECF No. 1 ¶ 1. The Defendants are the Department of the Army (Army), the OAC, and several Army officials sued in their official capacities. The suit seeks repatriation of the remains of two Winnebago boys, Samuel Gilbert and Edward Hensley, who (beginning in 1895, *see* Compl. Exs. 1 & 2, ECF Nos. 1-2, 1-3) attended the Carlisle school and are interred at the Post Cemetery. ECF No. 1 ¶ 2. [5] The complaint seeks a declaration that Defendants have violated NAGPRA, and an injunction requiring that Defendants take actions under NAGPRA. *Id*. at 52-53 (Relief Requested).

[5] While the Complaint's factual allegations are accepted on a motion to dismiss, Defendants do not admit their truth. In particular, the Complaint alleges that "identifying [the boys'] closest living relatives would be challenging, if not impossible, because neither Edward nor Samuel had any direct descendants[.]" ECF No. 1 ¶ 110. In its efforts to return the boys' remains, however, the Army learned that Plaintiff is aware of living relatives. *See* February 29, 2024, letter (attached as Exhibit A). That living relatives exist creates potential merits problems for the Complaint other than those addressed by the instant motion, including questions regarding prudential ripeness and the absence of justiciable final agency action. Given, however, that Plaintiff has failed to state a claim for relief redressable under NAGPRA, the Court need not reach those questions. Should the Court deny Defendants' motion, we reserve the right to raise those issues on summary judgment. Exhibit A has no bearing on the instant motion.

The Army has informed Plaintiff that it is willing to carry out "the disinterment and return of both children entirely at the Army's expense." The Army also stated that it would pay for the expenses of up to four individuals to attend each disinterment and would provide a casket and "headstone to mark [the boys'] final interment location." Compl. Ex. 7, ECF No. 1-8. The Army explained, however, that it does not believe that NAGPRA applies. *Id*.

**ARGUMENT**

NAGPRA's inventory and repatriation requirements, in Sections 3003 and 3005, apply only to "Federal agenc[ies] and . . . museum[s] which ha[ve] possession or control over holdings or collections of Native American human remains." 25 U.S.C. 3003(a). Those requirements do not apply to the remains now resting in the Post Cemetery because, under the statute's plain meaning, the cemetery's graves are not a "holding or collection." Additionally, the three federal court decisions that have addressed the issue have held that NAGPRA does not obligate anyone to disinter Native American remains. These holdings are firmly supported by the language, history, and purpose of NAGPRA, and by its implementing regulations.

**A. Legal Standards**

In general, a motion to dismiss for failure to state a claim should be granted where the plaintiff fails to "'state[] a plausible claim for relief,'" that is, if the allegations of the complaint fail "'to raise a right to relief above the speculative level.'" *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555(2007)). In considering a motion to dismiss, the court accepts as true all well-pleaded factual allegations and views the complaint in a light most favorable to the plaintiff. *Id*.

As the Fourth Circuit has explained, the purpose of Rule 12(b)(6) is to provide a defendant with a mechanism for testing "the legal sufficiency of the complaint," not the facts that support it. *See In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Walters*, 684 F. 3d at 439. Thus, a complaint should be dismissed if it lacks a cognizable legal theory. *Greer v. Gen. Dynamics Info. Tech., Inc.*, 808 F. App'x 191, 193 (4th Cir. 2020); *Holloway v. Pagan River Dockside Seafood, Inc.*, 669 F.3d 448, 452 (4th Cir. 2012). "A court properly dismisses a complaint on a Rule 12(b)(6) motion based upon the 'lack of a cognizable legal theory . . . '" *Searcy v. Locke*, 2010 WL 3522967, at *6 (E.D. Va. Sept. 7, 2010) (citation omitted); *cf. Neitzke v. Williams*, 490 U.S. 319, 326-27 (1989) (If "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations . . . a claim must be dismissed, without regard to whether it is based on an outlandish legal theory or on a close but ultimately unavailing one" (citation omitted)) *superseded by a statute on other grounds*, Omnibus Consolidated Rescissions and Appropriations Act of 1996, Pub. L. No. 104-134, 110 Stat. 1321.

### B. The Statute's Plain Meaning Shows, and All Pertinent Caselaw Holds, that NAGPRA's Repatriation Requirements Do Not Apply to Cemeteries

NAGPRA's inventory and repatriation requirements, in Sections 3003 and 3005, apply only to "Federal agenc[ies] and . . . museum[s] which ha[ve] possession or control over holdings or collections of Native American human remains." 25 U.S.C. 3003(a). There is no question that the Post Cemetery, which the Army controls, includes Native American remains. Whether the requirements of Sections 3003 and 3005 apply here therefore turns on two questions. First, do the remains now resting in the cemetery at the Carlisle Barracks comprise a "holding or collection" as those terms are used in NAGPRA? Second, do NAGPRA Sections 3003 and 3005

require disinterment of grave site remains? If the answer to either question is no, Plaintiff's suit fails. The answer to both questions is no.

