**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

| | |
|---|---|
| WINNEBAGO TRIBE OF NEBRASKA, a federally recognized Indian Tribe,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF THE ARMY; UNITED STATES DEPARTMENT OF THE ARMY, OFFICE OF ARMY CEMETERIES; CHRISTINE E. WORMUTH, in her official capacity; KAREN DURHAM-AGUILERA, in her official capacity; RENEA C. YATES, in her official capacity; and Lieutenant Colonel PRISCELLA A. NOHLE, in her official capacity,<br><br>Defendants. | Case No. 1:24-cv-00078-CMH-IDD |

**PLAINTIFF WINNEBAGO TRIBE OF NEBRASKA'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

**TABLE OF CONTENTS**


TABLE OF AUTHORITIES ..... ii

INTRODUCTION ..... 1

FACTUAL BACKGROUND ..... 3

STANDARD OF REVIEW ..... 3

ARGUMENT ..... 4

I. Defendants fail to address Winnebago's primary argument that Samuel and Edward must be repatriated because their remains are "Native American human remains" "possessed or controlled" by Defendants. ..... 4

A. Defendants misstate Winnebago's repatriation request as being made under 25 U.S.C. § 3005(a)(1), instead of 25 U.S.C. § 3005(a)(4). ..... 5

B. Defendants fail to address the plain language of 25 U.S.C. § 3005(a)(4) and Winnebago's argument that it is entitled to repatriation pursuant to it. ..... 8

II. Winnebago sufficiently alleged that the remains at Carlisle Cemetery constitute a "holding or collection" subject to NAGPRA. ..... 9

A. The remains at Carlisle Cemetery fit the ordinary meanings of "holding" and "collection," and such interpretations are supported by the Indian canons. ..... 10

B. Winnebago's interpretation of holding or collection is supported by the history of Carlisle and how Defendants have treated and managed the remains historically and in the present day. ..... 13

C. The new regulatory definition of holding or collection does not support Defendants' interpretation. ..... 17

D. Determining that the remains at Carlisle Cemetery constitute a holding or collection is consistent with NAGPRA's legislative history and purpose and Congress's intent. ..... 18

III. None of the cases Defendants rely on support their argument that NAGPRA's repatriation provisions do not apply to remains in the ground. ..... 20

A. *Hawk v. Danforth* and *Geronimo v. Obama* do not support Defendants' position. ..... 21

B. Defendants' reliance on *Thorpe v. Borough of Thorpe* is misplaced. ..... 23

IV. Defendants are not doing the "right thing" by refusing to comply with NAGPRA. ..... 28

CONCLUSION ..... 30

## TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....4

*Becerra v. San Carlos Apache Tribe*,
No. 23-250, 2024 WL 2853107 (U.S. June 6, 2024)....27

*Carlton & Harris Chiropractic, Inc. v. PDR Network, LLC*,
80 F.4th 466 (4th Cir. 2023)....4

*Fox v. Portico Reality Services Office*,
739 F. Supp. 2d. 912 (E.D. Va. 2010)....11

*Geronimo v. Obama*,
725 F. Supp. 2d 182 (D.D.C. 2010)....21, 22

*Haaland v. Brackeen*,
599 U.S. 255 (2023)....14, 27

*Hawk v. Danforth*,
No. 06-C-223, 2006 WL 6928114 (E.D. Wis. Aug. 17, 2006)....21

*Menders v. Loudoun Cnty. Sch. Bd.*,
580 F. Supp. 3d 316 (E.D. Va. 2022)....4

*Montana v. Blackfeet Indian Tribe*,
471 U.S. 759 (1985)....10

*Nahigian v. Juno Loudoun, LLC*,
684 F. Supp. 2d 731 (E.D. Va. 2010)....4

*N.C. Dep't of Env't Quality v. Federal Energy Regulatory Comm'n*,
3 F.4th 655 (4th Cir. 2021)....11

*Oneida Cnty v. Oneida Indian Nation of New York State*,
470 U.S. 226 (1985)....10, 11

*Roe v. Tucker*,
No. 3:22cv749 (RCY), 2023 WL 4353699 (E.D. Va. July 5, 2023)....3, 4

*Thorpe v. Borough of Thorpe*,
770 F.3d 255 (3d Cir. 2014)....23, 24, 25, 26

*United States v. Smith*,
925 F.3d 410 (9th Cir. 2019) ........................................................18

*United States v. Young*,
989 F.3d 254 (4th Cir. 2021) ........................................................10

*Virginia is for Movers, LLC v. Apple Federal Credit Union*,
No. 1:23CV576 (DJN), 2024 WL 1091786 (E.D. Va. Mar. 13, 2024) ..........4

*White v. University of California*,
765 F.3d 1010 (9th Cir. 2014) ........................................................20

**Statutes**

18 U.S.C. § 1170 ........................................................19

25 U.S.C. § 3001 ........................................................*passim*

25 U.S.C. § 3002 ........................................................19

25 U.S.C. § 3003 ........................................................6

25 U.S.C. § 3005 ........................................................*passim*

25 U.S.C. § 3010 ........................................................11

25. U.S.C. § 3011 ........................................................11

25 U.S.C. § 3013 ........................................................7, 30

**Regulations**[1]

43 C.F.R. § 10.1 (2023) ........................................................7, 29, 30

43 C.F.R. § 10.2 (2023) ........................................................5, 6, 17, 27

43 C.F.R. § 10.2 ........................................................5, 16, 17, 27

43 C.F.R. § 10.10 (2023) ........................................................30

43 C.F.R. § 10.10 ........................................................30

[1] Citations to the 2023 version of the Code of Federal Regulations include a parenthetical with the year. Citations to the current version are not dated.

Army Regulation 290-5, *available at* https://armypubs.army.mil/epubs/DR_pubs/DR_a/ARN31366-AR_290-5-001-WEB-2.pdf .29

**Executive Materials**

87 Fed. Reg. 63,202 (Oct. 18, 2023) ....................17, 23

88 Fed. Reg. 86,452 (Dec. 13, 2023) ....................17

U.S. DEP'T OF INTERIOR, FEDERAL INDIAN BOARDING SCHOOL INITIATIVE INVESTIGATIVE REPORT (May 2022), *available at* https://www.bia.gov/sites/default/files/dup/inlinefiles/bsi_investigative_report_may_2022_508.pdf ....................14

**Congressional Materials**

S. Rep. No. 101-473 (1990) ....................19

*Native American Grave and Burial Protection Act (Repatriation): Hearing on S. 1021 and S. 1980 before Select Committee on Indian Affairs*, 101 Cong. (1990) ....................15, 16, 18, 19

**Additional Authorities**

*Accumulate*, MERRIAM-WEBSTER DICTIONARY ONLINE, https://www.merriam-webster.com/dictionary/accumulate ....................12

Addie C. Rolnick, *Untangling the Web: Juvenile Justice in Indian County*, 19 N.Y.U. J. LEGIS. & PUB. POL'Y 49 (2016) ....................14

Casey Cep, *Deb Haaland Confronts the History of the Federal Agency She Leads*, NEW YORKER, (Apr. 29, 2024), *available at* https://www.newyorker.com/magazine/2024/05/06/deb-haaland-confronts-the-history-of-the-federal-agency-she-leads ....................2

*Collection*, MERRIAM-WEBSTER DICTIONARY ONLINE, https://www.merriam-webster.com/dictionary/collections ....................12

Complaint, *Geronimo v. Obama*, No. 1:09-cv-00303-RWR (D.D.C. filed Fed. 17, 2009) ....................22

*Holding*, MERRIAM-WEBSTER DICTIONARY ONLINE, https://www.merriam-webster.com/dictionary/holding ....................11, 12

Jack F. Trope & Walter R. Echo-Hawk, *The Native American Graves Protection and Repatriation Act: Background and Legislative History*, 24 ARIZ. ST. L.J. 35 (1992) ....................10, 18

Matthew L.M. Fletcher & Wenona T. Singel, *Indian Children and the Federal-Tribal Trust Relationship*, 95 NEB. L. REV. 885 (2017)....................14

*Object*, MERRIAM-WEBSTER DICTIONARY ONLINE, https://www.merriam-webster.com/dictionary/objects....................12

