**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

WINNEBAGO TRIBE OF NEBRASKA,
a federally recognized Indian Tribe,

Plaintiff,

v. Civil Action No. 1:24-cv-78-CMH-IDD

UNITED STATES DEPARTMENT OF THE ARMY; UNITED STATES DEPARTMENT OF THE ARMY, OFFICE OF ARMY CEMETERIES; CHRISTINE E. WORMUTH, KAREN DURHAM-AGUILERA, RENEA C. YATES, Lieutenant Colonel PRISCELLA A. NOHLE, in their official capacities,

Defendants.

**BRIEF OF UNITED SOUTH AND EASTERN TRIBES SOVEREIGNTY PROTECTION FUND AND CATAWBA NATION AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

Dale W. Pittman (VA Bar No. 15673)
THE LAW OFFICE OF DALE W. PITTMAN, PC
The Eliza Spotswood House
112-A West Tabb Street
Petersburg, VA 23803
Phone: (804) 861-6000
dale@pittmanlawoffice.com

Kaitlyn E. Klass (DC Bar No. 1032219)
*Pro hac vice forthcoming*
United South and Eastern Tribes
Sovereignty Protection Fund
1730 Rhode Island Ave. NW, Suite 406
Washington, DC 20036
Phone: (615) 872-7900
kklass@usetinc.org

Lydia Locklear (DC Bar No. 1618011)
*Pro hac vice forthcoming*
996 Avenue of the Nations
Rock Hill, SC 29730
Phone: (803) 366-4792
lydia.locklear@catawba.com

*Counsel for Amici Curiae*
June 12, 2024

**TABLE OF CONTENTS**


**TABLE OF AUTHORITIES** .......... iii

**CORPORATE DISCLOSURE STATEMENT** .......... vi

**INTEREST OF *AMICI*** .......... 1

**SUMMARY OF ARGUMENT** .......... 2

**BACKGROUND** .......... 4

**ARGUMENT** .......... 6

**I. ARMY'S POSITION CONTINUES TO TREAT NATIVE CHILDREN AS CAPTIVE MILITANTS AND THEREBY UNDERMINES THE FEDERAL GOVERNMENT'S TRUTH AND RECONCILIATION EFFORTS.** .......... 6

**II. IF ARMY COMPLIED WITH ITS NAGPRA OBLIGATIONS INSTEAD OF HIDING BEHIND ARMY REGULATION 290-5, CATAWBA'S CHILD AND OTHER NATIVE CHILDREN COULD COME HOME TO THEIR REQUESTING TRIBAL COMMUNITIES.** .......... 10

**A. The disinterment process under Army Regulation 290-5 is a far cry from the Tribal-specific protections Congress intended when it enacted NAGPRA.** .......... 10

**B. The federal government's conduct at Carlisle dismally failed to meet even the minimal standards of Army Regulation 290-5.** .......... 13

**III. CONGRESS INTENDED NAGPRA TO HERALD A NEW ERA OF RESPECT FOR NATIVE HUMAN REMAINS AND TRIBAL CULTURE.** .......... 14

**A. Congress designed NAGPRA's repatriation provision at 25 U.S.C. § 3005 to bring children who were collected and killed by the federal government home to their Tribal communities.** .......... 15

**B. Congress designed NAGPRA's graves provision at 25 U.S.C. § 3002 as a separate function from the repatriation provision at 25 U.S.C. § 3005.** .......... 16

**CONCLUSION** .......... 17

## TABLE OF AUTHORITIES

### CASES

*Haaland v. Brackeen*,
599 U.S. 255 (2023) (Gorsuch, J., concurring) ....7

*Thorpe v. Borough of Thorpe*,
770 F.3d 255 (3d Cir. 2014)....17

### STATUTES

18 U.S.C. § 1170(a) .... 17

25 U.S.C. § 3001(13) ....17

25 U.S.C. § 3002....16, 17

25 U.S.C. § 3002(a) ....16

25 U.S.C. § 3002(c) ....17

25 U.S.C. § 3002(d) ....16

25 U.S.C. § 3002(e) ....17

25 U.S.C. § 3003(a) ....12, 15

25 U.S.C. § 3003(b) ....12

25 U.S.C. § 3005....11, 15, 16, 17

25 U.S.C. § 3005(a) ....11

25 U.S.C. § 3005(a)(4) ....15

25 U.S.C. § 3005(d) ....12

25 U.S.C. § 3006....13

25 U.S.C. § 3010....11, 15

25 U.S.C. § 3013....13

### RULES

Rule 7.1(A) of the Local Civil Rules of the United States District Court for the Eastern District

of Virginia ........ vi

**REGULATIONS**

32 C.F.R. Part 553 ........ 9

43 C.F.R. Part 10 ........ 17

43 C.F.R. § 10.1(h) ........ 13

43 C.F.R. § 10.1(i) ........ 13

43 C.F.R. § 10.2 ........ 15

43 C.F.R. § 10.10(d) ........ 12

87 Fed. Reg. 24140 (Apr. 22, 2022) ........ 5, 9

**OTHER AUTHORITIES**

Harris Statement (attached as Exhibit A). ........ 4, 5, 6

Carlisle Indian Industrial School, Descriptive and Historical Record of Student, Wade Ayres, No. 3109, *available at* https://carlisleindian.dickinson.edu/sites/default/files/docs-ephemera/NARA_1328_b001_c00a_0150.pdf. ........ 4