### *1. Under the ordinary meaning of the terms the Post Cemetery is not a "holding or collection*"

Plaintiffs invoke the repatriation requirements of 25 U.S.C. § 3005. ECF No. 1 ¶¶ 2, 5, 123, 128, 140, 182, 183, 186, 226, 229, 233, 234, 235, 255, 259, 263, 270, 274, 275. We thus note at the outset that this case (and our motion) do not implicate Section 3002, which governs remains inadvertently discovered or intentionally disinterred after the Act's passage. Nor should they; by its terms Section 3002 applies to remains that have been unearthed, not to remains in the ground. *Hawk v. Danforth*, No. 06-C-223, 2006 WL 6928114, at *2 (E.D. Wis. Aug. 17, 2006) ("[T]o the extent § 3002 could apply without respect to whether a museum or agency is involved, the Act applies only to remains or artifacts that are 'excavated or discovered'—not to remains that may be still buried. 25 U.S.C. § 3002(a)").[6]

#### **a. A cemetery does not meet the ordinary meaning of a "holding or collection**"

NAGPRA Sections 3003 and 3005 do not apply here because the Post Cemetery is not a "holding or collection."[7] The Merriam-Webster online dictionary defines a "collection" as "an accumulation of objects gathered for study, comparison, or exhibition or as a hobby." The examples given are collections of poetry, photographs, and baseball cards. *See Collection*,

---

[6] As noted, Section 3002 also regulates the intentional excavation or removal of Native American funerary items from federal or tribal lands, requiring (among other things) a permit and prior consultation with the appropriate Tribe. *See* 25 U.S.C. § 3002(c)(1), (2), (4); 43 C.F.R. §§ 10.3(b), 10.5. *See*, generally, *Yankton Sioux Tribe v. U.S. Army Corps of Eng's*, 209 F. Supp. 2d 1008, 1016-17 (D.S.D. 2002). The Complaint does not invoke any of these provisions.

[7] The Complaint alleges otherwise. ECF No. 1 ¶¶ 2, 5, 10, 11, 12, 24, 25, 99, 132, 146, 190, 191, 192, 195, 196, 197, 199, 200, 203, 256, 271.

https://www.merriam-webster.com/dictionary/collection (last visited May 2, 2024). The collections of art, or of antiquities, held by museums around the world, provide another obvious illustration. A "holding" is defined as "property (such as land or securities) owned —usually used in plural." *Holding*, https://www.merriam-webster.com/dictionary/holding (last visited May 2, 2024). These definitions capture the everyday sense that a "collection" is *an accumulation of things* for science, culture, or curiosity, and a "holding" is an *accumulation* of assets. Both terms naturally apply to a museum's or federal agency's inventory of previously excavated remains; neither term naturally applies to burials in a cemetery.

Congress authorized the Interior Department to promulgate regulations implementing NAGPRA, 25 U.S.C. § 3011, and the Department's definition, while more expansive, captures this same sense. Under the regulations a "holding or collection" "means *an accumulation* of one or more objects, items, or human remains for any temporary or permanent purpose, including: (1) Academic interest; (2) Accession; (3) Catalog; (4) Comparison; (5) Conservation; (6) Education; (7) Examination; (8) Exhibition; (9) Forensic purposes; (10) Interpretation; (11) Preservation; (12) Public benefit; (13) Research; (14) Scientific interest; or (15) Study." 43 C.F.R. § 10.2 (emphasis added). Again, each of these purposes applies to a museum; none to a cemetery. And a cemetery simply cannot be called an "accumulation." Mirriam-Webster defines "accumulate" as "to gather or pile up." *Accumulate*, https://www.merriam-webster.com/dictionary/accumulate (last visited May 2, 2024). A cemetery is not an accumulation in this, its normal sense. In our cemeteries we commemorate and honor the dead; we do not hoard or amass the dead.[8]

[8] The Interior Department's commentary on its updated NAGPRA regulations is consistent,

But even if the statute were not clear, the legislative history (Section C below) reinforces this reading. Indeed, and in a very real sense, that is the whole point of NAGPRA. To our shame, European Americans, in the past, *did* treat Native American human remains and funerary objects as just so many collectibles, like stamps or baseball cards. Or as natural curiosities, like mammoth tusks. This macabre and prejudiced fascination is one reason why Native American human remains and cultural items were collected by museums, and why grave-robbers found such a ready market. Trope & Echo-Hawk, at 38-43. The point of NAGPRA was and is to right those wrongs, insofar as such wrongs can ever be righted.

And, as Plaintiffs assert, our boarding school system for Native Americans is yet another source of national shame. Regardless of the stated intent of its creators and administrators, it cannot be denied that that system far too often served as an instrument of racism and abuse. Boarding School Report, at 55-62.

But NAGPRA is not a vehicle for rendering judgement on the Native American public school system. Nor is it a vehicle for affirmatively relocating the contents of the cemeteries where students at those schools were laid to rest. NAGPRA Sections 3003 and 3005 are concerned with archaeological collections, not graveyards.

b. **In holding that NAGPRA does not require disinterment**

---

noting more than once that "holdings or collections" are typically maintained in "boxes." *See* Native American Graves Protection and Repatriation Act Systematic Processes for Disposition or Repatriation of Native American Human Remains, Funerary Objects, Sacred Objects, and Objects of Cultural Patrimony, 88 Fed. Reg. 86452-01,86495-96 (Dec. 13, 2023) ("A few comments provided details on how long it takes identify human remains or cultural items in a holding or collection . . . One comment stated it takes 10 hours to review a single, standard box to identify the presence of human remains or cultural items"); *id*. at 86496 ("A museum or Federal agency can choose to review each box in a holding or collection to determine if it contains human remains or cultural items, but it must do so within the timeframes required by the Act and the regulations.")