*Welcome*, DICKINSON COLLEGE, https://carlisleindian.dickinson.edu/ (last visited June 6, 2024) 16

Wambdi A. Was'tesWinyan, *Permanent Homelands Through Treaties with the United States: Restoring Faith in the Tribal Nation-U.S. Relationship in Light of the* McGirt *Decision*, 47 MICHELL HAMLINE L. REV. 640 (2021) ....................14

## INTRODUCTION

In 1895, Captain W. H. Beck, United States Army ("Army"), Indian Agent of the Omaha and Winnebago Indian Agency, sent Samuel Gilbert and Edward Hensley from their home on Plaintiff Winnebago Tribe of Nebraska's ("Winnebago") reservation to Carlisle Indian Industrial School ("Carlisle Indian School" or "Carlisle"). Pl.'s Compl. ¶ 36, ECF No. 1 (hereinafter "Compl."). Samuel and Edward would never return to Winnebago, as they died as a result of their time at Carlisle. *Id.* ¶¶ 38, 43. After their deaths, Carlisle and Army officials failed to notify Winnebago and the families of Samuel's and Edwards deaths, depriving them of any chance to bring the boys' remains home and give them proper Winnebago burials. *Id.* ¶ 45. Since their deaths, Congress passed the Native American Graves Protection and Repatriation Act ("NAGPRA" or "the Act"). NAGPRA is designed to ensure that misappropriated "Native American human remains",[2] like those of Samuel and Edward, are returned to their culturally affiliated Indian Tribes for proper burials. Today, Winnebago seeks to enforce its rights under NAGPRA to bring Samuel and Edward home and finally lay them to rest in their intended final resting place.

Samuel's and Edward's disposition in Carlisle Cemetery originates with the federal Indian boarding school era, during which the United States took Indian children, often by force and without consent, from their families and Tribal communities to assimilate them into Euro-American culture. Winnebago, like many other Indian Tribes, tried to protect its children from this fate. Winnebago hid its children in the woods to protect them from being abducted by Army soldiers. Other Indian Tribes resisted too, but the United States would not be deterred, using coercive and forcible tactics to achieve its ends. The United States was so relentless that by 1926,

---

[2] 25 U.S.C. 3001(13).

"more than eighty per cent of school-age Indian children had been removed from their families." Casey Cep, *Deb Haaland Confronts the History of the Federal Agency She Leads*, NEW YORKER, (Apr. 29, 2024), *available at* https://www.newyorker.com/magazine/2024/05/06/deb-haaland-confronts-the-history-of-the-federal-agency-she-leads. While the number is unknown, many Indian children, like Samuel and Edward, died at federal Indian boarding schools. Indian Tribes are now tasked with the horrific responsibility of locating and bringing the remains of their children home from places they never should have been in the first place.

Defendants have exacerbated these challenges by violating NAGPRA and refusing to honor Winnebago's request to repatriate Samuel and Edward from Carlisle Cemetery. Defendants' stance is not only unconscionable, but their arguments for why they are exempt from federal law are irreconcilable with NAGPRA's plain language. Defendants' actions defy the purpose of NAGPRA, which recognizes the right of Indian Tribes to bring their relatives home expeditiously and in a culturally appropriate manner, and equips Tribes with meaningful, enforceable legal mechanisms.

Defendants' Motion to Dismiss should be denied, as Winnebago has pled facts sufficient to be entitled to relief, as supported on two distinct legal grounds. First, under the plain language of NAGPRA's repatriation provisions, Samuel and Edward must be repatriated because they are "Native American human remains . . . possessed or controlled by" Defendants. 25 U.S.C. § 3005(a). Alternatively, Winnebago has pled facts sufficient to establish that the remains at Carlisle Cemetery are a "holding or collection," under the ordinary meaning of those terms and are thus subject to NAGPRA's repatriation provisions. Defendants' historical and present-day mistreatment and misappropriation of the human remains buried at Carlisle Cemetery

demonstrate Defendants understand the Cemetery to be, and hold it out as, a holding or collection. None of the cases relied on by Defendants support their interpretations and defenses.

NAGPRA was passed because Native American human remains and burials have long been stolen, looted, and abused. NAGPRA recognizes Indian Tribes share the basic universal right as all others to handle and bury the remains of their relatives in accordance with their cultures and traditions. This is all Winnebago seeks to vindicate in repatriating their boys.

## FACTUAL BACKGROUND

On October 16, 2023, Winnebago sent a formal letter to Defendants requesting the repatriation of the remains of Samuel and Edward from Carlisle Cemetery pursuant to NAGPRA, specifically to 25 U.S.C. § 3005(a)(4). Compl. ¶ 123. On December 11, 2023, Defendants denied this request and asserted that NAGPRA does not apply to the return of remains from Carlisle Cemetery. *Id.* ¶ 129. On January 17, 2024, Winnebago filed an action for declaratory and injunctive relief seeking the repatriation of its children pursuant to NAGPRA and to prevent other ongoing violations of the Act.

Winnebago's Complaint provides detailed factual allegations regarding how Defendants violated NAGPRA by refusing to repatriate Samuel's and Edward's remains in accordance with the Act. Defendants moved to dismiss Plaintiff's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. As detailed below, Winnebago alleged facts sufficient to satisfy the lenient pleading standard of Federal Rule of Civil Procedure 8, and Defendants' Motion should be denied.

## STANDARD OF REVIEW

Winnebago satisfies the pleading requirements of Rule 8. As such, Winnebago easily overcomes "the low bar required to survive a Motion to Dismiss[.]" *Roe v. Tucker*, No.

3:22cv749 (RCY), 2023 WL 4353699, at *4 (E.D. Va. July 5, 2023). To overcome a motion to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6), a plaintiff must only state a plausible claim for relief. *Nahigian v. Juno Loudoun, LLC*, 684 F. Supp. 2d 731, 736-37 (E.D. Va. 2010). In determining whether a plaintiff satisfies this standard, courts assume the truth of all well-pleaded factual allegations and views the complaint in a light most favorable to the plaintiff. A complaint is facially plausible when the plaintiff pleads factual content that allows a court to draw a reasonable inference that the defendant is liable for the alleged conduct. *Menders v. Loudoun Cnty. Sch. Bd.*, 580 F. Supp. 3d 316, 323 (E.D. Va. 2022) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)) (cleaned up). Courts construe all reasonable inferences in favor of the plaintiff. *Carlton & Harris Chiropractic, Inc. v. PDR Network, LLC*, 80 F.4th 466, 472 (4th Cir. 2023). A claim will survive a motion to dismiss as long as it is supported by factual allegations that would entitle the plaintiff to relief under at least one cognizable legal theory. The rules "do not countenance dismissal of a complaint for an imperfect statement of the legal theory supporting the claim asserted." *Va. is for Movers, LLC v. Apple Fed. Credit Union*, No. 1:23CV576 (DJN), 2024 WL 1091786, at *13, n.18 (E.D. Va. Mar. 13, 2024) (cleaned up).

For Defendants' motion to succeed, they must establish that none of Winnebago's claims are supported by allegations that would entitle Winnebago to relief under *any* cognizable legal theory. As set forth below, Defendants fail to meet their burden.

## ARGUMENT

### I. Defendants fail to address Winnebago's primary argument that Samuel and Edward must be repatriated because their remains are "Native American human remains" "possessed or controlled" by Defendants.

Defendants do not address Winnebago's primary argument that Defendants are required to repatriate Samuel and Edward pursuant to the plain language of 25 U.S.C. § 3005(a)(4) because they are "Native American human remains"[3] "possessed or controlled" by Defendants and are culturally affiliated with Winnebago. Defendants did not dispute these facts in their letter denying Winnebago's NAGPRA repatriation request, nor in their motion to dismiss. *See* Def.s' Mem. In Supp. of Mot. to Dismiss, ECF No. 31, 6, 8, (hereinafter "Def.s' Mot."). Defendants' failure to address the plain language of § 3005(a)(4) is fatal to their motion. Winnebago has pled allegations that, if true, entitle it to repatriation under § 3005(a)(4). Defendants' arguments that the remains at Carlisle Cemetery are not part of a "holding or collection" are not responsive to Winnebago's primary legal argument. As such, the Court may deny Defendants' motion without addressing whether Samuel's and Edward's remains are part of a holding or collection.