*Man on the band stand*, THE RED MAN AND HELPER, Jan. 22, 1904, *available at* https://carlisleindian.dickinson.edu/sites/default/files/docs-publications/RedMan-Helper_v04n21_1.pdf. ........ 5

Press Release, Office of Army Cemeteries Public Affairs, Office of Army Cemeteries finalized fifth disinterment project at Carlisle Barracks (July 7, 2022), *available at* https://www.armywarcollege.edu/News/archives/14284.pdf ........ 5, 9

HUGH MATTERNES, ET AL., NEW SOUTH ASSOCIATES, ARCHIVAL RESEARCH OF THE CARLISLE INDIAN SCHOOL CEMETERY (2017), *available at* https://armycemeteries.army.mil/Portals/1/Documents/CarlisleBarracks/Archival%20Research%20Report%20-%20July%202017v2.pdf?ver=2019-06-07-121535-723 ........ 6

U.S. DEP'T OF INTERIOR, FEDERAL INDIAN BOARDING SCHOOL INITIATIVE INVESTIGATIVE REPORT, App. A&B, List of Federal Indian Boarding Schools as of Apr. 1, 2022 (May 2022), *available at* https://www.bia.gov/sites/default/files/dup/inline-files/appendix_a_b_school_listing_profiles_508.pdf ........ 7, 8

U.S. DEP'T OF INTERIOR, FEDERAL INDIAN BOARDING SCHOOL INITIATIVE INVESTIGATIVE REPORT (May 2022), *available at*

https://www.bia.gov/sites/default/files/dup/inline-files/bsi_investigative_report_may_2022_508.pdf.........................................................7, 8, 9, 10

U.N. Declaration on the Rights of Indigenous Peoples (2007), *available at* https://www.un.org/development/desa/indigenouspeoples/wp-content/uploads/sites/19/2019/01/UNDRIP_E_web.pdf .........................................................7, 15

Army Regulation 290-5, Army Cemeteries (Oct. 21, 2020), *available at* https://armypubs.army.mil/epubs/DR_pubs/DR_a/ARN31366-AR_290-5-001-WEB-2.pdf ..9, 11, 12, 13, 14, 15

Army Cemeteries (July 2023), *available at* https://armycemeteries.army.mil/Portals/1/Disinterment-Request-Forms-23-JUL-2023.pdf ..9, 11, 13

## CORPORATE DISCLOSURE STATEMENT

This certificate is required by Rule 7.1(A) of the Local Civil Rules of the United States District Court for the Eastern District of Virginia:

> I, the undersigned, counsel of record for the United South and Eastern Tribes Sovereignty Protection Fund and Catawba Nation, certify that to the best of my knowledge and belief, there is nothing to report under Local Civil Rule 7.1(A)(1)(a) and (b).

June 12, 2024

/s/ *Dale W. Pittman*
Dale W. Pittman (VA Bar No. 15673)
THE LAW OFFICE OF DALE W. PITTMAN, PC
Eliza Spotswood House
112-A West Tabb Street
Petersburg, VA 23803
Phone: (804) 861-6000
Fax: (804) 861-3368
dale@pittmanlawoffice.com
*Counsel for Amici Curiae*

## INTEREST OF *AMICI*[1]

The United South and Eastern Tribes Sovereignty Protection Fund (USET SPF) is a non-profit, inter-Tribal organization advocating on behalf of 33 federally recognized Tribal Nations from the Northeastern Woodlands to the Everglades and across the Gulf of Mexico.[2] USET SPF was formed in 2014 as an affiliate of the United South and Eastern Tribes, Inc. to advocate on behalf of USET SPF's Tribal Nation members by upholding, protecting, and advancing inherent sovereign authorities and rights. The Catawba Nation (Catawba) is a federally recognized Tribal Nation with its seat of government located in South Carolina, and Catawba is a member Tribal Nation of USET SPF.

Tribal Nations' inherent rights necessarily include the right to bring the remains of our children home. This is even more true when those children were taken by the United States from our Tribal communities, without our consent, for the purpose of ending our cultures and ways of life to facilitate disposition of our lands and resources—too often resulting in our children's

---

[1] No counsel for any party authored this brief in whole or in part, no party or party's counsel contributed money intended to fund preparation or submission of this brief, and no other person or entity other than *Amici*, their members, and their counsel provided any monetary contribution to fund the preparation or submission of this brief.