**of Native American remains, the caselaw confirms that a cemetery is not a "holding or collection"**

The caselaw supports the idea that the inventory and repatriation requirements of Sections 3003 and 3005, in referring to "holdings or collections" of Native American remains, do not apply to gravesites. Two decisions have held that Sections 3003 and 3005 do not apply to remains in the ground.

In *Hawk v. Danforth*, the plaintiff alleged that his ancestors were buried underneath an Oneida tribal parking lot. He sued under NAGPRA to compel the Tribe to care for the gravesites and "provid[e] proper burials." 2006 WL 6928114, at *1. The suit was dismissed, partly because the defendant was not a museum or federal agency. But the court also dismissed the complaint on the basis that the repatriation requirements of NAGPRA do not apply to remains and artifacts that are still in the ground. "In the plaintiff's view," the court noted," "the Tribe should excavate under the parking lot to find the remains he asserts are there." *Id*. at 2. "This," the court held, "has the Act backwards." *Id*. "Simply put, no provision in the Act . . . requires a Tribe or anyone else to excavate an area in order to find remains or other artifacts."

The same result obtained in *Geronimo v. Obama*, 725 F. Supp. 2d 182 (D.D.C. 2010), which the court expressly tied to the "holding or collection" language in Section 3003. In *Geronimo*, the plaintiffs, claiming to be the descendants of the legendary Apache warrior, sought repatriation of Geronimo's remains from the Yale University organization known as the Order of Skull and Bones. Because no final agency action by any of the federal defendants was alleged, jurisdiction under the Administrative Procedure Act was lacking and the case was dismissed on grounds of sovereign immunity. 725 F. Supp. 2d at 186. Plaintiffs also apparently alleged that the Skull and Bones Society had reburied Geronimo's remains, because the court went on to

hold that in seeking excavation of those remains the complaint failed to state a cause of action. *Id*. at 186-87.

> To the extent the plaintiffs seek to require the federal defendants to excavate Geronimo's possible burial sites (see Compl. ¶ 1), they cite to no provision of NAGPRA that requires a federal agency to engage in an intentional excavation of possible burial sites. The plaintiffs refer to 25 U.S.C. § 3003, which required federal agencies and museums to create inventories of "holdings or collections of Native American human remains and associated funerary objects." However, the plaintiffs do not point to any authority interpreting this or any other section of NAGPRA as requiring an intentional excavation.

*Id.* at 187 n.4 (citing and comparing *Hawk,* 2006 WL 6928114, at *2 ). As in *Hawk v Danforth* and *Geronimo v Obama*, the remains in the ground at the Post Cemetery are not "holdings or collections" subject to NAGPRA. Sections 3003 and 3005 therefore do not apply here and Plaintiff's Complaint fails to state a claim.

**c. Plaintiff's contrary arguments fail**

The Complaint argues that it does not matter whether the Post Cemetery is a holding or collection. This, too, is incorrect.

The Complaint notes that the repatriation section, Section 3005, does not use the term "holding or collection." ECF No. 1 ¶ 184. While true, the point is irrelevant, because the statutory structure incorporates the "holding or collection" requirement into Section 3005. In regard to a "Federal agency or museum," and where the cultural affiliation of the remains has been established, the repatriation requirements of Section 3005 apply to remains that have been inventoried under Section 3003. 25 U.S.C. § 3005(a) ("If, pursuant to section 3003 . . . the cultural affiliation of Native American human remains . . . with a particular Indian . . . is established, then the Federal agency or museum, upon the request of a known lineal descendant of the Native American or of the tribe . . . and pursuant to subsections (b) and (e) of this section,

shall expeditiously return such remains . . ."). And the inventory obligations of Section 3003 only apply to "[e]ach Federal agency and each museum which has possession or control over holdings or collections of Native American human remains and associated funerary objects." 25 U.S.C. § 3003(a). Hence if Section 3003 does not apply, Section 3005(a) does not apply. And Section 3003(a) only applies to "holdings or collections."

Even more broadly, the Interior Department's regulations make it clear that *none* of the repatriation requirements of NAGPRA apply in the absence of a "holding or collection." The introductory provisions of the regulations state that "[t]hese regulations require certain actions by . . . (ii) Any Federal agency *that has possession or control of a holding or collection* or that has responsibilities on Federal or Tribal lands." 43 C.F.R. § 10.1(b)(1)(ii) (emphasis added).[9] Plaintiff's suggestion that the Act's repatriation requirements apply in the absence of a holding or collection is thus refuted by the language of the statute itself and also by the implementing regulations.

The Complaint seeks to avoid Interior's interpretive regulation by focusing attention on the now superseded version of 43 C.F.R. § 10.1(b)(1)(i), which did not refer to a "holding or collection."[10] The Complaint argues that the earlier version (the one in effect when Plaintiff originally requested repatriation and the Army agreed to cooperate, but denied the applicability of NAGPRA Section 3005) controls. ECF No. 1 ¶ 194. The Complaint is wrong, first, because "where a new rule constitutes a clarification—rather than a substantive change—of the law as it existed beforehand, the application of that new rule to pre-promulgation conduct necessarily

---

[9] The reference to "Federal or Tribal lands" relates to the provisions of Section 3004 dealing with excavations or inadvertent discoveries, which, the parties agree, are not relevant here.

does not have an impermissible retroactive effect[.]" *Hicks v. Fed. Bureau of Prisons*, 603 F. Supp. 2d 835, 841-42 (D.S.C.), *aff'd*, 358 F. App'x 393 (4th Cir. 2009); *Levy v. Sterling Holding Co., LLC*, 544 F.3d 493, 506 (3d Cir. 2008). Second, because the Complaint seeks only prospective relief (a declaratory judgment and an injunction) regulations that are no longer in effect are irrelevant. And we cannot imagine how Plaintiff could argue that an agency's regulatory *adoption of a statutory term* – here, "holding or collection" – could somehow be inconsistent with the statute.