**A. Defendants misstate Winnebago's repatriation request as being made under 25 U.S.C. § 3005(a)(1), instead of 25 U.S.C. § 3005(a)(4).**

NAGPRA provides for the "[r]epatriation of Native American human remains . . . possessed or controlled by Federal agencies and museums[.]" 25 U.S.C. § 3005(a). NAGPRA's repatriation provisions may apply regardless of whether the remains are part of a holding or collection. *See generally id*. § 3005. Generally, § 3005(a) establishes the procedures by which Native American human remains and other "cultural items"[4] are repatriated to Indian Tribes. Two subsections of § 3005(a)—*i.e.*, § 3005(a)(1) and § 3005(a)(4)—establish the procedures for

[3] NAGPRA defines "Native American human remains" as encompassing only remains of Native Americans that *were not freely given*; that is, remains to which a museum or federal agency does not have a "right of possession." 25 U.S.C. § 3001(13); 43 C.F.R. § 10.2(d)(1) (2023); 43 C.F.R. § 10.2. As Winnebago has thoroughly pled, Samuel's and Edward's remains were not freely given, and Defendants cannot prove they have a right of possession to their remains. *See* Compl. ¶¶ 5, 11, 41, 49, 51, 211, 261, 276.

[4] "Cultural items" includes human remains, associated and unassociated funerary objects, sacred objects, and cultural patrimony. 25 U.S.C. § 3001(3).

repatriation of human remains in specific circumstances. Defendants fail to recognize the critical differences between when § 3005(a)(1) and § 3005(a)(4) apply.

Section 3005(a)(1) concerns repatriation of human remains and cultural items whose cultural affiliation has been determined in an inventory of a holding or collection pursuant to 25 U.S.C. § 3003(a). *Id*. § 3005(a)(1). On the other hand, § 3005(a)(4) concerns repatriation of human remains and cultural items whose cultural affiliation has not been determined in an inventory of a holding or collection or that are excluded from a holding or collection but are nonetheless still possessed or controlled by an agency or museum. *Id*. § 3005(a)(4). Section 3005(a)(4) requires the repatriation of human remains or cultural items upon request of an Indian Tribe who "can show cultural affiliation by a preponderance of the evidence based upon geographical, kinship, biological, archaeological, anthropological, linguistic, folkloric, oral traditional, historical, or other relevant information or expert opinion." *Id*. The applicability of § 3005(a)(4) turns only on whether the human remains or cultural items are "possessed or controlled" by a federal agency. Thus, unlike § 3005(a)(1), § 3005(a)(4) is not limited to human remains and cultural items that have been inventoried as part of a holding or collection or included within a holding or collection.

In support of its primary argument on the merits for both of its claims, Winnebago only has to plead factual allegations to establish the following: first, that Samuel's and Edward's remains are "Native American human remains"; that is, they are human remains of Native Americans that were not freely given and Defendants do not have a right of possession, 43 C.F.R. § 10.2(d)(1) (2023); 25 U.S.C. § 3001(13); second, that their remains are in the Defendants' possession or control, 25 U.S.C. § 3005(a); third, that Winnebago requested their repatriation and demonstrated cultural affiliation by a preponderance of the evidence, *id*. §

3005(a)(4); and fourth, that Defendants denied Winnebago's repatriation request. *Id.* § 3013; 43 C.F.R. § 10.1(b)(3) (2023). Winnebago's Complaint sufficiently pleads allegations—which are undisputed—that establish these elements.

Instead of addressing Winnebago's argument head on, Defendants falsely attribute the language of § 3005(a)(1) to § 3005(a), making it appear as though all of NAGPRA's repatriation provisions are applicable only to Native American human remains that have been inventoried, pursuant to § 3003, as part of a holding or collection.[5] In so doing, Defendants also ignore the specific provision under § 3005(a), § 3005(4), pursuant to which Winnebago made its repatriation request. Defendants incorrectly assert that all repatriations under § 3005(a) require remains be within a holding or collection per § 3003. In support of this, Defendants cite to § 3005(a) and quote the statute as set forth below:

> "If, pursuant to section 3003 . . . the cultural affiliation of Native American human remains . . . with a particular Indian . . . is established, then the Federal agency or museum, upon the request of a known lineal descendant of the Native American or of the tribe . . . and pursuant to subsections (b) and (e) of this section, shall expeditiously return such remains . . ."

Def.'s Mot. 13-14 (alterations in original).

This language, however, is not actually found at § 3005(a). Rather, this language is in § 3005(a)(1). Despite Defendants' suggestion, § 3005(a) is a section title that does not mention holdings or collections or inventories, let alone cabins all repatriations to only human remains that are in holdings or collections. Instead, § 3005(a) affirms that NAGPRA's repatriation provisions apply broadly to human remains "possessed or controlled by Federal agencies and museums[.]" By misattributing § 3005(a)(1)'s language to § 3005(a) generally, Defendants

---

[5] Nowhere in their motion do Defendants explicitly reference § 3005(a)(1) or § 3005(a)(4). Instead, Defendants only generally cite § 3005(a) and obfuscate the specific statutory provision pursuant to which Winnebago made its repatriation request.

falsely suggest that § 3005(a)(1) is the sole provision that governs the repatriation of human remains. Defendants thus suggest that *all* repatriations are limited to human remains that are part of inventoried holdings or collections, ignoring § 3005(a)(4) entirely.

**B. Defendants fail to address the plain language of 25 U.S.C. § 3005(a)(4) and Winnebago's argument that it is entitled to repatriation pursuant to it.**

Defendants' argument ignores, or fails to recognize, that § 3005(a) contemplates multiple circumstances under which human remains can be repatriated; these circumstances are delineated in both § 3005(a)(1) and § 3005(a)(4). Section § 3005(a)(4) provides for repatriation where remains are not necessarily part of a holding or collection:

> Where cultural affiliation of Native American human remains and funerary objects *has not been established in an inventory prepared pursuant to section 3003* of this title, or the summary pursuant to section 3004 of this title, *or where Native American human remains and funerary objects are not included upon any such inventory*[.]

*Id*. § 3005(a)(4) (emphasis added). Section 3005(a)(4) contemplates repatriations occurring under two scenarios distinct from repatriations occurring under § 3005(a)(1). First, § 3005(a)(4) contemplates repatriation where a federal agency or museum has not established the cultural affiliation of Native American human remains and funerary objects pursuant to an inventory. *Id.* Nothing in the plain language of this scenario requires the remains or objects be part of a holding or collection. This first scenario simply allows for repatriation in situations where an inventory was not created to establish the cultural affiliation of remains or objects in the possession or control of a federal agency or museum.

The second scenario in § 3005(a)(4) contemplates repatriation where a federal agency or museum did not include Native American human remains in any inventory. *Id*. The plain language of this provision does not require that the remains or objects be part of a holding or collection either. This scenario simply pertains to situations where an inventory was created but

the remains or objects in question were not included in the inventory (*e.g.*, where a federal agency or museum purposefully excluded such remains from an inventory).

Defendants' argument is premised on the assertion that repatriation applies only to human remains that have been inventoried. Def.'s Mot. 8-15. This inventory requirement, Defendants assert, proves that the remains must be part of a holding or collection, since the inventory provision applies only to holdings and collections. *Id*. Yet, as discussed above, both scenarios described in § 3005(a)(4) specifically allow for repatriation of human remains that are not in inventories. This refutes Defendants' assertion that § 3005(a) requires human remains be in a holding or collection to be eligible for repatriation. In fact, § 3005(a)(4) contemplates the exact opposite, that human remains or cultural items must simply be in the possession or control of a federal agency or museum to be subject to repatriation.

Samuel's and Edward's remains are undisputedly Native American human remains, are in Defendants' possession and control, and are culturally affiliated with Winnebago. Winnebago requested repatriation of them pursuant to § 3005(a)(4), which requires Defendants to expeditiously repatriate the remains. Despite Winnebago establishing its right to repatriate Samuel and Edward, Defendants denied Winnebago's request. Winnebago has stated plausible allegations which, if true, entitle it to the declaratory and injunctive relief necessary to enjoin Defendants to repatriate Samuel and Edward to Winnebago, pursuant to NAGPRA. On this basis alone, Defendants' motion fails.