[2] USET SPF member Tribal Nations include: Alabama-Coushatta Tribe of Texas (TX), Catawba Indian Nation (SC), Cayuga Nation (NY), Chickahominy Indian Tribe (VA), Chickahominy Indian Tribe–Eastern Division (VA), Chitimacha Tribe of Louisiana (LA), Coushatta Tribe of Louisiana (LA), Eastern Band of Cherokee Indians (NC), Houlton Band of Maliseet Indians (ME), Jena Band of Choctaw Indians (LA), Mashantucket Pequot Indian Tribe (CT), Mashpee Wampanoag Tribe (MA), Miccosukee Tribe of Indians of Florida (FL), Mi'kmaq Nation (ME), Mississippi Band of Choctaw Indians (MS), Mohegan Tribe of Indians of Connecticut (CT), Monacan Indian Nation (VA), Nansemond Indian Nation (VA), Narragansett Indian Tribe (RI), Oneida Indian Nation (NY), Pamunkey Indian Tribe (VA), Passamaquoddy Tribe at Indian Township (ME), Passamaquoddy Tribe at Pleasant Point (ME), Penobscot Indian Nation (ME), Poarch Band of Creek Indians (AL), Rappahannock Tribe (VA), Saint Regis Mohawk Tribe (NY), Seminole Tribe of Florida (FL), Seneca Nation of Indians (NY), Shinnecock Indian Nation (NY), Tunica-Biloxi Tribe of Louisiana (LA), Upper Mattaponi Indian Tribe (VA), and Wampanoag Tribe of Gay Head (Aquinnah) (MA).

deaths. That is the stark truth of the United States' federal Indian boarding school system, which would today be considered a human rights violation. Failure to return the remains of our children who are interred at those schools is a continuing human rights violation.

Congress, in enacting the Native American Graves Protection and Repatriation Act (NAGPRA), recognized our right to be reunited with the remains of our people. And the U.S. Department of the Interior (Interior) has recently recognized the wrongs perpetuated by federal Indian boarding schools. USET SPF and Catawba have a deep interest in ensuring that Tribal Nations are able to utilize NAGPRA to bring our children home from those schools' graveyards. *Amici*'s interests in this litigation are made even stronger by Catawba's own experience seeking to bring a child home from the cemetery at Carlisle Indian Industrial School (Carlisle).

USET SPF and Catawba provide this brief to address issues not covered in the parties' briefs. *Amici* are grateful to the Plaintiff Winnebago Tribe of Nebraska (Winnebago) for bringing this case for the benefit of all Tribal Nations whose children remain interred at Carlisle and other federal Indian boarding schools. This brief will aid the Court in understanding how the position taken by the Defendants in this case, which include the U.S. Department of the Army, the Office of Army Cemeteries, and several Army officials sued in their official capacities (collectively, the Army), has harmed and continues to harm *Amici* and all of Indian Country.

## SUMMARY OF ARGUMENT

The Army paints a false picture for this Court of the allegedly good, but misguided, intentions behind the United States' federal Indian boarding school policy, and of the Army's allegedly good intentions in agreeing to apply Army Regulation 290-5 to repatriate children's remains from the graveyard at Carlisle. The Court should not be fooled. The federal government's recordkeeping when it disinterred and moved the children's bodies for its own

purposes in 1927 was callously negligent, making proper compliance with NAGPRA's inventory and other requirements today more difficult for the Army. This does not relieve the Army of its obligations under the law.

The Army's insistence on applying Army Regulation 290-5 rather than NAGPRA should not be viewed as generous or benevolent. Army Regulation 290-5 was designed for cemeteries containing service members and prisoners of war; it was not designed for cemeteries holding the remains of Native children who never chose military service—many of whom never even chose boarding school. Application of disinterment procedures designed for service members and prisoners of war is made even more upsetting by the fact that Carlisle, and the other Indian boarding schools based on it, were designed after military prisons and housed some Native children the United States coldly labeled as prisoners of war. The inhumane treatment Native children received at these so-called schools was harsh and often deadly. The U.S. Department of the Interior (Interior) is currently attempting to document and atone for the painful boarding school mark on our shared history. Application of Army Regulation 290-5, meanwhile, perpetuates the very harms the federal government is currently working to address. The Army must stop treating our children as militants and prisoners of war, and it must instead afford them the protections of NAGPRA.

Despite the Army's continued attempt to distract this Court by claiming that its willingness to apply a makeshift version of Army Regulation 290-5 should be enough, NAGPRA's application to the children held in Carlisle's graveyard could make a meaningful difference in helping to bring them home. NAGPRA has more robust protections than the limited procedures of Army Regulation 290-5, and Congress designed NAGPRA's protections in recognition of the United States' trust and treaty obligations to Tribal Nations, as well as the

harms perpetrated against our people and governments over the centuries. And, even if Army Regulation 290-5 was sufficient—and it is not—Army's actions at Carlisle fail to meet even the lower procedural standards of Army Regulation 290-5.

NAGPRA's provisions clearly apply to the remains at the Carlisle cemetery—which are only there because the federal government collected our children, subjected them to treatment that killed them, and now continues to hold their remains in a graveyard controlled by a federal agency and located on federal land.

**BACKGROUND**

USET SPF's Tribal Nation members know the reality of having our children taken from our homes and communities to be placed in Indian boarding schools. Catawba's experience in attempting to work with the Army to repatriate Wade Ayers,[3] a Catawba child who died in 1904 while attending Carlisle and has been interred there ever since, is particularly heart wrenching. *See* Harris Statement (attached as Exhibit A).

Wade was just 13 years old when he arrived at Carlisle on August 30, 1903, and he died only a few short months later on January 18, 1904, of what Carlisle officials called "vaccine fever." Harris Statement ¶ 6–8.[4] An obituary ran in the school's newspaper that read: "Wade Ayers, Catawba, of South Carolina, was laid to rest last Sunday. He was a boy of lovable

---

[3] Wade's last name is spelled "Ayers" and "Ayres" in different historical documents, but Catawba recognizes the spelling as "Ayers."