And even if, contrary to the statute and regulations, Plaintiff were correct that NAGPRA could apply to the Army in the absence of a "holding or collection," the Complaint would still be subject to dismissal. As held in both *Geronimo* and *Hawk*, the statute does not require exhumation of existing graves. To the same effect is the decision in *Thorpe v Borough of Thorpe*, to which we now turn.

### 2. The Third Circuit's decision in *Thorpe v Borough of Thorpe* confirms that NAGPRA Sections 3003 and 3005 do not create obligations to disinter buried remains

To apply NAGPRA Sections 3003 and 3005 to the Post Cemetery would produce results wholly at odds with the purpose and history of the statute. The Third Circuit's decision in *Thorpe v Borough of Thorpe* makes the point forcefully.

At the direction of his widow, the famous athlete Jim Thorpe was buried in the Pennsylvania town that bears his name. 770 F.3d at 257. Fifty years later, several of Thorpe's descendants sued the Borough, under NAGPRA, to have the remains disinterred for reburial near Thorpe's birthplace in Oklahoma. *Id*. The issue was whether the Borough was a "museum,"

---

[10] ECF No. 1 ¶ 189 ("Defendants' reliance on holdings or collections is irrelevant, as the

under Section 3003(a), subject to NAGPRA's inventory and repatriation requirements. *Id*. at 263. The court held that it was not.

The decision is striking because the parties agreed that the Borough had possession and control over the remains, *Thorpe*, 770 F.3d at 262, and because, as the court acknowledged, the statute's definition of "museum," read literally, plainly included the Borough. The relevance of the decision lies in the court's holding that reading NAGPRA to require the disinterment of buried remains was so totally at odds with the statute's purposes as to make adopting the literal meaning of the Act's definition intolerable. Plaintiff does not allege that the Post Cemetery is a museum,[11] so the actual holding does not apply here. But the court's rationale applies fully.

The *Thorpe* court noted, first, that the statutory definition of "museum" – "any institution or State or local government agency . . . that receives Federal funds and has possession of, or control over, Native American cultural items" – is "very broad[]." *Thorpe*, 770 F.3d at 262 (quoting 25 U.S.C. § 3001(8)). Because the defendant Borough was a local government body that had in fact received federal funds, and accepting the parties' agreement that the Borough had possession or control over the disputed remains, a literal reading would make the statute applicable. But, the court noted, Supreme Court precedent allows a different result in those rare situations where "the literal application of a statute will produce a result demonstrably at odds

---

applicable factor is possession or control. *See* 43 C.F.R § 10.1(b)(1)(i) (2023).")

[11] Creating potential confusion, the Complaint does describe the participation of the Army Medical Museum in the gathering of Native American remains "from 1865 through the 1880s." ECF No. 1 ¶ 87 (quoting *Native American Grave and Burial Protection Act (Repatriation); Native American Repatriation of Cultural Patrimony Act; and Heard Museum Report, S. Hrg. 101-952*: *Hearings on S. 1021 and S. 1980 Before the S. Select Comm. on Indian Affs*. (*May 14, 1990 Report),* 101st Cong. 319 (1990)) (statement of Select Committee Vice Chairman Sen. John McCain) at 29). But there can be no real confusion; the Post Cemetery is not a museum (either in common parlance, or under the statutory definition), and the Complaint does not allege that it is.

with the intentions of its drafters." *Id*. at 263 (quoting *First Merchs. Acceptance Corp. v. J.C. Bradford & Co*., 198 F.3d 394, 402 (3d Cir.1999) (quoting *Griffin v. Oceanic Contractors, Inc*., 458 U.S. 564, 571 (1982))). The court cautioned that "only absurd results and 'the most extraordinary showing of contrary intentions' justify a limitation on the 'plain meaning' of the statutory language." *Id*. (quoting *Garcia v. United States*, 469 U.S. 70, 75 (1984)). But even so, and "[a]s the Supreme Court has explained, '[s]tatutory interpretations "which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available."''" *Id*. (second alteration in original) (quoting *First Merchs.*, 198 F.3d at 402). *See also United States v. Rippetoe*, 178 F.2d 735, 737 (4th Cir. 1949) (interpretations that would lead to absurd consequences "should be avoided whenever a reasonable application can be given consistent with the legislative purpose.")

The court then "conclude[d] that we are confronted with the unusual situation in which literal application of NAGPRA 'will produce a result demonstrably at odds with the intentions of its drafters'" and that the court was therefore bound to "look beyond the text of NAGPRA to identify the intentions of the drafters of the statute," because "that intent 'must . . . control[] [our analysis.]'" *Thorpe*, 770 F.3d at 264 (alterations and ellipse in original) (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571 (1982)).