## II. Winnebago sufficiently alleged that the remains at Carlisle Cemetery constitute a "holding or collection" subject to NAGPRA.

Even if Defendants are correct that repatriation applies only to Native American human remains that are part of a museum's or federal agency's holding or collection, Samuel and Edward must nevertheless be repatriated, as the remains at Carlisle Cemetery constitute a

holding or collection. Between the ordinary meanings of the terms "holding" and "collection," application of the Indian canons of construction, Defendants' own conduct and treatment of the remains, and the legislative history and congressional intent of NAGPRA, it is clear that the remains at Carlisle Cemetery constitute a holding or collection. Consistent with the lenient pleading standard in Rule 8 and the requirement to construe all reasonable inferences in favor of the plaintiff, Winnebago has pled a plausible claim for relief under this alternative theory.

**A. The remains at Carlisle Cemetery fit the ordinary meanings of "holding" and "collection," and such interpretations are supported by the Indian canons.**

NAGPRA does not define "holding or collection." *See* 25 U.S.C. § 3001. Generally, when a statute does not define a term, courts give the term its ordinary meaning. *See United States v. Young*, 989 F.3d 254, 259 (4th Cir. 2021). Here, however, since NAGPRA implicates Tribal rights and interests, the standard principles of statutory interpretation are supplemented by the Indian canons of construction. *See Montana v. Blackfeet Indian Tribe*, 471 U.S. 759, 766 (1985) (acknowledging "that the standard principles of statutory construction do not have their usual force in cases involving Indian law."). The Court's interpretation of NAGPRA and the term holding or collection are governed by the Indian canons of construction. *See* Jack F. Trope & Walter R. Echo-Hawk, *The Native American Graves Protection and Repatriation Act: Background and Legislative History*, 24 ARIZ. ST. L.J. 35, 76 (1992) ("In interpreting NAGPRA, it is critical to remember that it must be liberally construed as remedial legislation to benefit the class for whom it was enacted.").

The Indian canons are binding rules for interpreting statutes, like NAGPRA, that implicate Tribal rights and interests. The canons "are rooted in the unique trust relationship between the United States and the Indians." *Oneida Cnty. v. Oneida Indian Nation of N.Y. State*, 470 U.S. 226, 247 (1985). Indeed, NAGPRA itself states that it "reflects the unique relationship

between the Federal Government and Indian tribes[.]" 25 U.S.C. § 3010. The Indian canons provide that "statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." *Oneida Cnty.* 470 U.S. at 247 (citation omitted); *see Fox v. Portico Reality Servs. Office*, 739 F. Supp. 2d. 912, 922 (E.D. Va. 2010) ("[A]s a general matter, statutes must be construed in favor of Native Americans[.]"). Thus, while Winnebago and Defendants interpret the definitions of the terms holding and collection differently, the Indian canons require the Court to construe the definitions favorable to Indian Tribes.

Defendants construe the dictionary definitions of holding and collection as narrowly as possible to argue that the remains at Carlisle Cemetery do not meet the ordinary meaning given to these terms. *See* Def.'s Mot. 15-16. According to Defendants, "these definitions capture the everyday sense that a 'collection' is an *accumulation of things* for science, culture, or curiosity, and a 'holding' is an *accumulation* of assets." *Id*. at 16 (emphasis in original). Defendants submit that these "terms naturally apply to a museum's or federal agency's inventory of previously excavated remains[,]" but not "to burials in a cemetery." *Id.*[6] Defendants, however, do not provide any analysis or explain how exactly the remains at Carlisle Cemetery do not satisfy these definitions. Instead, Defendants simply proclaim it to be so. This is unsurprising, as even a cursory examination of the ordinary meanings of holding and collection confirms that the remains at Carlisle Cemetery fit neatly.

"Holding" is defined as "property (such as land or securities) owned" and "something that holds[.]" *Holding*, MERRIAM-WEBSTER DICTIONARY ONLINE, https://www.merriam-

[6] Defendants are afforded no deference in interpreting NAGPRA. *Accord N.C. Dep't of Env't. Quality v. Fed. Energy Regulatory Comm'n*, 3 F.4th 655, 666-67 (4th Cir. 2021) ("Because FERC does not administer the Clean Water Act, *we owe no deference to its interpretation* of § 401.") (emphasis added, citations omitted)); *see* 25. U.S.C. § 3011.

webster.com/dictionary/holding. Defendants assert that the remains at Carlisle Cemetery cannot be a holding because the remains buried there are not "an accumulation of assets," Def.'s Mot. 16, (emphasis removed), *i.e.*, "property." A cemetery is, by its very nature, "something that holds" human remains. Moreover, Defendants' constrained interpretation belies the facts, namely that Defendants exercise complete control over the remains at Carlisle Cemetery today and historically. This is perhaps most strongly evidenced in their unilateral imposition of the Office of Army Cemeteries ("OAC") Disinterment and Return Process specific to Carlisle Cemetery, *see* Compl. ¶¶ 131, 134-58, by which they arbitrarily dictate the removal and disposition of remains.

"Collection" is defined as "something collected[,]" such as "an accumulation of objects gathered for study, comparison, or exhibition or as a hobby[,]" and a "group [or] aggregate[,]" such as "a collection of symptoms." *Collection*, MERRIAM-WEBSTER DICTIONARY ONLINE, https://www.merriam-webster.com/dictionary/collections. Defendants submit that the remains at Carlisle Cemetery do not constitute a collection because they are not "an accumulation of things[.]" Def.'s Mot. 16 (emphasis removed). Defendants' unduly narrow view is not supported by the dictionary definitions, particularly when construed liberally in favor of Winnebago, and considered in light of the factual circumstances surrounding Defendants' treatment of the remains and the Indian canons. "Accumulate" is defined as "to gather[.]" *Accumulate*, MERRIAM-WEBSTER DICTIONARY ONLINE, https://www.merriam-webster.com/dictionary/accumulate. An "object" is defined as "something material that may be perceived by the senses[.]" *Object*, MERRIAM-WEBSTER DICTIONARY ONLINE, https://www.merriam-webster.com/dictionary/objects. Human remains are undoubtedly objects, and the remains at Carlisle Cemetery have been, in the most literal sense, gathered or grouped. This is tragically demonstrated when, in 1927,

Defendants dug up the remains, gathered them together, put them into small boxes, and reburied them in what is now Carlisle Cemetery. Compl. ¶¶ 62-63, 202. Defendants now label them as "INDIANS WHO DIED WHILE ATTENDING THE CARLISLE INDIAN SCHOOL." Compl. ¶ 202. As described more fully *infra* Section II.B, Defendants treat Carlisle Cemetery as a holding or collection.

The remains at Carlisle Cemetery clearly fit the ordinary meaning of both holding and collection, especially when these terms are construed liberally in favor of Winnebago and all ambiguities are resolved in favor of Winnebago.

**B. Winnebago's interpretation of holding or collection is supported by the history of Carlisle and how Defendants have treated and managed the remains historically and in the present day.**

How Samuel and Edward came to be buried at Carlisle Cemetery, Defendants' historical treatment of the remains buried at Carlisle Cemetery, and Defendants' current management of the Cemetery support Winnebago's interpretation that the Cemetery is a holding or collection. Unsurprisingly, Defendants do not address the historical circumstances surrounding Samuel's and Edward's deaths, their initial burials, and their subsequent disinterment and reburials at Carlisle Cemetery. Nor do Defendants address how they currently manage the Cemetery as a museum exhibit and tourist attraction. Instead, they simply assert that the remains cannot be a holding or collection because they are buried in a cemetery. Defendants claim that cemeteries, including Carlisle Cemetery, are where "we commemorate and honor the dead." Def.'s Mot. 16. But Defendants have never, and do not now, honor Samuel and Edward at Carlisle Cemetery. Instead, Defendants' historical and contemporary actions demonstrate that Defendants hold the remains at Carlisle Cemetery out as a holding or collection.