[4] *See also* Carlisle Indian Industrial School, Descriptive and Historical Record of Student, Wade Ayres, No. 3109, *available at* https://carlisleindian.dickinson.edu/sites/default/files/docs-ephemera/NARA_1328_b001_c00a_0150.pdf.

disposition and with a keen sense of justice and right. After vaccination he took cold in his arm, which with serious complications ended his life."[5]

Wade's Catawba relatives fought for years for his repatriation, and, because the Army insisted that NAGPRA does not apply to children in the Carlisle graveyard, they were forced to use the disinterment process of Army Regulation 290-5. Harris Statement ¶ 13–16; 87 Fed. Reg. 24140 (Apr. 22, 2022). Because Wade died as a child, he left behind no lineal descendants to request his return under Army Regulation 290-5, and his immediate family is no longer living. Harris Statement ¶ 11–12. After years of persistent work by Catawba and Wade's relatives, in 2022 he was set to come home. Harris Statement ¶ 17; 87 Fed. Reg. 24140 (Apr. 22, 2022) (listing Wade Ayres as among those set for disinterment). But when Wade's grave was disinterred, the Army found a girl's body under his headstone instead. Harris Statement ¶ 18.[6]

Thereafter, the Army told Catawba and Wade's relatives it does not know the precise location of Wade's remains within the Carlisle cemetery, and thus the Army could not facilitate his repatriation home. Harris Statement ¶ 19. Catawba believes the federal government misplaced Wade when it moved his body and the bodies of the other children buried at Carlisle in 1927 to make way for the expansion of the Army War College and the construction of a parking lot. Harris Statement ¶ 21. Indeed, the Army admits in its Motion to Dismiss that its

---

[5] *Man on the band stand*, THE RED MAN AND HELPER, Jan. 22, 1904, at 3, *available at* https://carlisleindian.dickinson.edu/sites/default/files/docs-publications/RedMan-Helper_v04n21_1.pdf.

[6] Press Release, Office of Army Cemeteries Public Affairs, Office of Army Cemeteries finalized fifth disinterment project at Carlisle Barracks (July 7, 2022), *available at* https://www.armywarcollege.edu/News/archives/14284.pdf [hereinafter Army Press Release].

historical records associated with its movement of the cemetery are so poor that it is not sure the markers are correctly associated with the physical remains named on them. ECF No. 31 at 8.[7]

The Army still has not notified the Catawba Nation or Wade's relatives of the location of Wade's body or otherwise collaborated with them on finding Wade since the failed disinterment. Harris Statement ¶ 22–23. Instead, it has quietly removed Wade's headstone. Harris Statement ¶ 20. Wade remains trapped within the confines of Carlisle's graveyard, a prisoner of the Indian boarding school in death as he and his fellow students were in life. Harris Statement ¶ 24. Catawba does not believe Wade is at rest, and it harms the community for Wade to remain separated from his people. Harris Statement ¶ 25.

## ARGUMENT

### I. THE ARMY'S POSITION CONTINUES TO TREAT NATIVE CHILDREN AS CAPTIVE MILITANTS AND THEREBY UNDERMINES THE FEDERAL GOVERNMENT'S TRUTH AND RECONCILIATION EFFORTS.

The Army, in its Motion to Dismiss, fails to acknowledge the true horror of Indian boarding schools, instead parroting old ideologies by referring to a "school program" whereby "capable persons of good moral character" would instruct and teach Native people with their "consent." ECF No. 31 at 7. The Army refers blandly to the cemetery at Carlisle as "established for the burial of Native American students who died while attending the school." ECF No. 31 at 8. But the federal government treated Native children as militants and prisoners of war at federal Indian boarding schools, often resulting in their death, and the Army's insistence on applying its process for disinterring service members instead of NAGPRA perpetuates these harms.

---

[7] *See also* HUGH MATTERNES, ET AL., NEW SOUTH ASSOCIATES, ARCHIVAL RESEARCH OF THE CARLISLE INDIAN SCHOOL CEMETERY, 34–40 (2017), *available at* https://armycemeteries.army.mil/Portals/1/Documents/CarlisleBarracks/Archival%20Research%20Report%20-%20July%202017v2.pdf?ver=2019-06-07-121535-723.

The federal government operated Carlisle from 1879 until 1918.[8] It and other Indian boarding schools were an integral part of one of the darkest eras of federal Indian law and policy. *See Haaland v. Brackeen*, 599 U.S. 255, 298–302 (2023) (Gorsuch, J., concurring). During that era, the United States was bent on forcing Native people to assimilate into the colonizer's culture to simplify the United States' disposition of Tribal Nations' lands and resources and, ultimately, to extinguish Tribal Nations—using so-called "education" as a key weapon.[9] By ripping our children away from their families and Tribal Nations, disrupting family ties, and completely isolating them, the United States hoped to sever their ties to their cultures—tearing gaping holes in the fabric of our homes and communities, the effects of which continue to persist today. *See* DOI Report at 38, 42, 51. Assimilation in a larger sense was an attempt to end the existence of Tribal Nations as sovereign entities and the trust and treaty obligations owed to us. The federal Indian boarding school system would today be considered an egregious human rights violation.[10]

Carlisle was the first government-run Indian boarding school, DOI Report Appendix at 58, and it served as the model for what would become a system of 408 similar federal Indian boarding schools nationwide, DOI Report at 6. Children were forcibly removed from their families, including by police, and often without parental consent. DOI Report at 29. Congress enacted laws to compel Native parents to send their children, including through withholding

---

[8] U.S. DEP'T OF INTERIOR, FEDERAL INDIAN BOARDING SCHOOL INITIATIVE INVESTIGATIVE REPORT, App. A&B, List of Federal Indian Boarding Schools as of Apr. 1, 2022, 58 (May 2022), *available at* https://www.bia.gov/sites/default/files/dup/inline-files/appendix_a_b_school_listing_profiles_508.pdf [hereinafter DOI Report Appendix].