In seeking to "identify the intentions of the drafters of the statute," the court began by identifying NAGPRA's basic aims. Those aims, the court summarized, were twofold, "depending on whether the item in question is held by a federal agency or museum or is discovered on federal lands after November 16, 1990, NAGPRA's effective date." *Id.* at 262 (citing *Pueblo of San Ildefonso v. Ridlon*, 103 F.3d 936, 938 (10th Cir.1996)). "First, the Act

addresses items excavated on federal lands after November 16, 1990 and enables Native American groups affiliated with those items to claim ownership." *Id*. (citations omitted). As we have noted, the parties agree that this aspect of NAGPRA is not implicated here. "Second," the *Thorpe* court continued, "NAGPRA provides for repatriation of cultural items currently held by federal agencies, including federally-funded museums." *Id*. (citations omitted).

The problem, the court observed, was that a literal reading of the term "museum" would require the disinterment of Native American remains under circumstances completely unrelated to those contemplated by the statute's drafters. As the court explained, "NAGPRA requires 'repatriation' of human remains from 'museums,' where those remains have been collected and studied for archeological or historical purposes." *Id*. at 264 (citing 25 U.S.C. § 3005). But, the court concluded, "the definition of 'museum' in the text of NAGPRA sweeps much wider than that."

> If interpreted literally, it would include any state or local governmental entity that "has possession of, or control over, Native American cultural items[ ]" regardless of the circumstances surrounding the possession. This could include any items given freely by a member of the tribe. Here, it would include human remains buried in accordance with the wishes of the decedent's next-of-kin. Literal application would even reach situations where the remains of a Native American were disposed of in a manner consistent with the deceased's wishes as appropriately memorialized in a testamentary instrument or communicated to his or her family.

770 F.3d at 264 (second alteration in original). The court emphasized that judicial interpretations "adopting a restricted rather than a literal or usual meaning of [a statute's] words," where acceptance of the literal or usual meaning "would thwart the obvious purpose of the statute," must have restricted scope. *Id*. at 264. The court in *Thorpe* concluded that the word "museum" as used in NAGPRA plainly fits the rule. *Id*. at 264 (alteration in original) (citation omitted).

Here, it is clear that the congressional intent to regulate institutions such as museums

> and to remedy the historical atrocities inflicted on Native Americans, including plundering of their graves, is not advanced by interpreting "museum" to include a gravesite that Thorpe's widow intended as Thorpe's final resting place. . . As stated in the House Report, "[t]he purpose of [NAGPRA] is to protect Native American burial sites and the removal of human remains."

*Id*. at 264-65 (alterations in original).

In language directly applicable to the instant case, the Third Circuit in *Thorpe* went on to note that the statute should be read to avoid an intolerable result – namely, cemeteries all across the country, if under the management of State agencies or local governments, would be subject to NAGPRA's inventory and repatriation requirements.

> [Thorpe's] burial in the Borough is no different than any other burial, except that he is a legendary figure of Native American descent. If we were to find that NAGPRA applies to Thorpe's burial, we would also have to conclude that it applies to any grave located in "any institution or State or local government agency . . . that receives federal funds and has possession of, or control over, Native American cultural items." This could call into question any "institution" or "State or local government agency" that controls a cemetery or grave site where Native Americans are buried, and would give rights to any lineal descendant or tribe that has a claim to a person buried in such a cemetery.

*Id*. at 265 (ellipse in original). Because this result "would thwart the obvious purpose of the statute," the court concluded that the term "museum" must be construed more narrowly than its statutory definition would literally require.[12]

To read NAGPRA as requiring the unearthing of gravesites, as the court succinctly put it in *Hawk v. Danforth*, "has the Act backwards." 2006 WL 6928114, at *2. Congress confirmed this in the statute's statement of purpose: NAGPRA is "[a]n Act to provide for the *protection* of Native American graves" – not an Act for the *unearthing* of Native American graves. Native American Graves Protection and Repatriation Act, Pub. L. No. 101–601, 104 Stat 3048 (1990)

(codified at 25 U.S.C. § 3000 *et seq*.) (emphasis added). This statement of purpose is "a permissible indicator of [the statute's] meaning." *Bittner v. United States*, 598 U.S. 85, 98 n.6 (2023) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 217 (2012)). Indeed, it is "a key to open the mind of the makers, as to the mischiefs, which are to be remedied, and the objects, which are to be accomplished by the provisions of the statute." *Id*., (quoting 1 Joseph Story, *Commentaries on the Constitution of the United States* § 459, at 443 (1833)).

Here, the Complaint's expansive reading of "holding or collection" would result in exactly the "absurd results" the *Thorpe* court found it necessary to avoid in order to comport with Congressional intent.

The Boarding School Report has identified burial sites "at approximately 53 different schools across the Federal Indian boarding school system," and states that "the Department expects the number of identified burial sites to increase." Boarding School Report at 8, 86. A reading of "holding or collection" as encompassing cemeteries would mean that many (perhaps all) of these cemeteries would be subject to NAGPRA's inventory and repatriation requirements, including potential excavation of remains which, as the *Thorpe* court emphasized, would be contrary to NAGPRA's goals.

And it would not end at Indian schools. The federal government maintains almost 200 national cemeteries. These include 155 cemeteries managed by the Department of Veteran

[12] It may fairly be questioned whether an entity managing a cemetery actually has possession or control of remains buried there, but as noted the Borough chose to concede this point in *Thorpe*.

Affairs[13], 30 by the Department of the Army[14], and fourteen by the National Park Service.[15] The Complaint's reading of "holding and collection" would expand NAGPRA to require that some 200 federally controlled cemeteries be inventoried to determine any Indian affiliation of the buried and, potentially, that thousands of graves be exhumed and their contents relocated. This would be an enormous undertaking. Further, under Plaintiff's reading, such exhumation and relocation – as the *Thorpe* court emphasized – could be required even where the original burials were performed at the request of the decedents or their kin. 770 F.3d at 264. NAGPRA does not contain any indication that this was Congress's intent.