As Winnebago recounted in its complaint, how the collection of Native American human remains ended up at the Carlisle Cemetery begins with the history of the Carlisle Indian School. *See* Compl. ¶¶ 25-78. Carlisle Indian School was a model for 408 other institutions around the country whose goal was "destroying tribal identity and assimilating Indians into broader society." *Haaland v. Brackeen*, 599 U.S. 255, 298-99 (2023) (Gorsuch, J., concurring) (citations omitted). As Carlisle's founder, U.S. Army Captain Richard Henry Pratt, described Carlisle's mission: "All the Indian there is in the race should be dead. Kill the Indian in him, and save the man." *Id*. at 299 (cleaned up). Naturally, Indian Tribes and families resisted sending their children to these boarding schools. *Id*. Undeterred, Congress authorized the Department of the Interior to starve Tribal communities until they gave up their children. *Id*. When this failed, the government "sometimes resorted to abduction." *Id*. (citation omitted). The federal government's literal kidnapping of children into the federal boarding school program is well-documented. *See, e.g.*, Wambdi A. Was'tesWinyan, *Permanent Homelands Through Treaties with the United States: Restoring Faith in the Tribal Nation-U.S. Relationship in Light of the* McGirt *Decision*, 47 MICHELL HAMLINE L. REV. 640, 660 (2021).[7]

Children's tenures at federal Indian boarding schools were brutal. *See Brackeen*, 599 U.S. at 300-01 (Gorsuch, J., concurring) (describing the horrific conditions and rampant sexual, physical, and emotional abuse at Indian boarding schools); *see also* U.S. DEP'T OF INTERIOR, FEDERAL INDIAN BOARDING SCHOOL INITIATIVE INVESTIGATIVE REPORT 8, 56-57, 59-63 (May 2022), *available at* https://www.bia.gov/sites/default/files/dup/inlinefiles/bsi_investigative_report_may_2022_508.pdf. As a result of the harsh and abusive conditions, many children, like

---

[7] *See also* Addie C. Rolnick, *Untangling the Web: Juvenile Justice in Indian County*, 19 N.Y.U. J. LEGIS. & PUB. POL'Y 49, 63 (2016); Matthew L.M. Fletcher & Wenona T. Singel, *Indian Children and the Federal-Tribal Trust Relationship*, 95 NEB. L. REV. 885, 891 (2017).

Samuel and Edward, died during and because of their tenure at federal Indian boarding schools. Carlisle Indian School itself led to the deaths of at least 179 children before it was closed. Compl. ¶ 55. The legacy of the forcible taking of children to Carlisle Indian School is inextricably intertwined with why the remains are now buried at Carlisle Cemetery.

The injustices did not end with the children's deaths. When children died, Carlisle officials did not inform their families or Indian Tribes and originally buried them on the School's grounds, at the "Indian burial ground," without their families' or Indian Tribes' consent. *Id*. ¶¶ 56-57. After Carlisle Indian School closed, the federal government let the Indian burial ground fall into a state of disrepair and many of the grave markers rotted away. *Id*. ¶ 61. In 1926, the Army wanted to expand the Army War College, and saw the Indian burial ground as "an obstacle to the expansion of the post." *Id*. In 1927, the Army, again without informing or seeking consent of families or Indian Tribes, dug up the remains at the Indian burial ground and moved them to their current location, at Carlisle Cemetery. *Id*. ¶ 65. This work was hasty and disorganized. *Id*. ¶¶ 65-71.

As set forth in Winnebago's Complaint, when Samuel and Edward died, the Army never provided notice of their deaths to the boys' families or Winnebago. *Id*. ¶¶ 40-41, 45-46. The Army also never sought the consent of Samuel's and Edward's families or Winnebago to bury them at Carlisle. Nor did the Army seek the families' or Winnebago's consent to disinter and rebury them in 1927. In fact, the Army never provided notice of Samuel's and Edward's deaths, burials, disinterments, or reburials to their families or Winnebago. The boys were not buried according to Winnebago beliefs, customs, and practices,[8] and their headstones misspell

[8] *See Native American Grave and Burial Protection Act (Repatriation): Hearing on S. 1021 and S. 1980 before Select Comm. on Indian Affs.*, 101 Cong. at 51 (1990) (statement of Walter Echo-

"Winnebago." Compl. ¶¶ 11, 72-73. Accordingly, Samuel's and Edward's spirits remain lost and unable to rest, as they have been waiting to come for nearly 125 years. *Id*. ¶ 12. While Defendants claim they honor the dead at Carlisle Cemetery just as they would at any cemetery, they conveniently ignore this history.

The injustices have not ended, as Defendants continue to exploit the remains at Carlisle Cemetery for educational, exhibitive, interpretive, preservation, public benefit, and any other purposes they deem fit. *See* 43 C.F.R. § 10.2. Defendants conduct tours of the Carlisle Barracks, which focus on its history as a federal Indian boarding school. Compl. ¶ 201. The Cemetery is one of the stops on these tours. *Id*. ¶ 202. Defendants exhibit the Cemetery to whitewash the history of Carlisle, as explained in detail in Winnebago's Complaint. *See id*. ¶¶ 200-14. Defendants' website for the Carlisle Cemetery describes the Cemetery as "[s]mall, *orderly and historical*, the Carlisle Cemetery *offers visitors a glimpse into the unique past of the United States and Native American history*." *Id*. ¶ 207. Defendants' website invites visitors to seek further information in a "Digital Resource Center" hosted by Dickinson College. *Id*. ¶ 213. This Digital Resource Center is a repository of documents related to Carlisle and describes Carlisle and the Cemetery "as a source of study for students and scholars around the globe." *Welcome*, DICKINSON COLL., https://carlisleindian.dickinson.edu/ (last visited June 6, 2024). Indeed, an archival research report commissioned by Defendants specifically describes the Cemetery "as a repository for the remains of Indian school students." Compl. ¶ 204. The nature and extent of Defendants' exploitation of the remains in this manner is some of the most compelling evidence that they do not regard them as part of an ordinary cemetery.

---

Hawk) ("[NAGPRA] allows Indians and Native people to bury their dead under specified repatriation guidelines and procedures.").

While Defendants operate thirty cemeteries across the United States, Carlisle Cemetery has always been managed differently. *Id.* ¶¶ 209-10, 215-22. The Cemetery is held out as an exhibit on tours, used for educational and research purposes, and used to tell Defendants' whitewashed version of history. Defendants use and display the remains at Carlisle Cemetery as a "holding or collection," and have done so for many years.

### C. The new regulatory definition of holding or collection does not support Defendants' interpretation.

Defendants attempt to argue that the National Park Service's ("NPS") newly codified regulatory definition of "holding or collection" affirms Defendants' interpretation of those terms. Def.'s Mot. 16. When Defendants denied Winnebago's repatriation request on December 11, 2023, the NPS's regulations *did not* define "holding or collection." *See* 43 C.F.R. § 10.2 (2023). The current regulatory definition was codified in January 2024. *See* 88 Fed. Reg. 86,452 (Dec. 13, 2013) (setting effective date as January 12, 2024). Whether the new regulations apply to this case is immaterial, as the new regulatory definition supports Winnebago's interpretation.

The NPS now defines holding or collection as "an accumulation of one or more objects, items, or human remains for any temporary or permanent purpose, including: (1) Academic interest; (2) Accession; (3) Catalog; (4) Comparison; (5) Conservation; (6) Education; (7) Examination; (8) Exhibition; (9) Forensic purposes; (10) Interpretation; (11) Preservation; (12) Public benefit; (13) Research; (14) Scientific interest; or (15) Study." 43 C.F.R. § 10.2 ("holding or collection"). In defining the term for the first time, the NPS construed holding or collection broadly and intended this list to be non-exhaustive. *See* 87 Fed. Reg. 63,202, 63,212 (Oct. 18, 2023) ("While the proposed definition includes a wide variety of purposes, a holding or collection under this proposed rule would not be limited to only these purposes.").

As described in the Complaint and *supra* Section II.B, Defendants actively manage Carlisle Cemetery for educational, exhibitive, interpretative, preservation, and public benefit purposes. Defendants use the Carlisle Cemetery as an exhibit on tours, for educational and research purposes, and to tell the Defendants' slanted view of history. Considering this, the new and expansive regulatory definition of "holding or collection" offers Defendants no help. Instead, the new regulatory definition supports Winnebago's interpretation, especially when interpreted consistent with the Indian canons. *See United States v. Smith*, 925 F.3d 410, 419 (9th Cir. 2019) (citation omitted) (noting that the Indian canons apply to statutes and regulations).