[9] *See* U.S. DEP'T OF INTERIOR, FEDERAL INDIAN BOARDING SCHOOL INITIATIVE INVESTIGATIVE REPORT, 21, 51 (May 2022), *available at* https://www.bia.gov/sites/default/files/dup/inline-files/bsi_investigative_report_may_2022_508.pdf [hereinafter DOI Report].

[10] *See, e.g.,* U.N. Declaration on the Rights of Indigenous Peoples, art. 7(2) (2007), *available at* https://www.un.org/development/desa/indigenouspeoples/wp-content/uploads/sites/19/2019/01/UNDRIP_E_web.pdf [hereinafter UNDRIP].

treaty-promised rations. DOI Report at 35. Once placed at these so-called schools, children were subjected to corporal punishment that included solitary confinement, flogging, and withholding food, and they experienced public humiliation and were forced to punish each other for breaking rules. DOI Report at 54. Physical, sexual, and emotional abuse were rampant. DOI Report at 56. Children were also forced into manual labor that today would likely constitute violations of child labor laws, including young children made to do heavy industrial work. *See* DOI Report at 59–63. Children lived with disease, malnourishment, poor diet and water quality, overcrowding, and lack of healthcare. DOI Report at 56–57.

Interior has thus far identified 53 marked and unmarked burial sites containing Native children at different federal Indian boarding school locations. DOI Report at 86. Children who survived their boarding school experiences were significantly more likely to suffer from chronic physical health problems, illnesses such as cancer, tuberculosis, and diabetes, and post-traumatic stress disorder, depression, and unresolved grief. DOI Report at 88–89.

Baked into the fabric of Carlisle—and the entire federal Indian boarding school system that followed its template—was an undercurrent of treating Native children as grown militants. Carlisle was a military barracks prior to serving as a school, DOI Report Appendix at 58, and in this setting U.S Army Officer Richard H. Pratt imposed rigorous military discipline and structures on young and bewildered children taken there, *see* DOI Report Appendix at 78. This military template was replicated throughout the federal Indian boarding school system, which was run in a rigid military fashion and used systematic militarized and identity-alteration methodologies employed by the United States military on soldiers. DOI Report at 51. Children were often organized into military-like companies, with some being designated sergeants and corporals, and they were uniformed and drilled in military tactics. DOI Report at 52. It was the

War Department that initially led provision of education to Native children and dealt with Indian affairs, DOI Report at 26, and the War Department continued to play a role in federal Indian boarding schools even after Indian affairs was transferred to Interior, DOI Report at 29. Additionally, Carlisle housed Apache children taken captive after the Apache Wars ended, forcibly removed from their families and taken to Carlisle as prisoners of war. DOI Report at 1.

Application of Army Regulation 290-5, as modified by the Army for the Carlisle cemetery, perpetuates the United States' treatment of Native children at Indian boarding schools as militants and prisoners of war.[11] Army Regulation 290-5 is designed for cemeteries for which the Army is responsible, including not just cemeteries for those who served in the military, but also cemeteries located on Army property that were originally established to inter enemy prisoners of war and persons who died while criminally incarcerated. Army Regulation 290-5 at 1-1. Army Regulation 290-5 is not a procedure designed for the delicate task of reuniting children ripped from their Tribal communities and sent to federal Indian boarding schools, a task the United States must complete under its trust and treaty obligations.

[11] Army Regulation 290-5 does not on its face state that it applies to cemeteries located at Indian boarding schools. *See* Army Regulation 290-5, Army Cemeteries (Oct. 21, 2020), *available at* https://armypubs.army.mil/epubs/DR_pubs/DR_a/ARN31366-AR_290-5-001-WEB-2.pdf [hereinafter Army Regulation 290-5]; *see also* 32 C.F.R. Part 553. Additionally, Army Regulation 290-5's section on disinterment references only Army National Military Cemeteries and Army post cemeteries. Army Regulation 290-5 at 3-7. However, the Army has shared a form for requesting disinterment of Native remains from Carlisle cemetery that describes itself as "based on Army Regulation 290-5." *See* Army Cemeteries (July 2023), *available at* https://armycemeteries.army.mil/Portals/1/Disinterment-Request-Forms-23-JUL-2023.pdf [hereinafter Army Carlisle Modification]. And the Army describes its disinterment of such remains as "conducted under the authority of Army Regulation 290-5." *See, e.g.,* 87 Fed. Reg. 24140 (Apr. 22, 2022); *see also* ECF No. 1-8; Army Press Release. Thus, while the Army points to Army Regulation 290-5 as the appropriate mechanism for repatriation of Native children from Carlisle cemetery, its application is far from clear.