We do not mean to suggest that an inventory of federally controlled gravesites, and potential return of Native American remains interred there, would necessarily be beyond the interests of the federal government. Indeed, at the Post Cemetery, that is exactly what the Army is doing, on its own initiative and at its own expense. *See* Carlisle Research Report; *see also*, *e.g.*, Office of Army Cemeteries Public Affairs, *supra* Footnote 4. Our point, instead, is simply that a nationwide inventory and repatriation effort involving federally controlled cemeteries would be a substantial and costly undertaking without any indication in the text, legislative history, or implementing regulations that this is what Congress intended. It is not for the courts to expand the statute's reach. *Yates v. Collier*, 868 F.3d 354, 369 (5th Cir. 2017) ("[W]hen a statute is silent with respect to a particular subject, we will not construe the statute to nonetheless reach

[13] *See National Cemetery Administration*, U.S. Dep't of Veteran Affairs, https://www.cem.va.gov/find-cemetery/all-national.asp (last visited May 1, 2024).

[14] *See Visit Army Cemeteries*, Office of Army Cemeteries, https://armycemeteries.army.mil/Cemeteries (last visited May 2, 2024)..

[15] *See National Parks & National Cemeteries*, National Park Service, https://www.nps.gov/ande/planyourvisit/np-natcems.htm (last visited May 2, 2024).

the matter.") *See also Whitman v. Am. Trucking Associations*, 531 U.S. 457, 468 (2001) (to find a "fundamental" component in a regulatory scheme, the "textual commitment must be a clear one.")

### C. NAGPRA's Legislative History Confirms That the Statute's Repatriation Requirements do not Apply to Cemeteries

Even if the plain statutory meaning (and judicial interpretations thereof) were not enough, NAGPRA's legislative history also supports a conclusion that Congress did not intend "holdings and collections" to include cemeteries. As regards Sections 3003 and 3005, the legislative history is overwhelmingly concerned with remains held by museums. The references to museums are too numerous to recite; a simple frequency analysis makes the point.[16]

In the main House Report (H.R. Rep. No. 101-877 (1990), *as reprinted in* 1990 U.S.C.C.A.N. 4367) there are **154** references to "museum" and "museums," and **zero** references to "cemetery/ies" or "graveyard/s."[17] In the main Senate Report (S. Rep. No. 101-473 (1990)), there are **108** references to "museum/s" and, again, **zero** references to "cemetery/ies" or "graveyard/s."[18] In the May 17, 1989, Senate Hearing Report (135 Cong. Rec. S5517-5519 (daily ed. May 17, 1989) (statement of Sen. John McCain)), there are **40** references to

---

[16] The scholarly field of "corpus linguistics" applies quantitative analysis to the interpretation of legal texts, often employing usage frequencies. Stefan Th. Gries & Brian G. Slocum, *Ordinary Meaning and Corpus Linguistics*, 2017 B.Y.U. L. Rev. 1417, 1441 (2017). The word frequency numbers offered here present a simple indicator of the problem(s) Congress had in mind (or did *not* have in mind) when formulating NAGPRA.

[17] These numbers were derived by applying the locate function in Microsoft Word to the legislative materials found at the following locations in Westlaw: 1990 WL 200613.

[18] Applied to: 1990 WL 201723,

"museum/s" and, again, **zero** references to "cemetery/ies" or "graveyard/s."[19] In the May 14, 1990, hearing report on the Senate Select Committee on Indian Affairs (*Native American Grave and Burial Protection Act (Repatriation); Native American Repatriation of Cultural Patrimony Act; and Heard Museum Report, S. Hrg. 101-952*: *Hearings on S. 1021 and S. 1980 Before the S. Select Comm. on Indian Affs*. (May 14, 1990 Report), 101st Cong., (1990)) there are **971** references to "museum/s" and **152** references to "cemetery/ies" or "graveyard/s."[20] In the July 17, 1990, Hearing Report of the House Committee on Interior and Insular Affairs (*Protection of Native American Graves and the Repatriation of Human Remains and Sacred Objects, Serial No. 101-62: Hearings on H.R. 1381, H.R. 1646, and H.R. 5237 Before the Comm. on Interior and Insular Affs.* (July 17, 1990 Report), 101st Cong. (1990)) there are **736** references to "museum/s," and **20** references to "cemetery/ies" or "graveyard/s."[21]

As noted, the two cited Committee Reports (which include extensive exhibits) do refer to cemeteries and graveyards, but those references confirm that Congress was not considering the repatriation of remains buried there. The Senate Report, for example, refers to remains at the Smithsonian that were removed from a cemetery on Kodiak Island in the 1930's. May 14, 1990 Report, 101st Cong. at 55. Similarly, Chairman Inouye noted that "there are more skeletal

[19] Applied to: 1989 WL 176078

[20] Applied to: https://1.next.westlaw.com/Link/Document/Blob/I8ae0c16084d811dc817d010000000000.pdf?targetType=GAO&originationContext=document&transitionType=DocumentImage&uniqueId=97f0f2b3-de62-4c45-91ec-04a2e72da09b&ppcid=aaba3d7d72014f408020bc2534e7abb0&contextData=(sc.Keycite)

[21] Applied to: https://1.next.westlaw.com/Link/Document/Blob/I8ab348c084d811dc817d010000000000.pdf?targetType=GAO&originationContext=document&transitionType=DocumentImage&uniqueId=97f0f2b3-de62-4c45-91ec-

remains in these museums than you find in the largest cemetery in the United States." *Id*. at 60. The cited House Committee Report refers repeatedly to the *protection* of cemeteries, not to their exhumation. *See*, *e.g*., July 17, 1990 Report, 101st Cong. at 4, 73, 136, 139, 291.