**D. Determining that the remains at Carlisle Cemetery constitute a holding or collection is consistent with NAGPRA's legislative history and purpose and Congress's intent.**

Defendants claim that interpreting holding or collection to encompass the remains at Carlisle Cemetery is contrary to Congress's intent in passing NAGPRA and the statute's purpose. Def.'s Mot. 22-26. Nothing could be further from the truth. "NAGPRA is, first and foremost, human rights legislation" Trope & Echo-Hawk, *supra* at 59. During the Senate Select Committee on Indian Affairs' hearing on NAGPRA, Senator Daniel K. Inouye stated: "In light of the important role that death and burial rights play in Native American cultures, it is all the more offensive that the civil rights of America's first citizens have been so flagrantly violated for the past century." *Hearing on S. 1021 and S. 1980*, 101 Cong. at 2 (statement of Sen. Inouye). The overriding purpose of NAGPRA is to protect Native American burial sites and return Native American human remains held by museums and federal agencies to their Indian Tribes for proper burials. Requiring Defendants to comply with their repatriation obligations at Carlisle Cemetery only furthers the purpose of NAGPRA and the intent of Congress.

Defendants cannot exempt themselves from NAGPRA's repatriation obligations. When Congress debated NAGPRA, the Army's past conduct was front and center of its concerns. The legislative record is replete with discussions about the Army's abhorrent history of grave robbing, collecting, and desecrating Native American human remains and burial sites. Compl. ¶¶ 84-88. Holding Defendants accountable to repatriate children who were forcibly taken by the Army and who died because of their time at Carlisle Indian School, who were then buried on the school grounds without their families' and Indian Tribes' consent, and then dug up and reburied in their current place without their families' and Indian Tribes' consent is perfectly consistent with the purpose and intent of NAGPRA. *See Hearing on S. 1021 and S. 1980*, 101 Cong. at 51 (statement of Echo-Hawk).

Defendants assert that applying the repatriation provisions to Carlisle Cemetery is inconsistent with the purposes of NAGPRA because NAGPRA is intended to protect graves. To be sure, one of the main purposes of NAGPRA is to protect Native American graves, *see* 25 U.S.C. § 3002; 18 U.S.C. § 1170. But the protection of Native American graves cannot be used as a pretext to deny Indian Tribes their right to repatriate their ancestors. The graves protection provision of NAGPRA was intended to prevent grave robbing, looting, and the trafficking of Native American human remains. *See Hearing on S. 1021 and S. 1980*, 101 Cong. at 52 (statement of Echo-Hawk) ("Today, as we all know, Federal land managers and Indian Tribes are beset with illicit grave robbing and interstate trafficking of booty from Indian graves."); S. Rep. No. 101-473, at 3 (1990) ("Additional testimony was received from witnesses which indicated that tribal and Federal officials have been unable to prevent continued looting of Native American graves and the sale of these objects by unscrupulous collectors."). NAGPRA is equally concerned with repatriating Native American human remains held by federal agencies and

museums to their culturally affiliated Indian Tribes. 25 U.S.C. § 3005. Defendants cannot seriously contend that repatriating the children buried at the Carlisle Cemetery to their Indian Tribes is tantamount to grave robbing, looting, or desecration.

Defendants' restrictive interpretations of NAGPRA would yield absurd results. Under Defendants' contention that remains in the ground are not subject to repatriation, museums and federal agencies could evade their repatriation obligations by simply burying any Native American human remains and other cultural items they did not want to return. NAGPRA was enacted to ensure remains were returned to where they belong so they could be buried according to appropriate Tribal customs and traditions. Any interpretation of NAGPRA that would allow evasion of these repatriation requirements is out of step with NAGPRA and the Indian law canons that must be applied to interpret it.

Repatriation "is core to the notion of [Tribal] sovereignty." *White v. Univ. of Cal.*, 765 F.3d 1010, 1025 (9th Cir. 2014) (citation, quotation marks omitted). Samuel and Edward have been waiting to return home for nearly 125 years. Compl. ¶ 12. Their spirits remain lost and unable to rest. *Id*. Winnebago seeks the return of Samuel's and Edward's remains to give them proper Winnebago burials consistent with the purpose of repatriation under NAGPRA. It is up to Winnebago, and not Defendants, to determine how best to care for and protect Samuel and Edward.

## III. None of the cases Defendants rely on support their argument that NAGPRA's repatriation provisions do not apply to remains in the ground.

Defendants rely on three out-of-Circuit cases to support their argument that NAGPRA's repatriation provisions do not apply to Native American human remains in the ground and that remains in the ground cannot be a "holding or collection." Def.'s Mot. 12-21. Besides the fact that these cases are not binding on this Court, Defendants misrepresent their holdings.

Furthermore, the cases are clearly distinguishable. In the end, Defendants fail to identify any case that supports their position that the Native American human remains buried in Carlisle Cemetery do not constitute a "holding or collection" and that those remains are not subject to NAGPRA's repatriation provisions.

**A. *Hawk v. Danforth* and *Geronimo v. Obama* do not support Defendants' position.**

Defendants cite *Hawk v. Danforth*, No. 06-C-223, 2006 WL 6928114 (E.D. Wis. Aug. 17, 2006), and *Geronimo v. Obama*, 725 F. Supp. 2d 182 (D.D.C. 2010), in support of their argument that remains in the ground are not holdings or collections, arguing that these cases hold that NAGPRA's repatriation provisions do apply to Native American human remains in the ground. Def.'s Mot. 12-13. Thise cases do not support what Defendants suggest. Moreover, these cases concern the application of § 3002, *not* § 3005, and are therefore easily distinguishable. Neither *Hawk* nor *Geronimo* are relevant here.

In *Hawk*, an unreported case from the United States District Court for the Eastern District of Wisconsin, a *pro se* plaintiff sued the Chairman of the Oneida Tribe of Indians of Wisconsin, seeking to compel the defendant to *find* the remains of the plaintiff's ancestors allegedly buried underneath a Tribal parking lot. 2006 WL 6928114, at *1-2. Importantly, the plaintiff did not know whether any remains were actually buried underneath the parking lot. *Id*. As a threshold issue, the court questioned whether NAGPRA applied to the Oneida Tribe because it is neither a museum nor a federal agency. *Id.* at *1. Even if the Oneida Tribe was subject to NAGPRA, the court concluded that NAGPRA does not require anyone to "excavate an area *in order to find* remains or other artifacts." *Id*. at 2 (emphasis added).

Unlike in *Hawk*, it is undisputed that Samuel's and Edward's remains are located at Carlisle Cemetery. Winnebago has not asked Defendants to search for Samuel's and Edward's

remains; instead, Winnebago simply seeks their repatriation from Carlisle Cemetery. *Hawk*'s commentary on the excavation of an area to look for *potential* burial sites is thus irrelevant. Moreover, *Hawk* does not address the applicability of NAGPRA's repatriation provisions to buried human remains, nor whether such remains are holdings or collections. Instead, *Hawk* concerned only the applicability of NAGPRA's inadvertent discovery and intentional excavation provisions. *Hawk* fails to support Defendants' position that the human remains buried at Carlisle Cemetery are not subject to repatriation under § 3005 and are not part of a holding or collection.

Similarly, in *Geronimo*, plaintiffs claiming to be descendants of legendary Apache warrior Geronimo sought an order pursuant to § 3002 requiring the defendants to return Geronimo's remains. 725 F. Supp. 2d at 183-84. However, in their complaint, the plaintiffs only alleged that Geronimo's remains "*may be or may have been* in the possession, or control of defendants." Compl. ¶ 45, *Geronimo v. Obama*, No. 1:09-cv-00303-RWR (D.D.C. filed Fed. 17, 2009) (emphasis added). The *Geronimo* plaintiffs, like the plaintiff in *Hawk*, did not know where the remains were buried (or if they were buried at all) and sought to use NAGPRA to compel the defendants to find the potential burial sites. *See id*. ¶ 43. The United States District Court for the District of Columbia dismissed the complaint for failure to allege final agency action under the Administrative Procedure Act and failure to identify a waiver of the defendants' sovereign immunity. 725 F. Supp. 2d at 186. Defendants' reliance on *Geronimo* is based on a single footnote where the court mused that NAGPRA does not require federal agencies "to engage in an intentional excavation of *possible* burial sites." *Id*. at 187 n.4 (emphasis added).