Paradoxically, the United States, through Interior, has undertaken the important task of investigating the loss of human life and lasting consequences of the federal Indian boarding school system in furtherance of its trust and treaty obligations to Tribal Nations—documenting and acknowledging the true and dark history and purpose of federal Indian boarding schools. DOI Report at 3. In fact, the Army cites Interior's 2022 investigative report on federal Indian boarding schools in its Motion to Dismiss, stating there is no dispute as to its contents. ECF No. 31 at 7. Much of the history within this brief is taken from the undisputed pages of that report. Interior has developed significant expertise implementing the United States' trust and treaty obligations to Tribal Nations, and it houses the National NAGPRA Program. The Army must not undermine Interior's important work to grapple with and to help heal the federal Indian boarding school chapter of our history.

## II. IF THE ARMY COMPLIED WITH ITS NAGPRA OBLIGATIONS INSTEAD OF HIDING BEHIND ARMY REGULATION 290-5, CATAWBA'S CHILD AND OTHER NATIVE CHILDREN COULD COME HOME TO THEIR REQUESTING TRIBAL COMMUNITIES.

The Army claims magnanimously in its Motion to Dismiss that it is "ready and willing to assist in the return of the [children's] remains to their rightful resting place." ECF No. 31 at 1. But it is only willing to do so under a regime based on Army Regulation 290-5, a process whose procedures are wholly inadequate, and whose minimal protections the Army has nonetheless failed to provide.

### A. The disinterment process under Army Regulation 290-5 is a far cry from the Tribal-specific protections Congress intended when it enacted NAGPRA.

The protections of Army Regulation 290-5, as informally modified by the Army for disinterment of Native remains from the Carlisle cemetery, fall far short of the protections Congress designed when it crafted NAGPRA in recognition of its trust and treaty obligations to

Tribal Nations. *See* 25 U.S.C. § 3010 (acknowledging NAGPRA "reflect[ed] the unique relationship between the Federal Government and Indian tribes").

As a starting point, according to Army Regulation 290-5, disinterment is at the expense of the requester rather than the federal government. Army Regulation 290-5 at 3-7(a). The Army has said it will cover the costs of repatriation at Carlisle, ECF No. 31 at 1, and its example request for disinterment of Native remains from the Carlisle cemetery states that the requester will have no personal cost, Army Carlisle Modification. But Army Regulation 290-5 itself creates no such requirement, and the Army could change its position for the next child. NAGPRA does not put repatriation expenses on requesting Tribal Nations, instead appropriately leaving these burdens on the federal agency. *See* 25 U.S.C. § 3005.

Additionally, rather than reuniting Native human remains with their Tribal communities, Army Regulation 290-5 embodies the colonizer's ideas of kinship. Army Regulation 290-5 states that those requesting disinterment must submit notarized statements by all close living relatives—defined to include widowers, parents, adult brothers and sisters, and children. Army Regulation 290-5 at 3-7(b)(2). The Army's modification for disinterment requests for Native remains in the Carlisle cemetery requires a notarized affidavit by the closest living relative requesting the disinterment. Army Carlisle Modification. Tribal Nations have no role in this process, making it difficult to reclaim our stolen children who did not live long enough to get married and have children of their own and whose parents and siblings have now walked on.

Under NAGPRA, Tribal Nations are authorized to request repatriation of Native American human remains with which we have a cultural affiliation, and federal agencies—such as the Army—are mandated to "expeditiously return" such remains upon request. 25 U.S.C. § 3005(a). Catawba's child has faced an uphill battle because his Tribal Nation has a limited role

to play under Army Regulation 290-5, and instead the burden must fall to his relatives. Even still, he is lucky he has relatives alive today who are able to fight for his return. So many children alone at Carlisle and other Indian boarding school graveyards do not.

In addition, application of Army Regulation 290-5 has not functioned to compel the Army to take immediate action when the Army is unable to identify the precise location of a child's remains within the Carlisle cemetery—a common problem caused by the federal government's negligent recordkeeping when it moved the cemetery in 1927. While Army Regulation 290-5 does contain burial recordkeeping requirements, Army Regulation 290-5 at 5-4, these are hardly relatable to NAGPRA's inventory requirements and have not actually forced the Army to communicate the location of children's remains within the Carlisle cemetery when Tribal Nations request their repatriation.

Under NAGPRA, a federal agency must compile an inventory of collections or holdings containing Native American human remains over which the federal agency has possession or control, including identifying geographic and cultural affiliations for the remains. 25 U.S.C. § 3003(a). These inventories must be completed in consultation with Tribal Nations under a statutory deadline, and NAGPRA mandates that federal agencies must make their records and documentation available to Tribal Nations. 25 U.S.C. § 3003(b). Under Interior's newly updated implementing regulations, federal agencies are obligated to look back at whether they failed to comply with inventory requirements in the past, and they must meet those requirements now. *See* 43 C.F.R. § 10.10(d). NAGPRA also requires a federal agency to share any information it possesses with a Tribal Nation to assist in making a repatriation claim. 25 U.S.C. § 3005(d). If the Army complied with NAGPRA's inventory and information-sharing requirements at Carlisle, it would be required to disclose all of its records to Catawba and work

with Catawba to inventory and locate the precise location of Catawba's child within the Carlisle cemetery—removing the main barrier to his homecoming.