The Complaint's premise – that NAGPRA requires exhumation of remains from cemeteries – would, it seems, come as a surprise to those who, over several years, labored over the Act's provisions.

The above-referenced legislative history reports on NAGPRA do contain numerous references to federal agencies, albeit far fewer than the references to museums. But the references to agencies do not suggest that in crafting Sections 3003 and 3005 Congress had affirmative disinterment from federal cemeteries in mind. To the contrary, in those few instances where discussion focused on federal agencies, the subject was agencies with major landholdings on which Indian remains had been discovered and collected. Thus, again, the focus is on already extant "holdings" and "collections." To illustrate, the House Committee Report includes the testimony of Henry J. Sockbeson, Senior Staff Attorney of the Native American Rights Fund (NARF). Mr. Sockbeson testified:

> No hard data is available, but NARF has requested most federal agencies and departments which administer federal lands to reveal the number of dead Native American bodies that they possess. To date we have received the following responses:
>
> National Park Service 3,500 bodies
> Tennessee Valley Authority 10,000 bodies
> Bureau of Land Management 109 bodies
> Fish & Wildlife Service 637 bodies
> Air Force 140+bodies
> Navy 85 bodies

---

04a2e72da09b&ppcid=aaba3d7d72014f408020bc2534e7abb0&contextData=(sc.Keycite)

July 17, 1990 Report, 101st Cong. at 58. Similarly, testimony by NARF staff attorney Walter Echo-Hawk before the Senate Select Committee on Indian Affairs reported:

> To obtain census data on Native dead held by federal agencies, NARF is conducting a survey of 17 agencies identified by the National Park Service as having major archaeological programs. To date, only the National Park Service and the Tennessee Valley Authority have supplied figures: From National Park Service lands, about 3,500 Natives have been dug up and are now being warehoused; and the TVA has dug up about 10,000 Native dead from its lands.

May 14, 1990 Report, 101st Cong. at 185. In addition to confirming the fact that Congress's references to federal agencies contemplated agencies' archaeological collections, Mr. Echo-Hawk's testimony confirms that Mr. Sockbeson's references to "bodies" also refers to archaeological remains. And references to the Army typically involve the Army Medical Museum, not graveyards.

> [I]t must be noted that the taking of Indian body parts was official federal government policy under the 1868 Surgeon General's Order to army personnel to procure as many Indian crania as possible for the Army Medical Museum. Under that Order, over 4,000 heads were taken from [battlefields], POW camps and [hospitals], and fresh Indian graves or burial scaffolds across the country, including some from slain warriors of my own Pawnee Tribe.

*See id*. at 186.

This focus on holdings or collections is reflected in the Ninth Circuit's reference to the requirements in NAGPRA Sections 3003 and 3005 as involving "cultural items already held by certain federally funded museums and educational institutions." *White v. Univ. of California*, 765 F.3d 1010, 1016 (9th Cir. 2014). As we noted above, quoting the remarks of the Act's principal sponsors, these sections of NAGPRA represent a reconciliation of the interests of museums with those of Tribes. The court in *White* likewise describes them as a "response to widespread debate surrounding the rights of tribes to protect the remains and funerary objects of their ancestors and

the rights of museums, educational institutions, and scientists to preserve and enhance the scientific value of their collections." *Id*. (citing *Bonnichsen v. United States*, 367 F.3d 864, 874 n. 14 (9th Cir. 2004)); *see also id*. (describing "a process in which meaningful discussions between Indian tribes and museums regarding their respective interests in the disposition of human remains and objects in the museum[s'] collections could be discussed[,] and the resolution of competing interests could be facilitated") (first alteration in original) (quoting S. Rep. No. 101–473, at 4 (1990)).

In sum, the legislative history of NAGPRA confirms that Sections 3003 and 3005, relating to inventorying and repatriating Indian remains, pertain to archaeological collections, not gravesites. And that is no less true when applied to federal agencies than when applied to museums.

### D. NAGPRA's Implementing Regulations Further Confirm That the Statute's Repatriation Requirements do not Apply to Indian Boarding School Burial Sites

The regulations promulgated by the Interior Department also agree with our reading of NAGPRA. As previously noted, Congress delegated to the Secretary of the Interior the authority to issue regulations implementing NAGPRA. 25 U.S.C. § 3011. Section 10.4 of the current regulations details several requirements applicable to the disinterment or discovery of Native American remains occurring after NAGPRA's passage. 43 C.F.R. § 10.4. Comments received on the proposed rule "requested a separate and simplified procedure for boarding school cemeteries on Federal lands." 88 Fed. Reg. 86452-01 at 86487. The agency responded: "We cannot make the requested change for boarding school cemeteries. As stated in the proposed regulations, the Act does not require a Federal agency to engage in an excavation of possible burial sites

(*Geronimo v. Obama*, 725 F. Supp. 2d 182, 187, n. 4 (D.D.C. 2010)).” *Id*.