*Geronimo*, like *Hawk*, does not address the issues raised in this case. The *Geronimo* plaintiffs' claim arose under § 3002, *not* § 3005, and they did not allege that Geronimo's remains were buried or even in the defendants' possession or control. As such, the court did not discuss

whether human remains in the ground are subject to NAGPRA's repatriation provisions or constitute holdings or collections. It is undisputed that Samuel and Edward are located at Carlisle Cemetery and under Defendants' possession and control. Winnebago does not seek an order compelling Defendants to find Samuel's and Edward's burial sites.

Defendants misleadingly claim that their interpretation of *Geronimo* aligns with the Department of Interior's ("DOI") interpretation. Def.'s Mot. 27. Defendants state that DOI interprets *Geronimo* as holding that NAGPRA does not "require excavation." *Id*. This is incorrect. Instead, in its 2022 notice of proposed rulemaking for its recent update to NAGPRA's implementing regulations, the NPS noted that *Geronimo* simply states that "NAGPRA does not require a Federal agency to engage in an intentional excavation of *possible burial* sites [.]" 87 Fed. Reg. at 63,205 (emphasis added, citation omitted). This is consistent with *Geronimo*'s passing footnote stating as much. Moreover, the NPS recognized "the NAGPRA process as a possible method for repatriation of some Native American children[]" from federally-controlled boarding schools. *Id*. Accordingly, as with *Hawk*, *Geronimo* is irrelevant and does not support Defendants' position.

**B. Defendants' reliance on *Thorpe v. Borough of Thorpe* is misplaced.**

Defendants attempt to rely on *Thorpe v. Borough of Thorpe*, 770 F.3d 255 (3d Cir. 2014), to argue that NAGPRA's repatriation provision does not apply to Native American human remains in the ground, specifically in cemeteries. Def.'s Mot. 15-22. Defendants also rely on *Thorpe* to argue that extending NAGPRA to apply to Carlisle Cemetery would lead to absurd results that are inconsistent with the purpose and intent of Congress. *Id*., at 15-26. Defendants fundamentally mischaracterize the holding in *Thorpe* and fail to grasp the key factual differences that distinguish *Thorpe* and this case.

*Thorpe* concerned what the United States Court of Appeals for the Third Circuit characterized as an attempt at "resolving a family dispute by applying NAGPRA[.]" *Id.* at 257. When Jim Thorpe—a Native American man and legendary multi-sport Olympic champion—died in 1953, his third wife buried him in Jim Thorpe, Pennsylvania ("the Borough"), over the objection of some of his children. *Id*. at 257-58. Following the enactment of NAGPRA, Thorpe's son and second wife requested the Borough repatriate Thorpe to them so he could be buried at his home in Oklahoma. The Borough refused and the plaintiffs sued, alleging the Borough violated NAGPRA's repatriation provision. *Id*. at 258. The case turned on whether NAGPRA should apply to remains that were buried in their intended final resting place by someone with legal authority (*i.e.*, Thorpe's third wife) to make that decision. *Id.* at 266.

The Third Circuit reasoned that NAGPRA was not applicable because Thorpe's "remains [were] located at their final resting place and ha[d] not been disturbed." *Id*. The court concluded that removing Thorpe's remains from his "intended final resting place" would not have been consistent with Congress's intent in enacting NAGPRA as there was "nowhere for Thorpe to be 'returned' to." *Id.* The court reached this conclusion, *not* by finding that NAGPRA's repatriation provision did not apply to Thorpe, but by finding that "the Borough [wa]s not a 'museum' as intended by NAGPRA." *Id*. 263. While the court found the Borough met the plain meaning of "museum" as defined by NAGPRA (25 U.S.C. § 3001(8)), it reasoned that the Borough was not required to repatriate Thorpe because applying NAGPRA's repatriation provisions in this specific instance would be inconsistent with the Act, as such a result would disregard "the clearly

expressed wishes of Thorpe's wife by ordering his body to be exhumed and his remains delivered to John Thorpe." *Thorpe*, 770 F.3d at 257.[9]

Defendants jump to infer that *Thorpe* holds § 3003 and § 3005 do not apply to human remains buried in cemeteries. But this is a gross mischaracterization of the holding. The Fourth Circuit declined to interpret NAGPRA in a way that would allow disinterment of Thorpe's remains because it deemed Thorpe's remains were in their final resting place. The Fourth Circuit further stated that because the Borough was not a museum, it was not required to comply with NAGPRA's inventory and repatriation requirements. *Id*. at 263. The Fourth Circuit *did not* hold that § 3003 or § 3005 generally do not apply to remains in the ground or buried in cemeteries.[10] *Thorpe*'s actual holding cannot be extrapolated to the present facts.

Unlike Thorpe's remains, neither Winnebago nor Samuel's and Edward's families consented to their burials, disinterment, and reburials at Carlisle. Carlisle Cemetery was never intended to be the boys' final resting place. Samuel and Edward were first buried in the Indian burial ground without notice to or consent of their families or Winnebago. Compl. ¶¶ 36-47. The Army then, to make way for a parking lot, excavated the boys' remains and reburied them in their current location at the Carlisle Cemetery. *Id*. ¶ 211. The Army never provided Winnebago or the boys' families notice or sought their consent to disinter and rebury the boys. In *Thorpe*, the

[9] Centering its decision on the holding that it would be absurd to find that the Borough was a museum, even though it met the plain meaning of the statutory definition, rather than flatly stating that § 3005 did not apply outright, strongly suggests that the Fourth Circuit understood NAGPRA's repatriation provisions to generally apply to human remains in the ground.

[10] Indeed, at no point in the litigation did any party—including the Borough—argue that § 3005 was not generally applicable to Thorpe simply because he was buried in a cemetery. The court and the parties agreed that Thorpe's remains were Native American human remains that were possessed and controlled by the Borough. *Thorpe*, 770 F.3d at 262.

parties did not dispute that Thorpe's third wife had the legal authority to decide that the Borough would be Thorpe's final resting place. 770 F.3d at 258.

Defendants also misconstrue NAGPRA's purpose in their discussion of *Thorpe*. Defendants state that NAGPRA's purpose is to protect Native American graves, not to unearth them. Def.'s Mot. 19. This characterization is misleading. *Thorpe* recognized Congress's overall purpose in enacting NAGPRA was "to correct past abuses to, and guarantee protection for" Native American human remains and cultural items. 770 F.3d at 259-60. To this end, NAGPRA "was passed with two main objectives[,]" one of which was to protect Native American burial sites, and the other of which was to create a process for repatriation of Native American remains held by agencies and museums. *Id*. at 260. The court observed the long history of looting and plundering Native American burial sites that created the need for the dual purposes of graves protection and repatriation. *Id*. at 259-261. In the case of Carlisle, repatriation is appropriate and consistent with NAGPRA's intent because Carlisle Cemetery is not Samuel's and Edward's final resting place. Their exhumation and repatriation to Winnebago is not grave robbing or looting. Instead, the factual differences between Thorpe's burial and Samuel's and Edward's burials underscore that *Thorpe* does not apply as Defendants suggest.

Defendants also rely on *Thorpe* to suggest that finding Carlisle Cemetery constitutes a holding or collection would lead to absurd results whereby hundreds or thousands of cemeteries across the United States would suddenly become subject to NAGPRA's repatriation provisions, even where "the original burials were performed at the request of the decedents or their kin." Def.'s Mot. 20-21. This is a gross overstatement. NAGPRA's definition of Native American human remains and repatriation provisions foreclose Defendants' parade of horribles.