Last, Army Regulation 290-5 does not contain an enforcement function tied to disinterment or related records management. It is the Executive Director of the Office of Army Cemeteries who is tasked with providing approval authority to disinterment requests. Army Regulation 290-5 at 2-6(b)(2)(g); Army Carlisle Modification. Army Regulation 290-5 does not provide oversight or a right of action with regard to that person's disinterment decisions. *See* Army Regulation 290-5.

NAGPRA does contain enforcement provisions. NAGPRA establishes a review committee to monitor implementation, 25 U.S.C. § 3006, and it provides a private right of action for judicial review of legal actions alleging violations of NAGPRA, 25 U.S.C. § 3013; *see also* 43 C.F.R. § 10.1(h), (i). If Catawba could force the Army's compliance, Catawba may not be left in the limbo it lives in today.

### B. The federal government's conduct at Carlisle dismally failed to meet even the minimal standards of Army Regulation 290-5.

Applying the standards of Army Regulation 290-5 to Carlisle, the federal government's actions throughout time and today do not measure up. Although Army Regulation 290-5 as it currently exists may not have applied at the time of the cemetery's movement in the 1920s, it is important to highlight to this Court that the federal government is already in violation of the very standards the Army claims it will uphold through application of Army Regulation 290-5.

Under the terms of Army Regulation 290-5, the 1927 relocation of the children in the cemetery was itself a disinterment. Army Regulation 290-5 at 3-7(d) (noting only that repositioning of remains within the same grave is not considered disinterment). Thus, under Army Regulation 290-5, the relocation should have been accomplished with the consent of all

close living relatives. Army Regulation 290-5 at 3-7(b)(2). The federal government never sought approval from the children's families or Tribal Nations—not when it buried the children in the first place, and not when it moved their remains.

The Army is also failing to live up to Army Regulation 290-5 in its recordkeeping, as it admits to having records so poor that it cannot locate the precise location of some children's bodies after it moved the cemetery. ECF No. 31 at 8.[12] This failure is an ongoing violation of Army Regulation 290-5, which makes clear that all known burials in Army cemeteries must be maintained in a system of burial/internment permanent records, including the full accounting of all records of each specific gravesite and the individual interred there. Army Regulation 290-5 at 5-4(a). When graves are disinterred, such as happened when the Carlisle cemetery was moved, additional disinterment recordkeeping requirements must be met. Army Regulation 290-5 at 5-4(a)(4).

The Army cannot hide behind Army Regulation 290-5 as a so-called equitable alternative to its obligations under NAGPRA when the Army's conduct at Carlisle fails to even meet the minimum standards enshrined in it. Additionally, the fact that the Army informally modified Army Regulation 290-5 as it applies to the Carlisle cemetery shows that the Army does not feel beholden to the requirements and may change the processes the Army claims apply at the Carlisle cemetery at any given point.

## III. CONGRESS INTENDED NAGPRA TO HERALD A NEW ERA OF RESPECT FOR NATIVE HUMAN REMAINS AND TRIBAL CULTURE.

[12] While the Army no longer knows the precise location of some of the children's bodies, the children were lost due to the Army's own negligence in recordkeeping when it disinterred and moved the remains for its own purposes in 1927—and, regardless, the remains' location as within the boundaries of the cemetery is known.

When Congress enacted NAGPRA, it understood that it was carrying out its unique trust and treaty relationship with Tribal Nations. *See* 25 U.S.C. § 3010. A Tribal Nation's right to repatriation of its people's remains is a recognized human right under international law, *see, e.g.,* UNDRIP at art. 12, and NAGPRA is an important tool implementing this right.

### A. Congress designed NAGPRA's repatriation provision at 25 U.S.C. § 3005 to bring children who were collected and killed by the federal government home to their Tribal communities.

At issue in this case is the Army's denial of the request made by Winnebago for repatriation of children from Carlisle under NAGPRA. ECF No. 1-8. The Army takes the position that NAGPRA's repatriation requirement for museums and federal agencies at 25 U.S.C. § 3005 does not apply because graves located within the Carlisle cemetery do not constitute "holdings or collections" of the Army. ECF No. 31 at 14–15; ECF No. 1-8.

Winnebago asserts that NAGPRA's repatriation provision applies because the triggering standard is having "possession or control" of remains rather than remains being in a "holding or collection." ECF. No 1 at 36–37.[13] Winnebago also explains why, even if that were part of the standard, the Carlisle cemetery qualifies as a holding or collection for purposes of NAGPRA. ECF. No 1 at 37–43.[14] We agree with these interpretations of NAGPRA's plain language.

---

[13] Indeed, NAGPRA contains a specific provision whereby Tribal Nations with a cultural affiliation may request repatriation of human remains completely divorced from the inventory process, 25 U.S.C. § 3005(a)(4), thus clearly not incorporating the inventory process's reference to holdings or collections, 25 U.S.C. § 3003(a).