Similarly, Interior reported that some commenters raised the issue of “disposition of Native American children buried at Indian boarding schools.” Native American Graves Protection and Repatriation Act Systematic Process for Disposition and Repatriation of Native American Human Remains, Funerary Objects, Sacred Objects, and Objects of Cultural Patrimony, 87 Fed. Reg. 63202-01, 63205 (Oct. 18, 2022) (codified at 43 C.F.R. pt. 10). More specifically, the idea was that NAGPRA Section 3002, which deals with Native American remains disinterred after NAGPRA’s passage (either intentionally or inadvertently) provides “a possible method for repatriation of some Native American children” who were buried at Indian Boarding Schools. *Id*. The Interior Department agreed that, under Section 3002, “the intentional excavation provisions of NAGPRA apply to the human remains and cultural items disinterred from cemeteries on Federal or Tribal lands.” *Id*. But NAGPRA does not, Interior emphasized, *require* excavation. *Id*. (“NAGPRA does not require a Federal agency to engage in an intentional excavation of possible burial sites” (citing *Geronimo,* 725 F. Supp. 2d at 187 n.4)). But where excavation is undertaken, the federal agency “must comply with the Act, including the requirements for consultation with (or consent from) the appropriate Indian Tribe . . . (25 U.S.C. 3002(c)) and the order of priority for disposition of human remains (25 U.S.C. 3002(a)).” *Id*. This view, Interior emphasized, does “not conflict with the opinion of the United States Court of Appeals for the Third Circuit in *Thorpe v. Borough of Thorpe*, 770 F.3d 255 (3d Cir. 2014), where the Court ruled that the repatriation provisions of NAGPRA (25 U.S.C. 3005) did not apply to a proposed disinterment and repatriation of human remains.” *Id*.

The Interior Department’s most recent rulemaking process is significant in at least two

ways.

First, the discussion bears directly on Plaintiff's assertion that NAGPRA 3005 requires disinterment and proscribes procedures for disinterment. If Section 3005 applied to federally controlled cemeteries, Section 3002 would be irrelevant with respect to those cemeteries because disinterment and repatriation would already be required. In that case, Interior would have had no reason to explain that Section 3002 would apply where a federal agency such as the Army chooses to disinter Native American remains buried in a cemetery on Federal land. But Interior clearly saw the need for the latter. And—absent an indication of Congressional intent for the outcome—to read Section 3005 to make Section 3002 irrelevant when it comes to federally controlled cemeteries violates the fundamental canon prescribing interpretations that render parts of a statute unnecessary. *Navy Fed. Credit Union v. LTD Fin. Servs., LP*, 972 F.3d 344, 361 (4th Cir. 2020) ("The canon against surplusage is strongest when an interpretation would render superfluous another part of the *same statut[e]*" (alteration in original) (quoting *Marx v. Gen. Revenue Corp*., 568 U.S. 371, 386 (2013)).

Second, the discussion demonstrates Interior's understanding that, as the courts held in *Geronimo* and *Thorpe*, NAGPRA does not require disinterment of Native American remains. To the extent this Court finds that NAGPRA is ambiguous (or silent) on this point, Interior's interpretation is entitled to deference. *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc*., 467 U.S. 837, 844-845 (1984); *People for the Ethical Treatment of Animals v. U. S. Dep't of Agric*., 861 F.3d 502, 506 (4th Cir. 2017) (under *Chevron* "we give plain and unambiguous statutes their full effect; but, where a statute is either silent or ambiguous, we afford deference 'to the reasonable judgments of agencies with regard to the meaning of ambiguous terms [or silence] in

statutes that they are charged with administering'" (quoting *Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 739 (1996)).

## CONCLUSION

The Army is trying to do the right thing in honoring the remains of Samuel Gilbert and Edward Hensley. The Army is trying to do the right thing for all of those interred at the Post Cemetery in Carlisle. This lawsuit will not advance either goal. As a legal matter, this lawsuit *cannot* advance those goals, because the law invoked does not apply. In the Native American Graves Protection and Repatriation Act, Congress, working closely with representatives of Tribes, museums, and other interested parties, created rules and procedures designed to remedy many of the egregious wrongs done to the remains of Native American men, women, and children. But one thing the Act does *not* do is require cemetery managers to unearth the dead. That conclusion is compelled by the plain language of the Act as well as by the Act's legislative history and by its implementing regulations. That conclusion has also been reached by every court that has addressed the issue.

Accordingly, Defendants respectfully request that the Court dismiss the Complaint with prejudice.

Dated: May 3, 2024

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

JESSICA D. ABER
UNITED STATES ATTORNEY

/s/
REBECCA S. LEVENSON
Assistant United States Attorney
Office of the United States Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel: (703) 299-3760
Fax: (703) 299-3983
Email: rebecca.s.levenson@usdoj.gov

TODD KIM
Assistant Attorney General
U.S. Department of Justice
Environment and Natural Resources Division

Peter Kryn Dykema
U.S. Department of Justice
Environment and Natural Resources Division
Natural Resources Section
P.O. Box 663
Washington, D.C. 20044-0482
peter.dykema@usdoj.gov
Phone: (202) 305 0436
Fax: (202) 305 0274

*Counsel for Defendants*

CERTIFICATE OF SERVICE

I hereby certify that I will today file the foregoing using the court's electronic filing system, which will cause service upon all counsel of record.

/s/ *Peter Kryn Dykema*
Peter Kryn Dykema