Only "Native American human remains" are subject to NAGPRA's repatriation provisions and the repatriation provisions only apply to federal agencies and museums. The regulations in place at the time Winnebago filed its repatriation request confirm that this term does not include remains that were "freely given," such as remains buried with the consent of family or kin. *See* 43 C.F.R. § 10.2(d)(1) (2023). Likewise, the current regulatory definition of human remains "does not include human remains to which a museum or Federal agency can prove it has a right of possession." 43 C.F.R. § 10.2. Indeed, NAGPRA affirms that its repatriation provisions do not apply to human remains that were "otherwise obtained with full knowledge and consent of the next of kin." 25 U.S.C. § 3001(13). Accordingly, like in *Thorpe*, if a family member or next of kin makes a lawful decision to bury an individual in a cemetery, NAGPRA's repatriation provision would not apply. This conforms with the intent of NAGPRA and the plain text of the statute and its implementing regulations.

Finally, Defendants suggest that if cemeteries associated with federal Indian boarding schools were subject to NAGPRA, it would be costly and burdensome for federal agencies to comply with the NAGPRA's repatriation provisions. This assertion fails to garner sympathy, as the United States made Indian Tribes pay for the federal Indian boarding school system in the first place. *See Brackeen*, 599 U.S. at 301 (Gorsuch, J., concurring) ("Adding insult to injury, the United States stuck Tribes with a bill for these programs."). Moreover, if cost is to be considered a factor in determining whether any museum or federal agency must comply with NAGPRA, that is a policy determination that can only be addressed by Congress, not the courts. *See Becerra v. San Carlos Apache Tribe*, No. 23-250, 2024 WL 2853107, at *10 (U.S. June 6, 2024) ("[C]omplaints about costs are the domain of Congress, not [] Court[s]."). In sum, *Hawk*,

*Geronimo*, and *Thorpe* do not support Defendants' position that § 3005 (and § 3003) does not apply to Native American human remains buried at Carlisle Cemetery.

**IV. Defendants are not doing the "right thing" by refusing to comply with NAGPRA.**

Defendants cannot claim to honor Samuel and Edward while simultaneously refusing to repatriate their remains pursuant to federal law. To Winnebago, the repatriation of Samuel's and Edward's remains is not simply about their return, but also the manner in which they are returned. Under NAGPRA, Winnebago has clear rights and a formulaic process to bring Samuel and Edward home that includes safeguards to ensure Defendants' compliance. Under the OAC Disinterment and Return Process, Winnebago lacks everything Indian Tribes fought successfully to have codified in NAGPRA and its implementing regulations. Winnebago brought this action to bring its children home and vindicate Indian Tribes' long fought for rights in the repatriation of their relatives' remains to their proper resting places.

As detailed thoroughly in Winnebago's Complaint, the OAC Disinterment and Return Process deprives Winnebago of many rights Congress guaranteed under NAGPRA and is an arbitrarily modified version of Defendants' normal process for the disinterment and return of military servicemembers codified in Army regulations. *See* Compl. ¶¶ 134-58. While Defendants do not contend with the flaws of the OAC Disinterment and Return Process at all in their motion, Winnebago reemphasizes the inadequacies of the OAC Disinterment and Return Process compared to NAGPRA here. Glaringly, unlike NAGPRA, the OAC Disinterment and Return Process does not allow Indian Tribes to make requests for the return of culturally affiliated human remains. Furthermore, it does not require Defendants to return remains, and it does not include a timeline for when remains must be returned or establish legal mechanisms to hold Defendants accountable, among other deficiencies.

Winnebago made its repatriation request pursuant to § 3005(a)(4) because Defendants never developed an inventory of the remains in their possession and control. Under § 3005(a)(4) only Indian Tribes can request repatriation of culturally affiliated human remains. 25 U.S.C. § 3005(a)(4).[11] This is not the case under the OAC Disinterment and Return Process. The disinterment and return of individuals buried at Army cemeteries is generally governed by Army Regulation ("AR") 290-5, § 3-7, *available at* https://armypubs.army.mil/epubs/DR_pubs/DR_a/ARN31366-AR_290-5-001-WEB-2.pdf. Defendants arbitrarily restrict who can request the return of human remains from Carlisle Cemetery, prohibiting Indian Tribes from making a request. *Compare* Compl. Ex. 8, at 2, *with* AR 290-5, § 3-7(b). Under the OAC Disinterment and Return Process, only the "closest living relative" can make such a request. Compl. Ex. 8, at 2. This term is not defined. *See id.*[12] Defendants require the closest living relative sign an affidavit attesting under oath that they are the closest living relative. *Id*. Defendants then require a second affidavit by someone who can attest to the fact that the individual is in fact the closest living relative. *Id*. These affidavits are challenging if not impossible to attest to in Winnebago's case, as with other Indian Tribes, because many buried at Carlisle Cemetery died over 100 years ago as children. Compl. ¶ 100.[13] NAGPRA was passed to address coercion of this kind.

---

[11] Lineal descendants can request the repatriation of human remains only if their cultural affiliation has been established in an inventory. *See* 25 U.S.C. § 3005(a)(1); Cf. 25 U.S.C. § 3005(a)(4).

[12] AR 290-5, however, defines "close living relatives" as a "widow or widower; parents; adult brothers and sisters; and natural and adopted children[.]" AR 295-5, § 3-7(b)(1). Samuel and Edward died over 100 years ago; they did not have spouses or children, and their parents and siblings no longer alive. No one alive today meets this definition.

[13] Defendants suggest there may be an issue of "prudential ripeness and the absence of justiciable final agency action" based on potential living relatives. Def.'s Mot. 6, n.5. This is inapposite, as Winnebago's claim rests on § 3005(a)(4), which concerns the right of Indian Tribes to request repatriation and is not contingent upon anything related to "living relatives." And Defendants' denial of Winnebago's repatriation request constitutes final agency action. *See* 43 C.F.R. § 10.1(b)(3) (2023).

Further, under NAGPRA and its implementing regulations, federal agencies are required to repatriate human remains upon receipt of a valid repatriation request and are bound by specific repatriation timelines. *See* 25 U.S.C. § 3005(a)(4); 43 C.F.R. § 10.10(g)-(h); 43 C.F.R. § 10.10(b)(2) (2023). Likewise, NAGPRA provides a private right of action to hold federal agencies and museums accountable when they refuse to comply with the Act. *See* 25 U.S.C. § 3013. The OAC Disinterment and Return Process lacks those protections, as it does not include an affirmative duty to return remains, or any timelines for responding to requests for the repatriation of remains or returning remains. This means that those requesting the return of remains from Carlisle Cemetery are left to Defendants' whims. This lack of accountability and structure is contrary to Congress's intent in enacting a clear framework and clear procedures in NAGPRA.

Through NAGPRA, Congress recognized the challenges in the repatriation of Native American human remains of those who died generations ago and sought to avoid the barriers now posed by the OAC Disinterment and Return Process. NAGPRA, and not the OAC Disinterment and Return Process, ensures that Native American human remains, like those of Samuel and Edward, are returned home in a structured and culturally appropriate manner.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied.

DATED: June 7, 2024

Respectfully submitted,

*/s/ Gregory A. Werkheiser*
Gregory A. Werkheiser (VA Bar No. 45986)
CULTURAL HERITAGE PARTNERS, PLLC
1811 East Grace Street
Richmond, VA 23223
Tel. (703) 408-2002
gerg@culturalheritagepartners.com

Jennifer A. Morris (DC Bar No. 1630529)*
CULTURAL HERITAGE PARTNERS, PLLC
2101 L Street Northwest, Suite 800
Washington, DC 20037
Tel. (202) 567-7594
jennifer@culturalheritagepartners.com

Danelle J. Smith (NE Bar No. 22717)*
BIG FIRE LAW AND POLICY GROUP LLP
272 Ho-Chunk Plaza, Suite A
Winnebago, NE 68071
Tel. (402) 307-9905
dsmith@bigfirelaw.com

Beth Margaret Wright (CO Bar No. 55339)*
Jason Searle (CO Bar No. 57042)*
NATIVE AMERICAN RIGHTS FUND
250 Arapaho Avenue
Boulder, CO 80302
Tel. (303) 447-8760
wright@narf.org
searle@narf.org

Wesley James Furlong (AK Bar No. 1611108)*
NATIVE AMERICAN RIGHTS FUND
745 West 4th Avenue, Suite 502
Anchorage, AK 99501
Tel. (907) 276-0680
wfurlong@narf.org

*Counsel for Plaintiff Winnebago Tribe of Nebraska*

*Admitted *Pro Hac Vice*