[14] A "[h]olding or collection means an accumulation of one or more objects, items, or human remains *for any temporary or permanent purpose*." 43 C.F.R. § 10.2 (emphasis added). A cemetery is not a demarcation of the places where the deceased drew their last breaths, it is a place where the deceased are gathered—in this case, where the deceased children of Carlisle were gathered by the federal government. Because NAGPRA applies to an accumulation of Native remains for any temporary or permanent purpose, NAGPRA applies to a cemetery operated by a federal agency. Even Army Regulation 290-5 itself describes the Army's obligations to "captur[e] and convey[] the rich history of" the cemeteries it covers. Army

The Army talks about its "everyday sense" of the meanings for the terms "holding" and "collection," and its impression that NAGPRA's language simply could not be applied to a cemetery. ECF No. 31 at 16. The Army makes the bold assertion that "[i]n our cemeteries we commemorate and honor the dead; we do not hoard or amass the dead." ECF No. 31 at 16. It describes the children at Carlisle as having been "laid to rest." ECF No. 31 at 17.

But hoarding the dead is just what the United States did at Carlisle, subjecting them to treatment that was deadly, and then keeping their bodies rather than sending them home. This cemetery is not like other cemeteries, where loved ones choose to inter their family members in a consensual resting place. The family members of these children never chose to bury them at Carlisle, and they are not at rest. That is precisely why they must come home.

### B. Congress designed NAGPRA's graves provision at 25 U.S.C. § 3002 as a separate function from the repatriation provision at 25 U.S.C. § 3005.

The Army claims that NAGPRA's repatriation provision does not apply based on its assertion that NAGPRA does not require exhumation of graves. ECF No. 31 at 15. This assertion is faulty.

The Army conflates NAGPRA's graves provision related to the ownership of Native American human remains discovered or excavated on federal or Tribal land after NAGPRA's 1990 enactment, 25 U.S.C. § 3002, with NAGPRA's repatriation provision applicable to museums and federal agencies, 25 U.S.C. § 3005. NAGPRA's graves provision confirms lineal descendants' and Tribal Nations' ownership of Native American human remains through a series of actions that begins when those remains are known to still be located on federal or Tribal land, 25 U.S.C. § 3002(a), continues to when they are inadvertently discovered, 25 U.S.C. § 3002(d),

---

Regulation 290-5 at 6-1. It is hard to understand how the Carlisle cemetery is not a holding or collection of the Army for purposes of NAGPRA.

or excavated, 25 U.S.C. § 3002(c), and extends beyond to when they are trafficked, 18 U.S.C. § 1170(a).[15]

NAGPRA's repatriation provision is not limited by the parameters of NAGPRA's graves provision. *See* 25 U.S.C. § 3005 (not incorporating the provenance limitations of time and place embedded within 25 U.S.C. § 3002). In some limited instances, these functions may overlap, but they are nonetheless "two parallel procedures." *Thorpe v. Borough of Thorpe*, 770 F.3d 255, 262 (3d Cir. 2014); *see also* 43 C.F.R. Part 10 (separating into their own subparts "Protection of Human Remains or Cultural Items on Federal or Tribal Lands" and "Repatriation of Human Remains of Cultural Items by Museums or Federal Agencies").

**CONCLUSION**

The Army holds itself out as an honorable institution that celebrates duty, justice, and protecting American values. But the Army's insistence that NAGPRA does not apply violates the United States' trust and treaty obligations, basic principles of honor and justice, and our inherent sovereign right to reclaim our own people's remains. The parade of horribles the Army describes—where the 53 federal Indian boarding school burial grounds Interior has already identified in its truth and reconciliation efforts are subject to NAGPRA's inventory and repatriation requirements, ECF No. 31 at 26—would simply result in Tribal Nations being able to bring their lost and lonely children home. NAGPRA was meant to facilitate this reunion.

---

[15] A family member or Tribal Nation may relinquish this ownership by providing a right of possession. *See* 25 U.S.C. §§ 3001(13), 3002(e); 18 U.S.C. § 1170(a).

Respectfully Submitted,

June 12, 2024

/s/ *Dale W. Pittman*
Dale W. Pittman (VA Bar No. 15673)
THE LAW OFFICE OF DALE W. PITTMAN, PC
Eliza Spotswood House
112-A West Tabb Street
Petersburg, VA 23803
Phone: (804) 861-6000
Fax: (804) 861-3368
dale@pittmanlawoffice.com
Kaitlyn E. Klass (DC Bar No. 1032219)
*Pro hac vice forthcoming*
United South and Eastern Tribes
Sovereignty Protection Fund
1730 Rhode Island Ave. NW, Suite 406
Washington, DC 20036
Phone: (615) 872-7900
kklass@usetinc.org

Lydia Locklear (DC Bar No. 1618011)
*Pro hac vice forthcoming*
Catawba Nation
996 Avenue of the Nations
Rock Hill, SC 29730
Phone: (803) 366-4792
lydia.locklear@catawba.com

*Counsel for Amici Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 12, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Eastern District of Virginia by using the CM/ECF system, which will send notification of such filing to all counsel of record.

Respectfully Submitted,

June 12, 2024

/s/ *Dale Pittman*
Dale W. Pittman (VA Bar No. 15673)
THE LAW OFFICE OF DALE W. PITTMAN, PC
Eliza Spotswood House
112-A West Tabb Street
Petersburg, VA 23803
Phone: (804) 861-6000
Fax: (804) 861-3368
dale@pittmanlawoffice.com
*Counsel for Amici Curiae*